**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

_____

**HAYDEN RICHARDSON,**

       **Plaintiff,**

   **v.**                         **Case No. _____**

**NORTHWESTERN UNIVERSITY,
AMANDA DASILVA, HEATHER
VAN HOEGARDEN OBERING,
MICHAEL POLISKY, and PAMELA
BONNEVIER.**

       **Defendants.**

_____

**COMPLAINT AND JURY DEMAND**

_____

Plaintiff Hayden Richardson (hereinafter referred to as "Plaintiff"), by her attorneys Nesenoff & Miltenberg, LLP and Law Offices of Damon M. Cheronis, as and for her complaint against Defendants Northwestern University ("Northwestern" or the "University"), Amanda DaSilva ("DaSilva"), Heather Van Hoegarden Obering ("Obering"), Michael Polisky ("Polisky"), and Pamela Bonnevier ("Bonnevier") (hereinafter sometimes collectively referred to as "Defendants"), respectfully alleges as follows:

## THE NATURE OF THE ACTION

1. This action arises out of the willful and wanton acts of Defendants in coordinating, condoning, authorizing, and allowing the Northwestern cheerleading team, including Plaintiff, to be sexually exploited and subjected to a hostile environment including groping, harassment, and sexual touching by older alumni and intoxicated football fans for the University's financial gain.

2.      More specifically, as a condition of being a Northwestern cheerleader, female students, including Plaintiff, were required to attend fundraising events, tailgate parties and other events in their skimpy cheerleading uniforms in order to titillate high net worth donors. At these events, team members were frequently separated by their coach and prohibited from speaking with one another. They were required to participate in photo ops and directed to smile and act enthused regardless of how they were being treated. As a result, Plaintiff, and her team members, were forced to tolerate degrading and wholly inappropriate behavior.

3.      Plaintiff, a Truman Scholar, was encouraged by her coach and the University to suppress her intellect and instead flaunt her body as if she were just a commodity. Northwestern essentially defiled its cheerleaders and encouraged them to be temptresses and courtesans. The University forced its cheerleaders to behave in a degrading and demeaning manner intended to entice and captivate wealthy donors.

4.      When Plaintiff complained about specific acts of sexual assault, sexual harassment and exploitation to Defendant Bonnevier, the head coach, Bonnevier found the complaints humorous and told Plaintiff that she should just "take it" or say "Go Cats" to fans and alumni, regardless of the fact that she was being touched inappropriately at University-sponsored events.

5.      Despite Plaintiff's continuing concerns about being harassed and assaulted, not to mention the emotional toll it was taking on her, she was essentially trapped in her degrading, dehumanizing and exploitative role as a sex object for fans and alumni donors. If she did not comply, she would be terminated and forced to repay all expenses incurred while on the team. She would also lose her cheerleading scholarships.

6.      Moreover, despite Northwestern's outward appearance of supporting victims of sexual harassment and public pledges to end sexual harassment, the University mocked Plaintiff's

status as a victim. When Plaintiff finally found the courage to complain about the repeated instances of sexual assault and harassment to the associate athletic director, Defendant Obering, Plaintiff was sent away to gather her own evidence and prove her own case. Not only was Defendant Obering's conduct abhorrent, but it also violated the University's Title IX policy and federal Title IX guidance, which dictated that universities "must" respond to incidents that create a hostile environment.

7. It further became evident to Plaintiff that Northwestern's commitment to supporting victims was a façade to conceal a much uglier reality – Northwestern was willing to silence, and sacrifice the well-being of, its female athletes in order to keep its donors happy.

8. Refusing to be silenced, Plaintiff obtained numerous statements from her teammates, all saying the same thing – that they were forced to subject themselves to continuing sexual exploitation, assault and harassment, as encouraged and condoned by Bonnevier. With indisputable evidence, Plaintiff went back to Obering to prove her case and request a formal investigation by the Title IX office. Obering and Defendant Polisky then accused her of fabricating the evidence.

9. Even when presented with this evidence, Defendants continued to shame and discredit Plaintiff and obstruct the commencement of a formal investigation. Once the Title IX office was made aware of the hostile environment created by the University's exploitative fundraising strategy, it continued the cover up by refusing to undertake a formal investigation as requested by Plaintiff.

10. Instead, the Title IX Office acted in violation of the University's Title IX policy by opting for an under-the-radar, informal "educational training" for Bonnevier. Clearly any negative

3

publicity about the sexual harassment, assault and exploitation of female cheerleaders would have impacted the University's fundraising efforts.

11.     After Bonnevier's training, the Athletic Department told Bonnevier that she could not force the cheerleaders to attend tailgates. This had little impact, as the cheerleaders were still required to attend fundraising events, which were the primary source of Plaintiff's Title IX complaint. In any event, Bonnevier threatened the cheerleaders, telling them that if they did not tailgate they would not eat. Defendants again attempted to make the appearance that they were implementing measures to remedy the situation while knowingly subjecting Plaintiff to ongoing harassment to protect a significant source of donations from alumni.

12.     Plaintiff complied and did as she was told for the season, but again asked for help from the Title IX office because the sexual harassment continued. Knowing that they could not undergo another informal education for Bonnevier without upsetting Plaintiff and risking her speaking out on the matter, Defendant DaSilva agreed to commence a formal investigation.

13.     However, Defendant DaSilva stripped Plaintiff of her status, rights, and accommodations as a Title IX complainant when DaSilva relegated Plaintiff to witness status. DaSilva gave the appearance that she was going to protect Plaintiff and preserve her anonymity. Not knowing exactly what that entailed, Plaintiff was grateful and agreed. However, when Plaintiff inquired as to the status of the investigation, she was informed that, because she wished to remain anonymous, DaSilva had permanently changed her status to a witness in the matter and she therefore was not entitled to receive information about the investigation or its outcome.

14.     As a result of being relegated to witness status, Plaintiff was precluded from knowing the investigative findings or the steps the University was taking to address the matter. The University was able to keep the investigation under wraps and preserve its false reputation as

committed to preventing sexual harassment. Clearly the same commitment continued to be inapplicable to female athletes the University wished to exploit for financial gain.

15. As a result of the continuous exploitation and sexual misconduct suffered by Plaintiff as a condition of remaining on the cheer team, and maintaining her cheerleading scholarships, Plaintiff has suffered damages which include emotional distress, mental anguish, lost educational and career opportunities, and other direct and consequential damages.

16. Plaintiff therefore brings this action to obtain relief, after years of being subjected to sexual assault, sexual harassment and exploitation by Defendants, based on claims for violation of Title IX of the Education Amendments of 1972, the Trafficking Victims Protection Act ("TVPA"), and various state law claims.

**THE PARTIES**

17. Plaintiff is a natural person and a resident of the state of Nebraska.

18. Defendant Northwestern University is a partially-federally funded private university located in Evanston, Illinois, where it maintains its principal offices and place of business.

19. Defendant Amanda DaSilva is a natural person, and at all relevant times herein, was the Deputy Title IX Coordinator at Northwestern. On information and belief, DaSilva is a resident of Illinois.

20. Defendant Heather Van Hoegarden Obering is a natural person, and at all relevant times herein, was the Associate Athletic Director for Marketing at Northwestern. On information and belief, Obering is a resident of Illinois.

21. Defendant Michael Polisky is a natural person, and at all relevant times herein, was the Deputy Director of Athletics at Northwestern. On information and belief, Polisky is a resident of Illinois.

22.     Defendant Pamela Bonnevier is a natural person, and at all relevant times herein, was the head coach of the Northwestern cheerleading team. On information and belief, Bonnevier is a resident of Illinois.

<u>**JURISDICTION AND VENUE**</u>

23.     This Court has federal question, diversity and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332 and 28 U.S.C. § 1367 because: (i) the federal law claims arise under the statutes of the United States; (ii) Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000; and (iii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

24.     This Court has personal jurisdiction over Defendants DaSilva, Obering, Polisky, and Bonnevier on the grounds that they were, on information and belief, residents of Illinois during the time period at issue herein, were employed by Northwestern at all times relevant herein, and personally acted within the State of Illinois and the Northern District of Illinois.

25.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

<u>**FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**</u>

**I.      <u>Northwestern's Reluctance to Take Action in Response to Allegations of Sexual Misconduct</u>**

26.     Northwestern has been widely criticized, locally and nationally, for its failure to adequately respond to allegations of sexual misconduct, whether it be sexual assault, harassment, or exploitation. Not only has Northwestern faced harsh criticism, but it has also run into legal troubles along the way.

27.     Northwestern's historic silencing of victims and failure to acknowledge or take seriously allegations of sexual assault dates back to 2008, when a student filed a lawsuit against Northwestern, claiming that University administrators failed to discipline a student who raped her. *See* MCT Campus, *Northwestern student files lawsuit over alleged sexual attack*, The News Record (Mar. 3, 2014).

28.     In 2012, Northwestern faced similar allegations – a student claiming that the University mishandled her complaint, resulting in her withdrawal from the University. *See Consider Sexual Violence Policies and Practices*, Change.org (2014), available at https://www.change.org/p/northwestern-university-board-of-trustees-consider-sexual-violence-policies-and-practices, *See also* Lauren Caruba, *In Focus: Amherst account inspires Northwestern student to reveal own sexual assault*, The Daily Northwestern (Nov. 27, 2012). The student filed a complaint with the United States Department of Education's Office for Civil Rights ("OCR").

29.     In response to the student's OCR complaint, Northwestern entered into a "Resolution Agreement" with the OCR, however details of that resolution have not been made publicly available. *See* Justin Pope, *For colleges, rape cases a legal minefield,* Boston.com (Apr. 21, 2012).

30.     In 2014, yet another lawsuit was filed by a student against Northwestern, this time claiming that the University failed to act on her 2012 allegations of sexual assault against a professor at the University. Not only did the University fail to appreciate the student's concerns, making her walk the very same campus as her assaulter every day for nearly *two years*, but Northwestern also allowed the professor to retain his position at the University even following the filing of the complaint. *See* Phil Rogers, *NU Student's Suit Claims Prof's Sexual Harassment*

*Ignored,* NBC Chicago (Feb. 10, 2014), available at https://www.nbcchicago.com/news/local/nu-student-claims-sexual-harassment-claims-against-prof-ignored/1992067/.

31.     In light of the University's answer to the lawsuit demonstrating "a failure of judgment considering past events in providing complete and accurate information to the Northwestern community," Northwestern faculty petitioned the University Board of Trustees, requesting "a) accountability for misconduct, including failure to properly respond to allegations of criminal behaviors; and b) transparency to the greatest extent possible in sharing findings and disciplinary outcomes with those who have reported on misconduct and with the university community." The petition also demanded the release of the University's OCR resolution. *See Consider Sexual Violence Policies and Practices,* Change.org (2014).

32.     In an outrage following yet another attempt by the University to downplay a student's allegations of sexual assault, Northwestern students planned a sit-in during one of the professor's classes, which grew into a campus-wide protest of Northwestern's sexual assault policies, calling for greater transparency in the University's policies. Clearly, the issue was much larger than just Northwestern's egregious behavior at the immediate time – students were fed up with Northwestern's cover up tactics and done with being silenced. *See* Ciara McCarthy and Ally Mutnick, *Updated: Planned sit-in turns into protest of Northwestern's sexual assault policies*, The Daily Northwestern (Mar. 4, 2014), available at

https://dailynorthwestern.com/2014/03/04/campus/planned-sit-in-turns-into-protest-of-northwesterns-sexual-assault-policies/.

33.     Indeed, it took an entire campus-wide protest for Northwestern to finally take any action in the matter. Even when it did, its actions were clearly undertaken so as to quiet the student body, rather than in support of the woman who was sexually assaulted. The University did not

dismiss the professor, but merely stated that the professor would not teach classes for the remainder of the quarter. *See* Ally Mutnick, *Ludlow to stop teaching for rest of Winter Quarter*, The Daily Northwestern (Mar. 5, 2014), available at

https://dailynorthwestern.com/2014/03/05/campus/ludlow-to-stop-teaching-for-rest-of-winter-quarter/.

34.     Although Northwestern has been called upon for years to change its responses to sexual assault, the University has still failed its students despite the plethora of resources available to it. In fact, the University received a federal grant of nearly $300,000 in 2014 for the sole purpose of expanding its sexual assault prevention efforts. The University used the money largely to fund student training. *See* Tyler Page, *Northwestern receives federal grant to fight sexual assault*, The Daily Northwestern (Sept. 19, 2014). However, its prevention efforts with respect to faculty and staff remained lacking.

35.     In 2015, Students protested an opinion piece by a Northwestern faculty member which students claimed was triggering for sexual assault victims, stating that it was not just "a voice in isolation," but instead was representative of Northwestern's culture of "victim blaming" and "slut shaming." *See* Olivia Exstrum, *Students carry mattresses, pillows to protest professor's controversial article*, The Daily Northwestern (Mar. 10, 2015), available at https://dailynorthwestern.com/2015/03/10/campus/students-carry-mattresses-pillows-to-protest-professors-controversial-article/.

36.     Moreover, students were outraged by Northwestern's silence on the matter. By refusing to make a statement or take any action, Northwestern demonstrated that it was not going

to take steps to change its culture of victim shaming. As a result, students drafted a petition demanding action from the University. *See Petition*, available at

https://docs.google.com/forms/d/e/1FAIpQLScr34pXKmDVPSXbi4TQx2Yp01Rar8HOIm0nxx
AOUhUSp-6waw/viewform.

37.     The University's lack of care for victims was reaffirmed in 2016, when one student sat in a box on campus in protest of the University's lack of response to her rape. In a story of isolation all too familiar, the student's sign read, "I was raped on campus. Now, I am the one who has to leave." When asked for a comment by the University, Northwestern provided no statement of compassion for victims, but instead merely recited its Title IX policy. *See* Antonin Remond, *Northwestern student sits in a box in protest: 'I was raped on campus'*, Daily Dot (Apr. 26, 2016), available at https://www.dailydot.com/irl/northwestern-rape-student-protest/.

38.     In 2017, the #MeToo movement began to gain worldwide traction, including on college campuses. The movement was focused on "break[ing] the silence surrounding sexual harassment, sexual assault, and sexual bullying" and "creat[ing] avenues for survivors to speak up and share their stories." *See* Sherri Gordon, *What Is the #MeToo Movement?*, Verywell Mind (July 2, 2020). Northwestern took no steps in response to this Movement to ensure that survivors' voices were heard.

39.     In 2017, the student government called upon Northwestern to take action and provide for a better response to sexual assault, citing a "continuous lack of meaningful, tangible actions through which the University plans to combat the pervasive culture of sexual assault at Northwestern" despite the University's claims that it "strives to create a campus that is safe and secure." The University for too long had hidden behind the words of its policies without taking

proper action. Nehaarika Mulukutla and Rosalie Gambrah, *Letter to the editor: Students urge for better response to sexual assault*, The Daily Northwestern (Apr. 11, 2017).

40.     The article pointed out Northwestern's victim-shaming culture yet again, noting that "most survivors don't want to begin the reporting process with a hostile and dismissive administration on a campus that has demonstrated time and time again that it does not care about them. The Title IX process must support survivors during reporting and cannot continue to be a source of trauma for victims." *Id.*

41.     Unfortunately, despite the repeated calls upon the University for a better response to sexual misconduct, Northwestern has failed to make any meaningful changes. While the University pledged to prevent sexual harassment in higher education, *see Northwestern commits to preventing sexual harassment in higher education,* Northwestern Now (Apr. 10, 2019), Plaintiff's case, like the cases before hers, make clear that, in reality, the University does not take Title IX complaints seriously.

42.     During the same year that Northwestern pledged to prevent sexual harassment, a student wrote an opinion piece describing her experiences reporting sexual assault to the University. The student painted a reality that was all too real for far too many survivors who have tried to come forward, stating, "[r]emember the University sees you just as a student. One out of 8,000. They might think of you as one of their employees, possibly an engaged community member, hopefully a future donor. But the last thing they will see you as is a survivor." *Anonymous: What they don't say about sexual assault on your campus tour*, The Daily Northwestern (Nov. 10, 2019).

43.     In 2020, Northwestern pressure washed away a message painted on a University boulder which read "I can't be silenced." According to the student newspaper, a student "painted

11

an account of sexual assault that highlighted the University's complicity." *See* Isabelle Sarraf, *Northwestern washes away sexual assault survivor's story painted around the Rock*, The Daily Northwestern (Oct. 12, 2020).

44.     Northwestern has long placed its financial priorities ahead of supporting survivors and has only acted in response to negative publicity, when it had absolutely no choice but to act. As a general rule, Northwestern has implemented a policy of shaming and silencing survivors. Plaintiff experienced this firsthand in her efforts to expose the Athletic Department's strategy of intentionally exploiting its cheerleaders, and subjecting them to sexual assault and harassment, for financial gain.

## II.     Northwestern Attempts to Cover Up Sexual Exploitation of Cheerleaders

### A. Plaintiff's Background

45.     Plaintiff has been involved with the sport of cheerleading for much of her life.  In addition, she has been a staunch advocate for ending human trafficking and improving sex education and gender equality.

46.      As a current Miss Nebraska Candidate, Plaintiff undertook a three-year plan to raise awareness around sex education and gender equality, including working with the Attorney General of Nebraska.

47.     Plaintiff enrolled at the University of Nebraska-Lincoln for her freshman year of college, and then transferred to Northwestern to pursue the remainder of her education.

48.     Plaintiff matriculated at Northwestern in the Fall of 2018 as a political science and legal studies double major. Plaintiff also serves as the chair of the Political Science Undergraduate Board and was the treasurer of Phi Alpha Delta, a coed fraternity for students who want to pursue law as a career and is also a member of the University's academic integrity appeals committee.

49.     After transferring to Northwestern, Plaintiff began looking into Northwestern's cheerleading program, which, according to the program's webpage, boasted a prosperous non-competitive cheerleading team with dozens of happy, successful team members and countless benefits that came along with cheering "on the most beautiful campus in the world." In making the decision to join the team, Plaintiff also relied largely on the team's Instagram page[1], which displayed a happy, wholesome group of young women.

50.     Plaintiff contacted Bonnevier regarding possibly joining the team. Bonnevier asked Plaintiff to send videos of Plaintiff's stunting,[2] and after Bonnevier viewed Plaintiff's videos, Plaintiff was accepted onto the team immediately.

51.     Plaintiff received a scholarship for her participation on the team, in the amount of $5,500 in 2019 and $4,041 in 2020.

52.     Plaintiff also received the highly competitive Harry S. Truman Scholarship in Spring of 2020, which is awarded to college juniors to support graduate education for students who plan to pursue a career in public service.

### B. Northwestern Sexually Exploits Plaintiff

53.     For the entirety of Plaintiff's time on the cheerleading team, the Northwestern cheerleaders, including Plaintiff, have been repeatedly subjected to degrading and shameful treatment by Bonnevier. The team was constantly told that they were not attractive or skinny enough, and, as a result, many developed eating disorders to cope with Bonnevier's comments.

---

[1] The team's Instagram handle is @nu_cheerleading.
[2] "Stunting" entails a variety of cheerleading skills, such as tumbling and pyramids.

54.     Plaintiff would come to understand is that these comments, and the constant, overt pressure to be physically attractive was to encourage her to present herself as a new, young sex kitten for Northwestern to exploit and objectify for the University's financial gain.

55.     In the team's preseason meeting before the 2018-2019 season, the team, including Plaintiff, signed "Spirit Squad"[3] contracts which stated that team members were required to attend, in addition to home games and tournaments, "any other events prescribed by the coaching staff." In the event that a member of the team quit or was terminated, she was responsible for reimbursing the University for all fees and expenses associated with attending these events, including travel, food, equipment and camp expenses.

56.     At the meeting, Bonnevier spoke to the team about "dealing with creepy fans" and attempted to normalize inappropriate sexual behavior/sexual harassment as simply part of the sport of cheerleading. She advised the team that that the cheerleaders' number one priority was keeping the fans happy – they needed to always be "fun girls." Bonnevier also stated that there are "always those creepy fans, and if they place their hand too low or act uncomfortable, just take the picture and move on." This ideology of "just take it" permeated the team culture and was consistently reaffirmed by Bonnevier.

57.     On countless occasions, the team was subjected to harassment and sexual assault from fans. At every home game, the cheerleaders were instructed to saunter around the tailgating lots as if they were Victoria's Secret models on a runway, unsupervised, in their skimpy cheerleading uniforms. They were expressly told to split up and flirtatiously mingle with extremely intoxicated fans alone and were not provided any security. On several occasions, Bonnevier sent

---

[3] The Spirit Squad encompasses the Northwestern cheerleading team as well as the men on the Spirit Squad, who typically serve as mascots and "hype men."

Plaintiff to the Wilson Club[4] as a "splash of color" to flirt with wealthy, elderly donors prior to the start of the game.

58.     Bonnevier's directives to the team, including Plaintiff, to isolate and make themselves vulnerable to harassment, and to grin and bear it when it did happen, debased Plaintiff and repeatedly placed her in an unsafe situation.  Fans often badgered Plaintiff to drink alcohol, including taking Jell-O shots, even before she was 21, and placed their hands on her buttocks and breasts while taking pictures. In order to keep her spot on the cheerleading team and avoid financial liability under the Spirit Squad contract and her cheerleading scholarships, Plaintiff knew that all she could do was smile and say "happy gameday."

59.     From the very beginning of the football season, Plaintiff was demoralized and defiled due to the behavior she was forced to endure. By way of example and not limitation, on September 8, 2018, while Plaintiff was sent out to "mingle" with fans, she was subjected to numerous sexually charged comments from fans such as "can you dance for me," and "you and I will have fun together tonight." Bonnevier instructed her to take photos with these fans, and, on numerous occasions these fans used the photo opportunities as an invitation to slyly slide their hands onto Plaintiff's buttocks and breasts while putting their arms around Plaintiff to take the photo.

60.     Plaintiff knew that her only two options were either to do as her coach said and "take it," or leave the team. However, Plaintiff could not afford the financial liability attendant to quitting the team or being terminated.  Plaintiff also had a passion for cheerleading, and it gave her a sense of community at a new school. She had no choice but to do whatever was necessary to

---

[4] The Wilson Club is a private space that is only open to fans who hold courtside, loge or Wilson Club tickets.

remain on the team. Unfortunately, the hostile environment encouraged and condoned by Bonnevier only worsened as the year progressed.

61.     On September 15, 2018, Plaintiff was once again sent out by the University to flirtatiously interact with fans during the home football game "tailgate," again to appear as a young, fresh sex object for the University. Plaintiff was subjected to the same objectifying comments and sexual touching that she had experienced at the first game. Additionally, Bonnevier gave a group of intoxicated fans Plaintiff's name, and the fans were shouting inappropriately at Plaintiff throughout the entire game, saying that they would "find [her] after the game, baby" and that she was "too fine." The statements made by the fans grew increasingly offensive as they became more intoxicated throughout the game.

62.     Plaintiff, uncomfortable with the comments, asked Bonnevier if she could switch sides so that she would be away from the section shouting at her. Bonnevier merely laughed at Plaintiff and denied her request.

63.     October 13, 2018 and October 27, 2018 brought two more home football games in which Plaintiff was forced to mingle with inappropriate fans and "take" whatever was thrown her way. Bonnevier's demeanor seemed to be that the cheerleaders were commodities that could be touched anywhere and used in whatever way was fitting as long as it kept the football fans—and donating alumni—happy.

64.     While the game-day issues were disturbing enough, Plaintiff found out throughout the season that tailgating events were only the start. Cheerleaders were also told that they had to attend alumni events to please donors. The cheerleaders had to be especially enticing on days of alumni events, where they were forced to dress in their tiny cheerleading uniforms to parade around men old enough to be their fathers and even grandfathers.

16

65.     At these alumni events, Plaintiff and the rest of the cheerleading team would be instructed to prance around alone in their uniforms, flirt, and take pictures with the elderly men. These men would then take advantage of the situation to sexually assault the team, slyly touching them inappropriately on their lower backs and behinds while taking photos. The University used these events to portray Plaintiff as a sex object rather than the athlete and scholar that she is.

66.     It became clear to Plaintiff that the cheerleaders were being presented as sex objects to titillate the men that funded the majority of Northwestern's athletics programs. After all, the happier these men were, the more money the University would receive from them. The University's actions made it clear that brains do not bring in large donations, sex does.

67.     Notably, while the male student that served as the mascot occasionally attended these events in costume, the men on the Spirit Squad were never forced to attend. Clearly, this was about using the female cheerleaders as sex symbols – males on the team would not bring in the same level of satisfaction or donations for male alumni.

68.     On November 3, 2018, while Plaintiff was again forced to roam a football tailgate by herself, she was physically picked up by a fan during a photo opportunity and touched inappropriately on her buttocks. Despite Plaintiff asking to be put down, the fan would not release her until the photo was complete.

69.     Plaintiff told Bonnevier of this occurrence and stated that she was uncomfortable with being handled in that way, which rendered her essentially physically helpless, while scantily clad, in a stranger's arms. Bonnevier merely smirked and responded to Plaintiff's safety concern with, "Go 'Cats."

70.     Later on, at the November 3 home game, a dildo was thrown at the team from the stands. Bonnevier mockingly recounted this occurrence with administration in a subsequent staff

meeting and reiterated how humorous she thought it was, having complete lack of regard for how demoralizing and humiliating it was for Plaintiff and the rest of the team.

71.     On November 17, 2018, the cheerleading team went to Minneapolis, Minnesota for an away game. Bonnevier specifically informed the team that they should not eat before the game. It was more important for the team to look skinny on game day to entice fans and donors than to be appropriately fueled for physical activity.

72.     In fact, even though the football team was having breakfast at the hotel *along with Bonnevier*, the cheerleaders were not permitted to join them. Plaintiff told Bonnevier that she felt that she needed to eat something in order to have the strength to cheer. In response, Bonnevier told her that she would have to find something on her own to eat.

73.     At halftime of the game, the Minnesota cheerleading coach invited the Northwestern cheerleading team to eat with them and gave them food. When Bonnevier found out, she yelled at the team that they were not allowed to eat and forced Plaintiff and the rest of the team *to throw out the food that was given to them*, stating that eating was "unprofessional."

74.     After the Minnesota game, Bonnevier did not give the team time to change out of their uniforms in the locker room, but instead forced the team to change on the bus with fans walking by and looking in the windows, essentially forcing them to expose themselves.

75.     As distressing as the entire season of games was for Plaintiff, the Holiday Bowl served as a particularly disturbing event. In the days prior to the bowl game on January 1, 2019, Plaintiff was forced to attend an "open bar mingling event" in downtown San Diego.

76.     At the event, Plaintiff was forced to promenade around alone, and whenever she gravitated towards teammates due to the fact that she was in a crowd of intoxicated men in an

unknown city, Bonnevier would deliberately interfere and separate Plaintiff, telling her, "do your job"—in other words, demean herself and subject herself to harassment and abuse.

77.     At this event, not only was Plaintiff in a strange city, but numerous male fans hit on Plaintiff, badgering her to meet up at the end of the night. Another man physically picked Plaintiff up against her will, saying she was "so small." Plaintiff repeatedly asked to be put down; he would not listen and handled Plaintiff as if she were a plaything.

78.     At the same event, while taking photos, another man groped Plaintiff, grabbing her behind. None of these advances were welcome, and Plaintiff felt demeaned, belittled and isolated. However, her coach would not stop the behavior or even let her "mingle" with her teammates rather than being alone. Clearly, the University wanted Plaintiff to appear as lone, easy prey for fans to take advantage of to their satisfaction.

79.     On the day of the Holiday Bowl parade, it was raining and cold. However, Bonnevier forced the cheerleaders to arrive two hours prior to the start of the parade and refused to allow the team to wear rain gear while outside. Instead, the team had to stand outside in their crop tops in the cold. Plaintiff huddled with the rest of the team around the exhaust pipe of the float for warmth.

80.     After begging Bonnevier to be able to put their coats on, Bonnevier refused because that was not "what the fans wanted to see." Once again, Bonnevier was knowingly and deliberately sacrificing the team's health and well-being for the purpose of *literally* parading them around as sex objects. In contrast, the opposing team's cheerleaders arrived just prior to the start of the parade and were allowed to wear appropriate cold weather clothing throughout the parade.

81.     Following the parade, the team went straight to the game. Bonnevier yelled at the team and did not allow them to use the bathroom for hours. When they were ultimately given

access to the bathroom, the cheerleaders were forced to change clothes in the open in the concession stand area or common area in the public bathroom, as the team had not appropriated enough time or space to allow team to change in a safe and private space.

### C. Northwestern Attempts to Silence Plaintiff

82.     On January 8, 2019, during exit evaluations by the team's doctor, Dr. Jain, Plaintiff raised concerns regarding Bonnevier's treatment, including forcing Plaintiff and the cheerleading team to participate in events where they were subjected to sexual harassment, exploitation and sexual assault so the University could profit.

83.     On January 9, 2019, Plaintiff was contacted by Defendant Obering to set up a meeting regarding the concerns she raised with Dr. Jain.

84.     Plaintiff met with Obering a few days later at a basketball game and told her about the incidents set forth above. Rather than taking any action to address the hostile environment that Plaintiff had been subjected to and prevent the recurrence of the sexual misconduct to which Plaintiff, and the team had been subjected, Obering did not believe Plaintiff. Rather than supporting Plaintiff as a victim of sexual assault and sexual harassment, she subjected Plaintiff to the same victim shaming and re-traumatization that countless female Northwestern students had encountered in the past.

85.     Obering told Plaintiff that she needed to get other testimonials and evidence together to support her allegations before her concerns would even be acknowledged. Obering's actions violated the University's Title IX policy, which required Obering to report Plaintiff's complaint to the Title IX office. It also violated the United States Department of Education's September 2017 Q&A on Campus Sexual Misconduct (the "2017 Guidance"), which stated that

universities must respond to allegations of severe, pervasive and persistent conduct that creates a hostile environment.

86.     On January 22, 2019, Plaintiff delivered to Obering various letters and testimonials from other members of the cheerleading team regarding Bonnevier's behavior and the culture of sexual exploitation that permeated Northwestern Cheerleading.

87.     When the letters were delivered, Plaintiff requested to meet with Jim Phillips to discuss the matter, as he, as Northwestern's Athletic Director, proclaimed to oversee the well-being of the cheerleading program. However, Defendant Polisky did not permit Plaintiff to meet with Phillips.

88.     On January 24, 2019, Plaintiff and one of her teammates met with Defendants Obering and Polisky to discuss their concerns. Incredibly, Obering and Polisky accused Plaintiff of writing the letters and testimonials—which had been submitted anonymously—herself. Obering and Polisky then went so far as to question whether Plaintiff had sufficiently corroborated her claims. This was not a burden that should have been placed on Plaintiff under either the University's Title IX policy or the 2017 Guidance.

89.     At the meeting, Plaintiff further expressed that Bonnevier frequently put the team in unsafe situations, and that she had expressed concern to Bonnevier multiple times previously, but that the concerns raised were consistently shut down. Plaintiff emphasized the fact that the issues were, in fact, deeply embedded systemically and culturally in the team and Bonnevier's coaching methods, and that Bonnevier would likely be either unwilling or unable to make the necessary changes to turn around the damaging harassment, assault and exploitation that had already taken place.

90.     On February 1, 2019, nearly one month after Obering had first learned of Plaintiff's concerns, Plaintiff received an email from Defendant DaSilva. This email mischaracterized Plaintiff's concerns, documenting the issue as a single instance of harassment with "one fan," despite Plaintiff reiterating that there was a systemic problem of exploitation throughout the cheerleading team as a result of Bonnevier's actions, attitude, and behavior.

91.     Plaintiff responded to the email, informing DaSilva that there had been multiple events in which she had been harassed and assaulted, and provided specific dates of the events. DaSilva dismissively responded by stating that the Title IX office would reach out to the Athletics department to determine steps to address the situation.

92.     In the meantime, on February 5, 2019, Plaintiff emailed Obering following a home basketball game, stating that while Bonnevier had been more organized at this game following the January 24 meeting, she still made derogatory comments to members of the team regarding their physical appearance, and still was showing concerning behavior.

93.     On February 18, Defendant DaSilva notified Plaintiff that the Title IX office was "still working with" Bonnevier to address the situation, although no details were provided.

94.     Over one month after the first communication with the Title IX office, Plaintiff and her teammates met with DaSilva to discuss their concerns. Plaintiff asked DaSilva if there was any more information that she could provide to make the process move along quickly, but DaSilva merely stated that she was still working with her colleagues who were conducting "training" with Bonnevier.

95.     Despite Plaintiff's repeated requests for a formal investigation into the systemic exploitation, sexual harassment and assault of Plaintiff and the cheerleading team, DaSilva refused to undertake a formal investigation. Instead, the Title IX office conducted "training" with

22

Bonnevier, which was purportedly "completed" on April 17, 2019. On information and belief, there was no further action taken against Bonnevier, and she remained head coach of the cheerleading team.

96.     On May 28, 2019, Plaintiff had a follow up meeting with Defendants Obering and Polisky. In that meeting, Plaintiff expressed that the concerns had not been adequately addressed and that Bonnevier was still perpetuating the same objectifying culture throughout the team. On information and belief, no additional action was taken, against Bonnevier or otherwise.

### D. Northwestern Strips Plaintiff of Her Rights and Support as a Title IX Complainant

97.     Plaintiff decided to remain on the cheerleading team for the 2019 season with the understanding that, per Northwestern, Bonnevier had been trained and educated and that exploitation/sexual harassment would not be tolerated or continued. Unfortunately, Northwestern did nothing to ensure this was the case.

98.     Bonnevier, still head coach, began the 2019 preseason on a hunt to find out who "ruined tailgating" after she was told that she could not force the cheerleaders to wander tailgates helpless and alone among drunken fans.

99.     Bonnevier incredibly told the team that if they did not tailgate, they would not have food to eat, thereby enforcing the idea that if Plaintiff did not perform, there would be serious consequences. Plaintiff responded, "that is fine, I don't trade sexual harassment for food."

100.     However, even though the team was (finally) no longer forced to tailgate, Plaintiff was still sent to numerous alumni events as well as the Wilson Club during games to be paraded around in her skimpy uniform in order to please alumni and garner donations. As such, she was subjected to the same photo opportunities, groping, and harassment that she had previously notified Northwestern about.

101.    By the time Plaintiff realized that the exploitation had not been stopped, she was already under the impression that if she did not perform, there would be serious consequences, financial or otherwise. For example, if she quit the team, she would have to repay her cheerleading scholarship, which would impact her ability to obtain her education.

102.    By the end of the 2019-2020 season, however, Plaintiff had enough of being subjected to sexual exploitation in any form and decided to again raise her concerns to the Title IX office.

103.    On May 28, 2020, Defendant DaSilva contacted Plaintiff regarding her concerns. Plaintiff informed her that the same issues that had been raised previously regarding Bonnevier were still present throughout the year even after Bonnevier's "training."

104.    On June 11, 2020, the Title IX office *finally* agreed to launch an "official investigation" into Plaintiff's continued reports of sexual harassment, assault and exploitation. Plaintiff provided a list of witnesses who could testify to Bonnevier's sexual exploitation of the team and the pervasive hostile environment caused by Bonnevier's behavior.

105.    Plaintiff then had a phone call with DaSilva to discuss her participation in the investigation. DaSilva claimed that she was prioritizing the anonymity of Plaintiff throughout the course of the investigation, to which Plaintiff agreed, but DaSilva *never* informed Plaintiff that ensuring her anonymity would mean shifting her role in the investigation from a complainant to a witness. Had she been advised that anonymity would change her status and therefore preclude her from substantively participating in the process, she would not have moved forward anonymously and would have chosen to remain as the complainant.

106.    On October 7, 2020, having received no updates on the supposed formal investigation, Plaintiff emailed DaSilva and asked for a status update. However, to Plaintiff's

surprise, DaSilva responded that because Plaintiff was a "witness" as opposed to the "complainant," Plaintiff would *not* be provided with a copy of the investigative report. As a witness, Plaintiff further had no right to be informed of the outcome of the investigation or opportunity to appeal any findings or sanction.

107.    Plaintiff was shocked and distressed, as until this point, Plaintiff was never informed that she was considered merely a "witness" in the matter—indeed, such designation did not make sense, as she was the complainant that brought the issue to the Title IX office. Conveniently, this foreclosed any need to provide specifics about the investigation to Plaintiff.

108.    A mere few days later, Plaintiff had a phone call with DaSilva to discuss her designation as a witness, Plaintiff was informed that her witness status was permanent and that the "case was closed."

109.    On November 3, 2020, Plaintiff was notified by Amy Truelove, Senior Equity Specialist, that "steps" had been taken by the University to address Bonnevier's behavior. However, because Plaintiff was designated as a witness, Truelove would not provide Plaintiff with any specifics as to what the investigation found, or what specific actions were taken.

110.    Plaintiff later discovered from Polisky that Bonnevier had been fired on October 31, nearly *three weeks* after the University refused to make Plaintiff a complainant in the matter due to the fact that the case was "closed." Curiously, the University refused to provide any reasoning for the firing as well as for the gap of time between the case closure and the action taken. On information and belief, given the lapse of time, Bonnevier's termination did not concern Plaintiff's complaints.

### III. Agreements, Representations, Covenants & Warranties Between Plaintiff and Defendant Northwestern

111. Upon Plaintiff's matriculation at Northwestern, Plaintiff and Northwestern became mutually bound by the Northwestern Student Handbook (the "Handbook"), Policy on Discrimination & Harassment (the "Harassment Policy"), and Comprehensive Policy on Sexual Misconduct (the "Misconduct Policy") (collectively "the Policies").

112. On information and belief, the Policies are updated and/or reviewed each new school year.

113. The Policies are available on Northwestern's website.

114. The Policies collectively constitute and represent a contract between students and the University, and in particular, between Plaintiff and Northwestern.

115. Throughout the Title IX process in this case, Defendants breached their contractual obligations and the implied covenant of good faith and fair dealing by failing to abide by the Policies and by failing to take action to address Plaintiff's reports of sexual harassment.

116. The Policies describe certain prohibited conduct which is defined in the Sexual Misconduct Policy, including different types of sex discrimination and sexual misconduct.

117. Under the Misconduct Policy, "An attempt to commit an act identified in this policy, as well as *assisting or willfully encouraging any such act*, is also considered a violation of this policy." (Section I.2.) (emphasis added).

118. Under the Misconduct Policy, acts that constitute prohibited conduct include:

   a. "Sexual contact without consent: Knowingly touching or fondling a person's genitals, breasts, or anus, . . . when consent is not present. This includes contact done directly or indirectly through clothing, bodily fluids, or with an object. It also includes causing or inducing a person, when consent is not present, to similarly touch or fondle oneself or someone else" (Section I.F.2.a.(ii)); and

26

    b. "Sexual Harassment: Sexual harassment is any unwelcome conduct of a sexual nature where: (i) Submission to or rejection of such conduct is made, either explicitly or implicitly, a term or condition of a person's employment, academic standing, or participation in any University program and/or activity, or is used as the basis for University decisions affecting the individual (often referred to as "quid pro quo" harassment); or (ii) Such conduct creates a hostile environment. . . . Examples of conduct that may constitute sexual harassment include: Pressure for a dating, romantic, or intimate relationship; Unwelcome sexual advances; Unwelcome touching, kissing, hugging, or massaging; Pressure for or forced sexual activity; Unnecessary references to parts of the body; Sexual innuendoes, gestures, or humor; or Sexual graffiti, pictures, or posters." (Section I.F.2.e.).

119.    The Misconduct Policy states that "Northwestern is committed to fostering an environment in which all members of our community are safe, secure, and free from sexual misconduct in any form… " (Section I.C.).

    a. Northwestern breached the Misconduct Policy when it failed to take adequate steps to remedy the prohibited conduct that Plaintiff was subjected to by/as a result of Bonnevier's actions. Instead, the University took steps to cover up the misconduct and allowed the exploitation and harassment to fester throughout the team and continue despite repeated complaints.

120.    According to the Misconduct Policy, "[w]hen learning of conduct or behavior that may not meet these standards, community members and the University are expected to take an active role in upholding this policy and promoting the dignity of all individuals." (Section I.C.).

    a. Northwestern breached this provision when it learned of Bonnevier's exploitation of the Northwestern Cheerleaders, her willful encouragement of prohibited conduct against Plaintiff and her teammates, and her creation of a hostile environment for Plaintiff and the cheerleading team conduct clearly in violation of the Misconduct Policy prohibition on sexual harassment, yet failed to take an active role in remedying the situation, and instead made efforts to make the allegations disappear quietly by appearing to investigate the situation, but providing no formal finding or remedy.

121.    The Misconduct Policy mandates that "*[a]ll University employees (including student employees) and graduate students with teaching or supervisory authority, are obligated to promptly report sexual misconduct of which they become aware in the scope of their work for the*

*University to the Office of Equity unless they are a resource listed in Section II(A)."* (Section I.F.3.b.(i)) (emphasis in original).

    a. Northwestern breached the Misconduct Policy when Defendants failed to report Plaintiff's complaint to the Office of Equity in a timely manner. Rather, Plaintiff was not contacted by the Title IX office until nearly one month after her complaints were raised to Defendants Obering and Polisky.

122. The Misconduct Policy states "[i]nformal action involves measures taken by the University in response to a situation or report of sexual misconduct when formal resolution is not desired by the person who may have experienced sexual misconduct, and/or when there is not enough information to proceed with a formal resolution process against a known respondent." (Section III.C).

    a. Northwestern violated the Misconduct Policy when it chose to pursue an informal resolution with Bonnevier in 2019, despite Plaintiff's repeated requests for a formal investigation. Moreover, the University clearly had enough information to proceed with a formal resolution due to Plaintiff's submitted letters and testimonials from her teammates that the University mandated that she provide before her allegations were even considered.

123. The Misconduct Policy states that "When a complainant chooses to move forward with the complaint resolution process, the first step is an initial inquiry. An initial inquiry is an assessment by the Office of Equity as to whether the allegations, if substantiated, would rise to the level of a violation of University Policy." (Section III.B.).

    a. The University breached this provision by failing to perform any initial inquiry into the matter when Plaintiff first came forward after the 2018 season. Instead of an initial inquiry, Plaintiff's allegations were not believed, and she was sent away to gather her own evidence to prove her case. She was then accused of fabricating testimonials and failing to corroborate her allegations.

124. The Misconduct Policy provides numerous rights to complainants throughout Title IX proceedings. By way of example and not limitation, the Misconduct Policy provides that:

    a. "After each party has had the opportunity to meet with investigator(s), identify witnesses, and suggest questions, and the investigators have completed witness

interviews and the gathering of evidence, the investigator(s) will prepare a preliminary report… The parties will be provided with an opportunity to review the preliminary report and respond" (Section III.D.a);

b.  "Complainants… may be accompanied by one advisor throughout the investigation and any sanctioning process" to provide support throughout the process (Section III.A);

c.  Complainants are given interim measures including "counseling, extensions of time or other course-related adjustments, modifications of work or class schedules, campus escort services, restrictions on contact between the parties, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of campus, and other similar accommodations" (Appendix A.6);

d.  "During an investigation, the complainant will have the opportunity to describe their allegations and present supporting evidence to the investigator(s)" (Section III.D.);

e.  The Complainant will "have the opportunity to present names of potential witnesses and questions the investigator(s) might ask the other party" (Section III.D.);

f.  "The complainant and the respondent will both be notified simultaneously in writing of the outcome of the investigation. The notifications will include findings related to violations of policy and the rationale for all findings" (Section III.D.a.);

g.  "The complainant will be notified of remedies offered or provided to the complainant, sanctions imposed on the respondent that directly relate to the complainant, and any other steps the University has taken to prevent the recurrence and eliminate a hostile environment, if one was found to exist" (Section III.D.2.a.);

h.  "The complainant's… decision whether to participate in the Sanctioning Panel and/or listen to the other party is completely voluntary" (Section III.D.2.i);

i.  The Complainant "may appeal the findings and, if sanctions are imposed, a determination of sanctions." (Section III.E.).

125.  The Misconduct Policy states that "[a] complainant is the person who has been impacted by an alleged policy violation and has chosen to participate in the complaint resolution process" and "[a] witness is a person who has knowledge related to specific aspects of a case." (Section III.A.).

     a.   Northwestern breached the Misconduct Policy when it designated Plaintiff as a witness in the matter rather than a complainant, stripping away Plaintiff's right to participate fully and receive information about the investigation and outcome, despite the fact that Plaintiff was the very person who was impacted by the policy violation and who reported and chose to participate.

126.    Due to the fact that the University designated Plaintiff as a witness and not the complainant, without Plaintiff's knowledge, Plaintiff was stripped of all of the above rights which were designed to give her concerns a full and adequate hearing.

## IV.    Plaintiff's Damages

127.    As a direct and proximate result of Defendants' unlawful, wanton, and improper conduct, Plaintiff was sexually harassed, sexually assaulted and exploited for *nearly two years* under Bonnevier's watch and at her express direction, all with Northwestern's tacit blessing.

128.    By failing to properly address Plaintiff's complaints of sexual assault and sexual harassment following the 2018-2019 football season, Defendants knowingly and deliberately subjected Plaintiff to and/or willfully ignored further assaults and harassment at the hands of wealthy older men and intoxicated fans throughout the 2019-2020 football season.

129.    Defendants, clearly on notice of the conduct following Plaintiff's complaints in 2019, nonetheless failed to adequately address the issue and refused to publicly sanction Bonnevier's actions, likely because they knew that permitting Bonnevier to continue exploiting and sexually harassing the cheerleading squad brought alumni donations to Northwestern Athletics, namely, to Northwestern football.

130.    Due to Defendants' unlawful, wanton, grossly negligent and/or improper conduct, Plaintiff has been forced to endure a hostile educational environment and repeated instances of sexual assault and harassment.

131.    Due to Defendants' unlawful, wanton, grossly negligent and/or improper conduct, Plaintiff was subjected to quid pro quo sexual harassment, where she was forced to endure continual harassment and assaults in order to keep her spot on the cheerleading team.

132.    Due to Defendants' unlawful, wanton, grossly negligent and/or improper conduct, Plaintiff was forced to resort to therapy twice weekly from October 2018 to September 2020, to cope with the severe emotional impact and trauma of being repeatedly assaulted, harassed and exploited, not to mention being mocked and ignored by head coach Bonnevier and shamed by Obering and Polisky. Defendants' outrageous conduct is the textbook definition of what ***not to do*** in response to a complaint of sexual misconduct.

133.    Due to Defendants' unlawful, wanton, grossly negligent and/or improper conduct, Plaintiff experienced extreme difficulties in completing her schoolwork because of the mental toll that Bonnevier's sexual exploitation was taking on her. As a result, Plaintiff's grades suffered significantly throughout the Fall of 2018 into the Spring of 2020.

134.    Due to Defendants' unlawful, wanton, grossly negligent and/or improper conduct, Plaintiff suffered depressive episodes, including panic attacks. As a result, Plaintiff was prescribed medication which inhibited Plaintiff's ability to sleep. In fact, at one point, Plaintiff was prescribed four different psychiatric medications to counteract the effects of one another.

135.    Due to Defendants' unlawful, wanton, grossly negligent and/or improper conduct, Plaintiff's ability to focus and prepare for the LSAT, and ultimately score well on the LSAT, was hindered, which forced Plaintiff to retake the LSAT and incur the associated costs. Additionally, Plaintiff's lack of ability to focus hindered her ability to partake in the LSAT preparation course she had purchased, causing her to lose the value of monies paid for the course.

136. Due to Defendants' unlawful, wanton, grossly negligent and/or improper conduct, Plaintiff's inability to partake in her LSAT preparation course has resulted in Plaintiff's law school rejections from Yale University, Arizona State University, and Georgetown University.

137. Due to Defendants' unlawful, wanton, grossly negligent and/or improper conduct, Plaintiff's grades suffered throughout her time at Northwestern. Prior to her time at Northwestern, Plaintiff was an "A" student. However, due to the mental toll that the sexual assault and harassment took on Plaintiff, her grades were negatively impacted, with Plaintiff receiving several grades of a B-, significantly impacting her GPA.

138. Due to Defendants' unlawful, wanton, grossly negligent and/or improper conduct, Plaintiff has suffered and will continue to suffer emotional pain, mental anguish, and loss of educational opportunities.

**AS AND FOR A FIRST CAUSE OF ACTION**
**Violation of Title IX of the Education Amendments of 1972: Deliberate Indifference**
**(Against Northwestern)**

139. Plaintiff repeats and realleges the responses to each and every allegation hereinabove as if fully set forth herein.

140. Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

141. Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant Northwestern.

142. Northwestern receives federal funding. According to Northwestern's Annual Financial Report for the period ending June 30, 2019, Northwestern received over $696 million in

government grants and contracts. In addition, Northwestern receives additional federal assistance in the form of tax breaks, student loans, and Pell grants.

143.     Title IX is enforceable through a private right of action.

144.     Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the *prompt and equitable resolution* of student… complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (emphasis added).

145.     The failure of a university to promptly and adequately address complaints of sexual harassment amounts to "deliberate indifference" for which Defendant Northwestern may be held liable under Title IX.

146.     Northwestern's failure to promptly and adequately address Plaintiff's complaints of sexual harassment and sexual assault, failure to conduct a timely and thorough investigation, and its failure to take real steps to stop the harassment and address its effects, was knowing, intentional, and unreasonable.

147.     Bonnevier's actions and conduct towards Plaintiff constitute sex discrimination under Title IX as well as sexual harassment under Northwestern's Sexual Misconduct Policy. Bonnevier forced Plaintiff to attend University events at which Bonnevier intended to sexually exploit Plaintiff and her teammates for the University's financial gain. At these events, Plaintiff was groped, assaulted and subjected to incessant sexual comments and propositions under the threat of losing her ability to participate in cheerleading and having to repay her scholarship and all costs incurred during the season,

148.    Northwestern acted with deliberate indifference to known acts of sexual exploitation and harassment when it: (1) required Plaintiff to obtain testimonials from others before even considering addressing Plaintiff's complaints; (2) failed to properly investigate and address Plaintiff's 2019 allegations; (3) failed to properly investigate and address Plaintiff's 2020 allegations; and (4) failed to take adequate corrective measures to prevent Bonnevier from sexually exploiting and harassing Plaintiff and Northwestern cheerleaders for the University's financial gain.

149.    As early as January 2019, an "appropriate person" at Northwestern had knowledge of Bonnevier's actions creating a hostile environment for Plaintiff, as a result of Dr. Jain's report of Plaintiff's complaints to Defendant Obering.

150.    However, instead of conducting a formal investigation as requested by Plaintiff, Northwestern mandated that Plaintiff first collect testimony from others before her allegations would be considered and went against its Policy by pursuing an informal resolution against Plaintiff's wishes, which apparently concluded in nothing more than non-specific "education" for Bonnevier. On information and belief, this was done in an effort to cover up Northwestern's sexual exploitation of its cheerleaders.

151.    Despite Northwestern's knowledge of Bonnevier's conduct creating a hostile environment for Plaintiff and her teammates, the University failed to take real action to remedy the situation. Instead, the University simply prohibited Bonnevier from forcing the cheerleaders to tailgate, while permitting Bonnevier to continue exploiting and harassing the team through alumni events and other game day activities that consistently exposed the team to sexual harassment and groping.

152.     As a result of Northwestern's deliberate indifference and/or willful ignorance to Plaintiff's complaint and failure to adequately remedy Bonnevier's conduct, Plaintiff continued to be subjected to sexual assault and sexual harassment at various alumni events throughout the 2019 football season and was forced to submit to this misconduct in order to keep her spot on the cheerleading team and avoid financial liability and loss of her cheerleading scholarships.

153.     Extremely uncomfortable with the harassment that was taking place, Plaintiff once again reported Bonnevier's conduct to the Title IX office in 2020. Knowing that the University could not undertake an additional informal "resolution" without the cheerleaders speaking out, the University finally purportedly pursued a "formal" investigation.  However, the University also surreptitiously designated Plaintiff as a mere "witness" in the process by convincing Plaintiff to agree to anonymity, functionally stripping her of all of the requisite protections afforded by the Sexual Misconduct Policy and conveniently permitting Northwestern to "resolve" the matter, once again, behind closed doors.

154.     When the University did finally take action and terminate Bonnevier, it was not until weeks after the investigation was purportedly "closed." The gap of time and the University's refusal to provide a reason for the termination indicates that Bonnevier's termination was not strictly due to the result of the investigation and therefore that the action was not taken in an attempt to remedy the matter. Moreover, this action took place nearly two years after Plaintiff first complained about Bonnevier's abhorrent misconduct—and was disbelieved and shamed by Obering and Polisky.

155.     Northwestern's actions constitute deliberate indifference as its inadequate investigations and remedies to Plaintiff's complaints were clearly unreasonable in light of the known circumstances, including the gravity of the allegations, the severity and pervasiveness of

the alleged misconduct, Plaintiff's numerous requests for a formal investigation, the numerous witness statements in support of the allegations, and Plaintiff's statement at her May 28, 2019 meeting with Obering that Bonnevier's misconduct could not adequately be remedied through education or training.

156.    Northwestern's failure to promptly and adequately respond to Plaintiff's repeated complaints of Bonnevier's sexual exploitation of Plaintiff subjected Plaintiff and numerous other Northwestern cheerleaders to further sexual exploitation and harassment as well as a sexually hostile environment, which was so severe, pervasive, and objectively offensive that it effectively denied them access to educational opportunities at Northwestern.

157.    As a direct and proximate result of Northwestern's deliberate indifference to Plaintiff's complaints of sexual misconduct in violation of Title IX, Plaintiff was subjected to a hostile educational environment while attempting to pursue her education on Northwestern's campus.

158.    As a direct and proximate result of Northwestern's deliberate indifference to Plaintiff's complaints of sexual misconduct in violation of Title IX, Plaintiff was deprived of her access to educational opportunities as she was unable to adequately focus on her studies in light of the continuing sexual assault and sexual harassment that the University refused to remedy. As a result, Plaintiff's grades were negatively impacted and her LSAT preparation was compromised, thereby forcing her to take the LSAT twice. As a result, Plaintiff has received three law school rejection letters to date.

159.    As a direct and proximate result of Northwestern's deliberate indifference to Plaintiff's complaints of sexual misconduct in violation of Title IX, Plaintiff has suffered and continues to suffer significant, severe, and ongoing emotional distress and mental anguish.

160.    In light of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and career opportunities, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A SECOND CAUSE OF ACTION
### Violation of Title IX of the Education Amendments of 1972: Hostile Environment
### (Against Northwestern)

161.    Plaintiff repeats and realleges the responses to each and every allegation hereinabove as if fully set forth herein.

162.    To state a claim under Title IX for hostile environment, a plaintiff must allege that (1) she was a student at an educational institution receiving federal funds, (2) she was subjected to harassment based on her sex, (3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity, and (4) there is a basis for imputing liability to the institution." *Doe v. Columbia Coll. Chicago*, 299 F. Supp. 3d 939, 950 (N.D. Ill. 2017), aff'd, 933 F.3d 849 (7th Cir. 2019) (quoting *Jennings v. Univ. of N. Carolina*, 482 F.3d 686, 695 (4th Cir. 2007)).

163.    Northwestern receives federal funding. According to Northwestern's Annual Financial Report for the period ending June 30, 2019, Northwestern received over $696 million in government grants and contracts. In addition, Northwestern receives additional federal assistance in the form of tax breaks, student loans, and Pell grants.

164.    Plaintiff was subjected to harassment on the basis of her sex when she was forced by Bonnevier to attend various alumni and tailgating events where she was subject to sexual assault and sexual harassment while her male teammates were not required to attend these events.

165.     Such harassment was sufficiently severe or pervasive to create a hostile educational environment. As a result of the University's failure to adequately address Bonnevier's actions, Plaintiff was forced to endure incidents of sexual assault and continuous sexual harassment for nearly two years in order to keep her place on the Northwestern cheerleading team and avoid financial liability and loss of her cheerleading scholarships.

166.     Despite the fact that the University had notice of the sexual misconduct immediately following the 2018 season, the University failed to pursue a formal investigation into Bonnevier's actions. Instead, the University allowed Bonnevier to remain in her position as head coach and to continue subjecting Plaintiff, and her teammates, to sexual harassment throughout the 2019 season.

167.     As a result of the continued sexual harassment that Plaintiff was forced to endure in order to maintain her place on the team, and avoid financial liability, Plaintiff suffered severe emotional distress and mental health issues, including panic attacks, causing her to resort to therapy twice weekly from October 2018 to September 2020. Plaintiff was also prescribed numerous medications in an attempt to curtail her mental anguish.

168.     As a result of the mental toll that the sexual harassment had taken on Plaintiff, she was unable to adequately focus on her studies and her grades suffered from 2018 to 2020, she was unable to adequately prepare for the LSAT, had to take the LSAT for a second time and recently received rejection letters from three law schools.

169.     There is a basis for holding the University liable for Plaintiff's sexual harassment as the University maintained control over the Northwestern cheerleading team and the University had notice of the sexual harassment well before the start of the 2019 season due to Plaintiff's

complaint. Nevertheless, the University failed to address Bonnevier's actions and allowed the sexual harassment to persist into the 2019 season.

170.    Northwestern's failure to promptly and adequately respond to Plaintiff's repeated complaints of Bonnevier's sexual exploitation of Plaintiff subjected Plaintiff and numerous other Northwestern cheerleaders to further sexual exploitation and harassment as well as a sexually hostile environment, which was so severe, pervasive, and objectively offensive that it denied Plaintiff access to educational opportunities at Northwestern as she was unable to adequately focus on her studies in light of the continuing sexual assault and sexual harassment that the University refused to remedy. As a result, Plaintiff's grades were negatively impacted and her LSAT preparation was compromised, thereby forcing her to take the LSAT twice. As a result, Plaintiff has received three law school rejection letters to date.

171.    As a direct and proximate result of Northwestern's deliberate indifference to Plaintiff's complaints of sexual misconduct in violation of Title IX, Plaintiff was subjected to a hostile educational environment while attempting to pursue her education on Northwestern's campus.

172.    As a direct and proximate result of Northwestern's deliberate indifference to Plaintiff's complaints of sexual misconduct in violation of Title IX, Plaintiff has suffered and continues to suffer significant, severe, and ongoing emotional distress and mental anguish.

173.    In light of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and career opportunities, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**AS AND FOR A THIRD CAUSE OF ACTION**
**Trafficking in Violation of 18 U.S.C. § 1590**
**(Against Northwestern, DaSilva, Obering, Polisky and Bonnevier)**

174.    Plaintiff repeats and realleges the responses to each and every allegation hereinabove as if fully set forth herein.

175.    18 U.S.C. § 1590 prohibits individuals from "knowingly recruit[ing], harbor[ing], transport[ing], provid[ing], or obtain[ing] by any means, any person for labor or services" of a "commercial sex act."

176.    A commercial sex act is defined as "any sex act, on account of which anything of value is given to or received by any person."  18 USC § 1591(e)(3).

177.    "Sex act" is not defined in the statute.  Plaintiff respectfully submits that sexual groping/touching constitutes a "sex act" covered by the statute.

178.    Plaintiff brings this claim pursuant to 18 U.S.C. § 1595, which provides for civil remedies for violations of 18 U.S.C. § 1590.

179.    Defendants knowingly recruited, enticed, harbored, transported, and/or obtained Plaintiff for labor or services with knowledge, or at least, reckless disregard for the fact that she would be forced to engage in commercial sex acts.

180.    Plaintiff was enticed to join the Northwestern cheerleading team through, amongst other means, the advertisements and representations that were made about the team via the team's webpage. On information and belief, this webpage and the representations made therein were produced by Defendants Obering, Polisky, and Bonnevier.

181.    Defendants enticed cheerleaders, including Plaintiff, to join the team by claiming that the team offered great opportunities to cheer at "some of the most storied stadiums in college athletics," and provided members with gear, financial grants, and the opportunity to be on TV

40

every week. The website encourages students to join the team "on the most beautiful campus in the world and be a part of Chicago's Big Ten Cheer Team."

182. While the University enticed team members, including Plaintiff, based upon its representations of glamour and fame, it did not disclose the dark side of Northwestern cheerleading: that a titillating appearance was the main component of participation on the team, and their positions on the team were conditioned on pleasing and being groped by wealthy older men and intoxicated fans for the purpose of encouraging donations to the University and supporting Northwestern Football.

183. Accordingly, Plaintiff was exploited and forced to attend numerous events where she was knowingly and deliberately subjected to sexual assault and sexual harassment, including sexual propositions and the fondling of her buttocks and breasts, in order to maintain a position on the Northwestern cheerleading team and avoid financial liability and loss of her cheerleading scholarships.

184. Plaintiff was further forced to participate in these events because if she refused, she would be terminated from the team and financially responsible for travel, food, equipment, camp and other expenses incurred throughout the season which were paid for by the University.

185. Defendants Northwestern, DaSilva, Obering, Polisky and Bonnevier formed a venture by virtue of their relationships with each other within Northwestern athletics.

186. Northwestern, as the employer, served as one member of the venture as well as provided the structure of the venture, with DaSilva, Overing, Polisky, and Bonnevier, as Northwestern employees, serving as the other members of the venture.

187. The venture served to protect Northwestern's and the individual defendants' interests, including institutional and financial interests, at the expense of Northwestern students such as and including Plaintiff.

188. Defendants Northwestern, DaSilva, Obering, Polisky and Bonnevier had the purpose of blocking and covering up investigations into Bonnevier's actions relating to the Northwestern Cheerleading team in order to avoid public criticism and to continue receiving large financial grants from donors. By way of example and not limitation, this purpose was demonstrated by:

> a. Defendant Obering's reluctance to pursue Plaintiff's allegations and insistence that Plaintiff obtain her own evidence before the complaint would be addressed;
>
> b. Defendants Obering and Polisky's failure to promptly report Plaintiff's allegations to the Title IX office;
>
> c. Defendant Bonnevier's continued harassment and exploitation of the Northwestern Cheerleading team after being expressly notified of said harassment and purportedly "educated" concerning sexual misconduct;
>
> d. Defendant DaSilva's inadequate response and initial refusal to pursue a formal investigation despite Plaintiff's requests;
>
> e. The University's lack of response or sanctioning for Bonnevier even after the second investigation;
>
> f. The University's naming of Plaintiff as a witness in the investigation, thereby foreclosing any necessity to disclose information regarding the handling of the matter to Plaintiff; and
>
> g. Bonnevier's continued, uninterrupted position as the head coach of the Northwestern cheerleading team from 2018 to 2020, despite Plaintiff's repeated complaints.

189. Through the venture, the University enticed Plaintiff and other members to join Northwestern's cheerleading team by representing it to be an elite noncompetitive team with numerous benefits.

190.    The venture knew, however, that members would be forced to engage in commercial sex acts upon joining the team.

191.    The venture collectively received a financial benefit as a result of the sexual exploitation it subjected Northwestern cheerleaders to in the form of large alumni donations which funded Northwestern athletics and subsequently Defendants' salaries.

192.    Defendant Northwestern, directly receiving financial benefit from Plaintiff's exploitation in the form of alumni and fan donations that funded Northwestern athletics, acted as the principal. Defendants DaSilva, Obering, Polisky, and Bonnevier formed a venture with Northwestern for the purpose of increasing donations to Northwestern, which on information and belief, allowed for larger salary opportunities and continued employment.[5]

193.    Defendants Northwestern, DaSilva, Obering, Polisky, and Bonnevier benefitted from participating in a venture which they knew or should have known was a violation of the TVPA.

194.    In light of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and career opportunities, together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

---

[5] Northwestern actively encourages and asks for donations to support Northwestern coaches and staff through "endowed coaching and administrative positions." *See Campaign Priorities,* Support The Cats, available at https://www.supportthecats.com/our-priorities/campaign-priorities.html.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Trafficking in Violation of 18 U.S.C. § 1591
### (Against Northwestern, DaSilva, Obering, Polisky and Bonnevier)

195.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

196.    18 U.S.C. § 1591 prohibits individuals from "knowingly . . . recruit[ing], harbor[ing], transport[ing], provid[ing], obtain[ing] . . . or solicit[ing] by any means a person . . . knowing, . . . or with reckless disregard of the fact, that means of force, fraud, coercion . . . or any combination of such means will be used to cause the person to engage in a "commercial sex act."

197.    The term "coercion" is defined as "threats of serious harm to or physical restraint against any person" or "any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person." 18 U.S.C.A. § 1591(e)(2).

198.    "Serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm." 18 U.S.C.A. § 1591(e)(5).

199.    A commercial sex act is defined as "any sex act, on account of which anything of value is given to or received by any person."  18 U.S.C. § 1591(e)(3).

200.    "Sex act" is not defined in the statute.  Plaintiff respectfully submits that sexual groping/touching constitutes a "sex act" covered by the statute.

201.    Plaintiff brings this claim pursuant to 18 U.S.C. § 1595, which provides for civil remedies for violations of 18 U.S.C. § 1591.

202.    Defendants knowingly recruited, enticed, harbored, transported, and/or obtained Plaintiff for labor or services while knowing she would be forced to engage in commercial sexual acts.

203.    Plaintiff was enticed to join the Northwestern cheerleading team through, amongst other means, the advertisements and representations that were made about the team via the team's webpage. On information and belief, this webpage and the representations made therein were produced by Defendants Obering, Polisky, and Bonnevier.

204.    Defendants enticed cheerleaders, including Plaintiff, to join the team by claiming that the team offered great opportunities to cheer at "some of the most storied stadiums in college athletics," and provided members with gear, financial grants, and the opportunity to be on TV every week. The website encourages students to join the team "on the most beautiful campus in the world and be a part of Chicago's Big Ten Cheer Team."

205.    While the University enticed team members, including Plaintiff, based upon its representations of glamour and fame, it did not disclose the dark side of Northwestern cheerleading: that a titillating appearance was the main component of participation on the team, and their positions on the team were conditioned on pleasing and being groped by wealthy older men and intoxicated fans for the purpose of encouraging donations to the University and supporting Northwestern Football.

206.    Accordingly, Plaintiff was exploited and forced to attend numerous events where she was knowingly and deliberately subjected to sexual assault and sexual harassment, including sexual propositions and the fondling of her buttocks, in order to maintain a position on the Northwestern cheerleading team and avoid financial liability and loss of her cheerleading scholarships.

207.    Accordingly, Plaintiff was exploited and forced to attend numerous events where she was knowingly and deliberately subjected to sexual assault and sexual harassment, including sexual propositions and the fondling of her buttocks, in order to maintain a position on the Northwestern cheerleading team and avoid financial liability and loss of her cheerleading scholarships.

208.    Defendants transported Plaintiff and other members of the Northwestern cheerleading team to various sporting events, tailgates, and bars throughout the country between 2018 and 2020, thereby affecting interstate commerce, and forced Plaintiff to participate in sexual exploitation and sexual harassment in order to maintain a position on the cheerleading team.

209.    Defendants Northwestern, DaSilva, Obering, Polisky and Bonnevier formed a venture by virtue of their relationships with each other within Northwestern athletics.

210.    Northwestern, as the employer, served as one member of the venture as well as provided the structure of the venture, with DaSilva, Overing, Polisky, and Bonnevier, as Northwestern employees, serving as the other members of the venture.

211.    The venture served to protect Northwestern's and the individual defendants' interests, including institutional and financial interests, at the expense of Northwestern students such as and including Plaintiff.

212.    Defendants Northwestern, DaSilva, Obering, Polisky and Bonnevier had the purpose of blocking and covering up investigations into Bonnevier's actions relating to the Northwestern Cheerleading team in order to avoid public criticism and to continue receiving large financial grants from donors. By way of example and not limitation, this purpose was demonstrated by:

        a.    Defendant Obering's reluctance to pursue Plaintiff's allegations and insistence that Plaintiff obtain her own evidence before the complaint would be addressed;

b. Defendants Obering and Polisky's failure to promptly report Plaintiff's allegations to the Title IX office;

c. Defendant Bonnevier's continued harassment and exploitation of the Northwestern Cheerleading team after being expressly notified of said harassment and purportedly "educated" concerning sexual misconduct;

d. Defendant DaSilva's inadequate response and initial refusal to pursue a formal investigation despite Plaintiff's requests;

e. The University's lack of response or sanctioning for Bonnevier even after the second investigation;

f. The University's naming of Plaintiff as a witness in the investigation, thereby foreclosing any necessity to disclose information regarding the handling of the matter to Plaintiff; and

g. Bonnevier's continued, uninterrupted position as the head coach of the Northwestern cheerleading team from 2018 to 2020, despite Plaintiff's repeated complaints.

213.    Through the venture, the University enticed Plaintiff and other members to join Northwestern's cheerleading team by representing it to be an elite noncompetitive team with numerous benefits.

214.    The venture knew, however, that members would be forced to engage in commercial sex acts upon joining the team.

215.    The venture collectively received a financial benefit as a result of the sexual exploitation it subjected Northwestern cheerleaders to in the form of large alumni donations which funded Northwestern athletics and subsequently Defendants' salaries.

216.    Plaintiff was directly and indirectly coerced to participate in these events because if she refused, she would be terminated from the team and subjected to serious financial harm by becoming financially responsible for her cheerleading scholarships, travel, food, equipment, camp and other expenses incurred throughout the season which were paid for by the school, thereby foreclosing her ability to pay for and obtain her education.

217. Additionally, Northwestern, through its agent Bonnevier, transported Plaintiff and other members of the Northwestern cheerleading team across state lines to events where they were exploited and subjected to sexual harassment.

218. Defendant Northwestern, directly receiving financial benefit from Plaintiff's exploitation in the form of alumni and fan donations that funded Northwestern athletics, acted as the principal. Defendants DaSilva, Obering, Polisky, and Bonnevier formed a venture with Northwestern for the purpose of increasing donations to Northwestern, which on information and belief, allowed for larger salary opportunities and continued employment.

219. Defendants Northwestern, DaSilva, Obering, Polisky, and Bonnevier benefitted from participating in a venture which they knew or should have known was a violation of the TVPA.

220. In light of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and career opportunities, together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**Trafficking in Violation of 18 U.S.C. § 1589**
**(Against Northwestern, DaSilva, Obering, Polisky and Bonnevier)**

221. Plaintiff repeats and realleges the responses to each and every hereinabove as if fully set forth herein.

222. 18 U.S.C. § 1589(a) makes it unlawful for any person to "knowingly provide[] or obtain[] the labor or services of a person by… means of any scheme, plan, or pattern intended to

cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."

223.    § 1589(b) makes unlawful "Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means."

224.    "Serious harm" is defined in the statute as any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm. 18 U.S.C.A. § 1589(c)(2).

225.    Plaintiff brings this claim pursuant to 18 U.S.C. § 1595, which provides for civil remedies for violations of 18 U.S.C. § 1589.

226.    Defendants knowingly obtained services from Plaintiff by forcing her to attend various alumni and tailgating events.

227.    By means of the cheerleading contract and Bonnevier's representations to Plaintiff, Plaintiff reasonably believed that if she did not participate, she would be seriously harmed financially by becoming liable for all expenses that had been incurred while she was part of the team and by having to pay back her scholarship, which would impact her ability to obtain her education. As such, Plaintiff reasonably believed that she had to attend the events.

228.    Defendants Northwestern, DaSilva, Obering, Polisky and Bonnevier formed a venture by virtue of their relationships with each other within Northwestern athletics.

229. Northwestern, as the employer, served as one member of the venture as well as provided the structure of the venture, with DaSilva, Overing, Polisky, and Bonnevier, as Northwestern employees, serving as the other members of the enterprise.

230. The venture served to protect Northwestern's and the individual defendants' interests, including institutional and financial interests, at the expense of Northwestern students such as and including Plaintiff.

231. Defendants Northwestern, DaSilva, Obering, Polisky and Bonnevier had the purpose of blocking and covering up investigations into Bonnevier's actions relating to the Northwestern Cheerleading team in order to avoid public criticism and to continue receiving large financial grants from donors. By way of example and not limitation, this purpose was demonstrated by:

    a. Defendant Obering's reluctance to pursue Plaintiff's allegations and insistence that Plaintiff obtain her own evidence before the complaint would be addressed;

    b. Defendants Obering and Polisky's failure to promptly report Plaintiff's allegations to the Title IX office;

    c. Defendant Bonnevier's continued harassment and exploitation of the Northwestern Cheerleading team after being expressly notified of said harassment and purportedly "educated" concerning sexual misconduct;

    d. Defendant DaSilva's inadequate response and initial refusal to pursue a formal investigation despite Plaintiff's requests;

    e. The University's lack of response or sanctioning for Bonnevier even after the second investigation;

    f. The University's naming of Plaintiff as a witness in the investigation, thereby foreclosing any necessity to disclose information regarding the handling of the matter to Plaintiff; and

    g. Bonnevier's continued, uninterrupted position as the head coach of the Northwestern cheerleading team from 2018 to 2020, despite Plaintiff's repeated complaints.

232. Through the venture, the University enticed Plaintiff and other members to join Northwestern's cheerleading team by representing it to be an elite noncompetitive team with numerous benefits.

233. The venture knew, however, that members would be forced to perform services for the venture's financial benefit upon joining the team.

234. The venture collectively received a financial benefit as a result of the sexual exploitation it subjected Northwestern cheerleaders to in the form of large alumni donations which funded Northwestern athletics and subsequently Defendants' salaries.

235. Defendant Northwestern, directly receiving financial benefit from Plaintiff's exploitation in the form of alumni and fan donations that funded Northwestern athletics, acted as the principal. Defendants DaSilva, Obering, Polisky, and Bonnevier formed a venture with Northwestern for the purpose of increasing donations to Northwestern, which on information and belief, allowed for larger salary opportunities and continued employment.

236. Defendants Northwestern, DaSilva, Obering, Polisky, and Bonnevier benefitted from participating in a venture which they knew or should have known was a violation of the TVPA.

237. In light of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and career opportunities, together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A SIXTH CAUSE OF ACTION
### Breach of Contract
### (Against Northwestern)

238.    Plaintiff repeats and realleges the responses to each and every allegation hereinabove as if fully set forth herein.

239.    At all times relevant hereto, a contractual relationship existed between Northwestern and Plaintiff through Northwestern's policies and procedures, including but not limited to the Student Handbook and sexual misconduct policies. Through the documents it publishes, Northwestern makes express contractual commitments to students, including specific protections and procedures for those who bring forth allegations of sexual misconduct.

240.    These contracts contain an implied covenant of good faith and fair dealing. They implicitly guaranteed that any proceedings would be conducted with basic fairness.

241.    Northwestern committed numerous breaches of its agreements with Plaintiff, including but not limited to:

   a.    Failing to take steps to foster an environment where Plaintiff could be free from sexual exploitation, in violation of Section I.C. of the Misconduct Policy which states that "Northwestern is committed to fostering an environment in which all members of our community are safe, secure, and free from sexual misconduct in any form… ";

   b.    Failing to take an active role to remedy Bonnevier's actions, instead taking active steps to cover up the situation/allegations in violation of Section I.C. of the Misconduct Policy which states that, "[w]hen learning of conduct or behavior that may not meet these standards, community members and the University are expected to take an active role in upholding this policy and promoting the dignity of all individuals";

   c.    Failing to promptly refer Plaintiff's complaint to the Title IX office, in violation of Section I.F.3.b.(i) of the Misconduct Policy which states that "*[a]ll University employees (including student employees) and graduate students with teaching or supervisory authority, are obligated to promptly report sexual misconduct of which they become aware in the scope of their work for the University to the Office of Equity unless they are a resource listed in Section II(A)*";

d. Undertaking an informal resolution despite Plaintiff's requests for a formal investigation in violation of Section III.C of the Misconduct Policy, which states that "[i]nformal action involves measures taken by the University in response to a situation or report of sexual misconduct when formal resolution is not desired by the person who may have experienced sexual misconduct, and/or when there is not enough information to proceed with a formal resolution process against a known respondent";

e. Designating Plaintiff as a witness in the matter rather than as the complainant, in violation of Section III.A. which clearly designates a complainant as the person who has been impacted by an alleged policy violation and has chosen to participate in the complaint resolution process";

f. Forcing Plaintiff to obtain her own evidence before she was believed instead of conducting an initial inquiry into the matter, in violation of Section III.B. of the Misconduct Policy, which states "[w]hen a complainant chooses to move forward with the complaint resolution process, the first step is an initial inquiry. An initial inquiry is an assessment by the Office of Equity as to whether the allegations, if substantiated, would rise to the level of a violation of University Policy"; and

g. Refusing to allow Plaintiff to review evidence or receive specifics as to the steps being taken by the University in her own Title IX case, in violation of Section III.D.a of the Misconduct Policy, which states, "[a]fter each party has had the opportunity to meet with investigator(s), identify witnesses, and suggest questions, and the investigators have completed witness interviews and the gathering of evidence, the investigator(s) will prepare a preliminary report… The parties will be provided with an opportunity to review the preliminary report and respond".

242.    These unlawful breaches by Northwestern of the University's contractual agreements with Plaintiff caused Plaintiff to sustain substantial injury, damage, and loss, including loss of educational opportunities, economic injuries, and other consequential damages.

243.    In light of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, including past and future economic losses, loss of educational and career opportunities and prejudgment interest.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Estoppel and Reliance
### (Against Northwestern)

244.    Plaintiff repeats and realleges the responses to each and every allegation hereinabove as if fully set forth herein.

245.    Northwestern's various policies constitute representations and promises that it should have reasonably expected to induce action or forbearance by Plaintiff.

246.    Northwestern made express promises that it would provide a safe environment free from discrimination and harassment, and that it would provide a thorough and equitable process to resolve any alleged violation of Northwestern's Policies. Plaintiff relied on those promises when she made the decision to enroll and remain at Northwestern, and such reliance was expected or should have been expected by Northwestern.

247.    Plaintiff relied to her detriment on these promises and representations by Northwestern.

248.    As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages including loss of educational and career opportunities and other direct and consequential damages.

249.    Thus, Plaintiff is entitled to damages in an amount to be determined at trial, including, without limitation, past and future economic losses, loss of educational and career opportunities and prejudgment interest.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### (Against DaSilva, Obering, Polisky and Bonnevier)

250.    Plaintiff repeats and realleges the responses to each and every allegation hereinabove as if fully set forth herein.

251.    A plaintiff can establish a claim for intentional infliction of emotional distress by showing: "(1) that the defendant's conduct was truly extreme and outrageous, (2) that the defendant either intended that his conduct would cause severe emotional distress or knew that there was a high probability that his conduct would do so, and (3) that the defendant's conduct did in fact cause severe emotional distress." *Taliani v. Resurreccion*, 115 N.E.3d 1245, 1254, *appeal denied*, 124 N.E.3d 500 (Ill. 2019).

252.    Defendants engaged in extreme and outrageous conduct by sexually exploiting Plaintiff and other members of the Northwestern cheerleading team for the University's financial gain. Exploiting young, vulnerable women and allowing them to be groped and harassed by wealthy men of their fathers' generation goes beyond the bound of all possibly decency to be regarded as intolerable in a civilized community. By way of example and not limitation, Defendants acted with extreme and outrageous conduct when:

      a.  Bonnevier's laughing off of Plaintiff's complaints of sexual assault and sexual harassment;

      b.  Bonnevier giving fans Plaintiff's name, subjecting her to further harassment;

      c.  Bonnevier's preseason team meeting speech telling the team to "just take it" when it comes to "creepy fans";

      d.  Bonnevier's refusal to allow the cheerleading team to eat;

      e.  Obering and Polisky's refusal to believe Plaintiff's complaints, forcing Plaintiff to obtain her own evidence to prove her own case;

      f.  Obering and Polisky's accusing Plaintiff of falsifying testimonial letters when she did bring forth additional evidence as asked;

      g.  DaSilva's refusal to believe Plaintiff and the minimizing of her complaint, stating that it was only one incident;

      h.  DaSilva's refusal to open a formal investigation, resorting to an informal resolution despite Plaintiff's requests;

      i.   DaSilva's deceitful tactics in convincing Plaintiff she was going to be kept anonymous to protect Plaintiff but failing to disclose that she would use that to strip Plaintiff of her rights as a victim and a complainant.

253.    Defendants knew that there was a high probability that their conduct would cause severe emotional distress, as demonstrated by Bonnevier's preseason speech where she told the team to "just take it" regarding sexual harassment by fans.

254.    Moreover, Defendants knew that Plaintiff's emotional distress would be furthered by their inadequate response and refusal to sanction Bonnevier, which resulted in Plaintiff being subjected to another year of sexual exploitation and harassment.

255.    Plaintiff did in fact suffer severe emotional distress as a result, as she suffered depressive episodes, panic attacks, and was even prescribed medication as a result.

256.    Thus, Plaintiff is entitled to damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and career opportunities, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

(i)    on the first cause of action against Northwestern for violation of Title IX of the Education Amendments of 1972: deliberate indifference, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and career opportunities, together with prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii)    on the second cause of action against Northwestern for violation of Title IX of the Education Amendments of 1972: hostile environment, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological

damages, past and future economic losses, loss of educational and career opportunities, together with prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)    on the third cause of action against Defendants Northwestern, DaSilva, Obering, Polisky, and Bonnevier for Trafficking in Violation of 18 U.S.C. § 1590, a judgment awarding Plaintiff damages are in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and career opportunities, together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)    on the fourth cause of action against Defendants Northwestern, DaSilva, Obering, Polisky, and Bonnevier for Trafficking in Violation of 18 U.S.C. § 1591, a judgment awarding Plaintiff damages are in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and career opportunities, together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)    on the fifth cause of action against Defendants Northwestern, DaSilva, Obering, Polisky, and Bonnevier for Trafficking in Violation of 18 U.S.C. § 1589, a judgment awarding Plaintiff damages are in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and career opportunities, together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)    on the sixth cause of action for breach of contract against Northwestern, a judgment awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest;

(vii)    on the seventh cause of action for estoppel and reliance against Northwestern, a judgment awarding Plaintiff damages in an amount to be determined at trial;

(viii)    on the eighth cause of action for intentional infliction of emotional distress against Defendants DaSilva, Obering, Polisky, and Bonnevier, a judgment awarding Plaintiff damages in an amount to be determined at trial; and

(ix)    such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues presented herein that are capable of being tried by a jury.

**Dated:    New York, New York**
         _____

                                    **Respectfully submitted,**

                                    **Nesenoff & Miltenberg LLP**
                                    *Attorneys for Plaintiff Hayden Richardson*

                                    By: /s/Andrew T. Miltenberg, Esq.
                                    Andrew T. Miltenberg, Esq., *pro hac vice*
                                    *admission pending*
                                    Kara L. Gorycki, Esq., *pro hac vice*
                                    *admission pending*
                                    Adrienne Levy, Esq., *pro hac vice*
                                    *admission pending*
                                    363 Seventh Avenue, 5th Floor
                                    New York, New York 10001
                                    212-736-4500 (telephone)
                                    212-736-2260 (fax)
                                    amiltenberg@nmllplaw.com
                                    kgorycki@nmllplaw.com
                                    alevy@nmllplaw.com

                                    **Law Offices of Damon M. Cheronis**
                                    *Attorneys for Plaintiff Hayden Richardson*

                                    By: /s/ Damon M. Cheronis, Esq.
                                    Damon Matthew Cheronis, Esq.
                                    The Marquette Building
                                    140 S. Dearborn St., Suite 411
                                    Chicago, Illinois 60603
                                    312-663-4644 (telephone)
                                    312-277-1920 (fax)
                                    damon@cheronislaw.com