**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Hayden Richardson, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No. 1:21-cv-00522 |
| | § | |
| Northwestern University, Amanda DaSilva, | § | Honorable Edmond E. Chang |
| Heather Van Hoegarden Obering, Michael | § | |
| Polisky, and Pamela Bonnevier, | § | |
| | § | |
| *Defendants*. | § | |
| | § | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS NORTHWESTERN UNIVERSITY, DASILVA, OBERING, AND
## POLISKY'S MOTION TO DISMISS UNDER RULE 12(B)(6)

# TABLE OF CONTENTS

**Page**

LEGAL STANDARD...........................................................................................................1

PLAINTIFF'S ALLEGATIONS ........................................................................................2

ARGUMENT .....................................................................................................................5

I.  The Complaint Fails to State Any Cognizable Claim Under the Trafficking Victims
    Protection Reauthorization Act..................................................................................5

   A.  Because the Elements of § 1595 Are Not Met, All of Plaintiff's TVPRA Claims Fail
       as a Matter of Law. ..........................................................................................7

      1.  The Complaint Does Not Plausibly Allege That Defendants Formed or Participated
          in a Venture.................................................................................................8

         a.  Plaintiff Does Not Allege the Formation of a Venture. ...............................8

         b.  Plaintiff Fails to Allege Participation in a Venture.....................................12

      2.  The Complaint Does Not Plausibly Allege That Defendants Knew or Should Have
          Known That the Alleged Venture Engaged in an Act in Violation of the Trafficking
          Chapter.......................................................................................................14

      3.  The Complaint Does Not Plausibly Allege a Knowing Benefit. ................................17

   B.  The Complaint Does Not Sufficiently Allege a Violation of the Trafficking Chapter as to
       Counts Three, Four, and Five. . ........................................................................19

      1.  Under Count Four, the Complaint Has Not Plausibly Alleged the Required
          Elements of § 1591. . ...................................................................................19

         a.  The Complaint Does Not Plausibly Allege a "Commercial Sex Act"
             Under § 1591.........................................................................................20

         b.  The Complaint Does Not Plausibly Allege "Force, Fraud, [or] Coercion"
             Under § 1591.........................................................................................21

      2.  Under Counts Three and Five, the Complaint Has Not Plausibly Alleged the
          Necessary Elements of § 1590 and § 1589. ..................................................23

II. Plaintiff's Breach of Contract Claim Against Northwestern Should Be Dismissed. ...........26

A.    Plaintiff's Breach of Contract Claim Should Be Dismissed Insofar as It Pertains to the Handbook and Harassment Policy Because Plaintiff Fails to Allege Any Facts Whatsoever with Respect to such Documents. .................................................................. 27

B.    Plaintiff's Breach of Contract Claim Should Be Dismissed Because the Sexual Misconduct Policy Does Not Create Any Binding Promise. ............................................. 27

C.    Plaintiff Fails to Meet the Standard Required for a Student to State a Breach of Contract Claim Against a University. ............................................................................................... 29

III.    Plaintiff's Estoppel and Reliance Claims Against Northwestern Should Be Dismissed.. 31

IV.    Plaintiff's IIED Claim Against the Individual Defendants Should Be Dismissed. . ........ 32

A.    Plaintiff's IIED Claim Against Defendants Obering and Polisky Should Be Dismissed Because It is Time-Barred. ................................................................................. 33

B.    Plaintiff's IIED Claim Against All of the Individual Defendants Should Be Dismissed Because Plaintiff Fails to Plead Facts Sufficient to Give Rise to IIED. ........................... 34

1.    Plaintiff Fails to Allege the Individual Defendants Engaged in Extreme and Outrageous Conduct. ................................................................................................... 34

2.    Plaintiff Also Fails to Allege the Individual Defendants Intended to Inflict Severe Emotional Distress on Plaintiff. ..................................................................................... 37

3.    Plaintiff Fails to Allege She Suffered Severe Emotional Distress Because of the Individual Defendants. ................................................................................................... 39

CONCLUSION ..................................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*188 LLC v. Trinity Indus., Inc.*,
    300 F.3d 730 (7th Cir. 2002) ................................................................1

*A.B. v. Wyndham Hotels & Resorts, Inc.*,
    No. 3:19-cv-01992-IM, 2021 WL 1235241 (D. Or. Mar. 31, 2021) ................................17, 21

*A.D. v. Wyndham Hotels & Resorts, Inc.*,
    No. 4:19cv120, 2020 U.S. Dist. LEXIS 250670 (E.D. Va. Sep. 21, 2020) ............................14

*Abrams v. Ill. Coll. of Podiatric Med.*,
    77 Ill. App. 3d 471 (Ill. App. Ct. 1979) ................................................................27

*Alex v. City of Chi.*,
    2016 U.S. Dist. LEXIS 25292 (N.D. Ill. Feb. 29, 2016) ..................................39, 40

*Alvarado v. Universidad Carlos Albizu*,
    No. 10–22072–CIV, 2010 WL 3385345 (S.D. Fla. Aug. 25, 2010) ........................................25

*Ardolf v. Weber*,
    332 F.R.D. 467 (S.D.N.Y. 2019) ................................................................5, 21

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................1, 15, 27

*B.M. v. Wyndham Hotels & Resorts, Inc.*,
    No. 20-cv-00656-BLF, 2020 WL 4368214 (N.D. Cal. July 30, 2020) ................................15

*Behn v. Kiewit Infrastructure, Co.*,
    No. 17 C 5241, 2017 WL 5152346 (N.D. Ill. Nov. 7, 2017) ................................34

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................1, 27

*Bilut v. Northwestern Univ.*,
    269 Ill. App. 3d 125 (Ill. App. Ct. 1994) ................................................................29

*Bistline v. Parker*,
    918 F.3d 849 (10th Cir. 2019) ................................................................7, 11

*Bogie v. Rosenberg*,
    705 F.3d 603 (7th Cir. 2013) ................................................................5, 14

iii

*Boyle v. United States*,
    556 U.S. 938 (2009)................................................................................................9

*Bridges v. Poe*,
    487 F. Supp. 3d 1250 (N.D. Ala. 2020) ................................................................8

*Canosa v. Ziff*,
    No. 18 Civ. 4115 (PAE), 2019 WL 498865 (S.D.N.Y. Jan. 28, 2019)............................10, 14

*Cook v. Winfrey*,
    141 F.3d 322 (7th Cir. 1998) ................................................................34, 35, 37, 39

*Dahl v. Fed. Land Bank Ass'n*,
    213 Ill. App. 3d 867 (3d Dist. 1991)....................................................................33

*Doe v. Brandeis Univ.*,
    177 F. Supp. 3d 561 (D. Mass. 2016) ..................................................................35

*Doe v. Columbia Coll. Chi.*,
    299 F. Supp. 3d 939 (N.D. Ill. 2017) ................................................31, 35, 36, 37, 38

*Doe v. Columbia Coll. Chi.*,
    933 F. 3d 849 (7th Cir. 2019) ................................................................26, 27, 30

*Doe v. Ind. Wesleyan Univ.*,
    No. 1:20-CV-00039-HAB, 2020 U.S. Dist. LEXIS 84209 (N.D. Ind. May 12,
    2020) ..............................................................................................................35

*Doe v. Sperlik*,
    No. 05 C 1277, 2005 WL 3299818 (N.D. Ill. Nov. 30, 2005)................................7

*Doe v. Trs. of the Univ. of Pa.*,
    270 F. Supp. 3d 799 (E.D. Pa. 2017) ............................................................35, 36

*Doe v. University of Chicago*,
    No. 16 C 08298, 2017 WL 4163960 (N.D. Ill. Sept. 20, 2017)........................31, 32

*E.S. v. Best Western Int'l, Inc.*,
    No. 3:20-cv-00050-M, 2021 WL 37457 (N.D. Tex. Jan. 4, 2021) ....................10, 16

*Eisele v. Ayers*,
    63 Ill. App. 3d 1039 (Ill. App. Ct. 1978) ........................................................28, 31

*F.A.A. v. Cooper*,
    566 U.S. 284 (2012) ..........................................................................................9

*Fierro v. Taylor*,
    No. 11 Civ. 8573 (BSJ), 2012 WL 13042630 (S.D.N.Y. July 2, 2012) ..................19

*Frederick v. Northwestern Univ. Dental Sch.*,
    247 Ill. App. 3d 464 (Ill. App. Ct. 1993) ...............................................................29

*Geiss v. Weinstein Co. Holdings LLC*,
    383 F. Supp. 3d 156 (S.D.N.Y. 2019)...................................................10, 14, 18

*Gociman v. Loyola Univ. of Chi.*,
    No. 20 C 3116, 2021 WL 243573 (N.D. Ill. Jan. 25, 2021) .................................28

*H.G. v. Inter-Cont'l Hotels Corp.*,
    No. 19-cv-13622, 2020 WL 5653304 (E.D. Mich. Sept. 23, 2020) ......................10

*Holert v. Univ. of Chi.*,
    751 F. Supp. 1294 (N.D. Ill. 1990) .................................................................29, 30

*J.B. v. G6 Hosp., LLC*,
    No. 19-cv-07848-HSG, 2020 WL 4901196 (N.D. Cal. Aug. 20, 2020)....................10, 13, 14

*Jackson Ave. Subs, Inc. v. 407 Dearborn, LLC*,
    No. 16 C 4697, 2016 WL 4639152 (N.D. Ill. Sept. 6, 2016)................................5, 14

*Jane Doe 1 v. Red Roof Inns, Inc.*,
    No. 1:19-cv-03840-WMR, 2020 WL 1872335 (N.D. Ga. Apr. 13, 2020) .............13

*Javier v. Beck*,
    No. 13cv2926, 2014 WL 3058456 (S.D.N.Y. July 3, 2014) .................................22

*Jensen v. U.S. Tennis Ass'n*,
    No. 20-2422-JWL, 2020 WL 6445117 (D. Kan. Oct. 30, 2020) ..........................15

*Kyung Hye Yano v. City Colls. of Chi.*,
    No. 08 C 4492, 2009 WL 855977 (N.D. Ill. Mar. 30, 2009) ................................31

*Liu v. Northwestern University*,
    78 F. Supp. 3d 839 (N.D. Ill. 2015) ...................................................................28

*M.A. v. Wyndham Hotels & Resorts, Inc.*,
    425 F. Supp. 3d 959 (S.D. Ohio 2019) .........................................................13, 19

*Mouloki v. Epee*,
    262 F. Supp. 3d 684 (N.D. Ill. 2017) .................................................................24

*Muchira v. Al-Rawaf*,
    850 F.3d 605 (4th Cir. 2017) ........................................................................25, 26

*Mulvey v. Carl Sandburg High School*,
    66 N.E.3d 507 (Ill. App. Ct. 2016) ....................................................................28

*Noble v. Weinstein*,
    335 F. Supp. 3d 504 (S.D.N.Y. 2018)...........................................................5, 7, 10, 11, 14, 21

*Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*,
    790 F. Supp. 2d 1134 (C.D. Cal. 2011) ...............................................................................23

*Nungesser v. Columbia Univ.*,
    169 F. Supp. 3d 353 (S.D.N.Y. 2016)...................................................................................35

*Paguirigan v. Prompt Nursing Empl. Agency LLC*,
    286 F. Supp. 3d 430 (E.D.N.Y. 2017) .............................................................................6, 19

*Ratha v. Phatthana Seafood Co.*,
    No. CV 16-4271-JFW, 2017 WL 8293174 (C.D. Cal. Dec. 21, 2017) .......................11, 12, 16

*Ricchio v. McLean*,
    853 F.3d 553 (1st Cir. 2017)............................................................................................10, 13

*Rosemond v. United States*,
    572 U.S. 65 (2014)...................................................................................................................12

*In re S. White Transp., Inc.*,
    725 F.3d 494 (5th Cir. 2013) .................................................................................................12

*SEC v. Edwards*,
    540 U.S. 389 (2004).................................................................................................................9

*Seitz-Partridge v. Loyola Univ. of Chi.*,
    409 Ill. App. 3d 76 (Ill. App. Ct. 2011) ...............................................................................29

*Stein v. World-Wide Plumbing Supply, Inc.*,
    71 F. Supp. 3d 320 (E.D.N.Y. 2014) ...................................................................................16

*Texaco Inc. v. Dagher*,
    547 U.S 1 (2006)......................................................................................................................9

*United States v. Afyare*,
    632 F. App'x 272 (6th Cir. 2016) (per curiam) ................................................9, 10, 12, 13, 14

*United States v. Calimlim*,
    538 F.3d 706 (7th Cir. 2008) .................................................................................................25

*United States v. Carson*,
    870 F.3d 584 (7th Cir. 2017) .................................................................................................22

*United States v Dann*,
    652 F.3d 1160 (9th Cir. 2011) ........................................................................................22, 25

*Venture Assoc. Corp. v. Zenith Data Sys. Corp.*,
   987 F.2d 429 (7th Cir. 1993) ................................................................2

*Wright v. City of Danville*,
   174 Ill.2d 391 (Ill. 1996) ....................................................................7

*Zvunca v. Motor Coach Indus. Int'l, Inc.*,
   No. 08 C 4507, 2009 U.S. Dist. LEXIS 15408 (N.D. Ill. Feb. 26, 2009) ..............34

**Statutes**

735 ILCS 5/13-202 .................................................................................33

18 U.S.C. §1589 .........................................................................7, 23, 24, 25

18 U.S.C. § 1589(a) ................................................................................17, 23

18 U.S.C. § 1589(a)(4) ............................................................................24, 25

18 U.S.C. § 1589(c)(2) ............................................................................23, 25

18 U.S.C. § 1590 ................................................................................7, 15, 23

18 U.S.C. § 1590(a) .................................................................................7, 23

18 U.S.C. § 1591 ......................................................................7, 15, 19, 20, 21

18 U.S.C. § 1591(a) ........................................................................17, 19, 21

18 U.S.C. § 1591(e)(2) .............................................................................21

18 U.S.C. § 1591(e)(3) .............................................................................20

18 U.S.C. § 1591(e)(4) ..........................................................................10, 12

18 U.S.C. § 1591(e)(5) .............................................................................21

18 U.S.C. § 1591(e)(6) ..............................................................................9

18 U.S.C. § 1595(a) ........................................................................... *passim*

22 U.S.C. § 7101 .................................................................................14

22 U.S.C. § 7101(a), (b)(14) ......................................................................6

**Other Authorities**

Federal Rule of Civil Procedure 8 ................................................................1

Federal Rule of Civil Procedure 12(b)(6) ...............................................................1, 34

Federal Rule of Civil Procedure 56 ............................................................................1

*From*, MERRIAM-WEBSTER ONLINE DICTIONARY ........................................................19

H.R. Conf. Rep. No. 106–939 (2000) ........................................................................25

*Knowing*, BLACK'S LAW DICTIONARY (11th ed. 2019)................................................19

*Knowingly*, BLACK'S LAW DICTIONARY (11th ed. 2019)......................................18, 19

*Participation*, BLACK'S LAW DICTIONARY (11th ed. 2019)..........................................12

*Participation*, OXFORD ENGLISH DICTIONARY (2d ed. 1989) .......................................12

*Venture*, BLACK'S LAW DICTIONARY (11th ed. 2019) ..................................................8

*Venture*, OXFORD ENGLISH DICTIONARY (2d ed. 1989)................................................9

Defendants Northwestern University ("Northwestern"), Amanda DaSilva ("DaSilva"), Heather Van Hoegarden Obering ("Obering"), and Michael Polisky ("Polisky") (collectively, the "Defendants")[1] respectfully file this memorandum in support of their Motion to Dismiss Counts Three through Eight of Plaintiff's Complaint[2] for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) and state as follows:

## LEGAL STANDARD

Federal Rule of Civil Procedure ("Rule") 12(b)(6) requires that a complaint meet the pleading standards of Rule 8 so as to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). The complaint must "state a claim to relief that is plausible on its face," with allegations sufficient to "raise a right to relief above the speculative level." *Id.* at 555, 570. Thus, a complaint must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citations omitted). Courts need not accept as true "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Instead, courts must conduct a context-specific inquiry and rely on "judicial experience and common sense" to determine if a plaintiff's "well-pleaded factual allegations . . . plausibly give rise to an entitlement to relief." *Id.* at 679.

In deciding a motion to dismiss, the Court may consider documents referenced in the complaint which are central to the plaintiff's claim. *E.g., 188 LLC v. Trinity Indus., Inc.*, 300 F.3d

---

[1]Throughout this Brief, Defendants Northwestern, DaSilva, Obering and Polisky are referred to collectively as "Defendants." The term "Individual Defendants" refers to DaSilva, Obering and Polisky, but not Northwestern. Neither definition includes Defendant Bonnevier, who will separately file her motion.

[2]With respect to Counts One and Two (Violation of Title IX Against Northwestern), Northwestern anticipates seeking dismissal pursuant to a Rule 56 motion for summary judgment following the completion of discovery.

730, 735 (7th Cir. 2002) (citing Fed. R. Civ. P. 10(c)); *Venture Assoc. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993).

**PLAINTIFF'S ALLEGATIONS**

For purposes of the instant Motion to Dismiss only, the Defendants assume – as they must – that the facts as set forth in the Complaint are true, and set forth the following allegations relevant to this Motion. Plaintiff Hayden Richardson ("Plaintiff") is a current student at Northwestern University. (*See* Compl. ¶ 48.) Plaintiff transferred to Northwestern from the University of Nebraska-Lincoln in the Fall of 2018. (*Id.* ¶¶ 47–48.) Shortly after transferring to Northwestern, Plaintiff contacted Bonnevier, the then-coach of the Cheer Team, to inquire about joining Northwestern's Cheer Team. (*Id.* ¶ 50.) Plaintiff sent videos of her stunting to Bonnevier, and after viewing Plaintiff's videos, Bonnevier accepted Plaintiff onto the Cheer Team. (*Id.*) Plaintiff subsequently received a scholarship for her participation on the team in the amount of $5,500 in 2019 and $4,041 in 2020. (*Id.* ¶ 51.)

Plaintiff alleges she was subjected to degrading and inappropriate behavior "[f]rom the . . . beginning of the [2018] football season." (*Id.* ¶ 59.) Plaintiff alleges Bonnevier encouraged members of the Cheer Team to mingle with and tolerate "creepy fans." (*See*, *e.g.*, *id.* ¶¶ 56, 57, 59, 63.) Plaintiff alleges, while taking pictures with fans, some fans placed their hands on Plaintiff's buttocks and/or breasts during tailgating before home football games on September 8, 2018 (*id.* ¶ 59), September 15, 2018 (*id.* ¶ 61) and on November 3, 2018 (*id.* ¶ 68). Plaintiff also alleges unidentified men at alumni events "touch[ed] [unidentified cheerleaders] inappropriately on their lower backs and behinds while taking photos." (*Id.* ¶ 65.) The end of the 2018 football season culminated in the football team playing in the Holiday Bowl in San Diego, on or about January 1, 2019. (*Id.* ¶ 75.) Plaintiff attended an "open bar mingling event" in San Diego, during which

Plaintiff alleges unidentified men "hit on" her, a man groped her and another physically picked her up against her will. (*Id.* ¶¶ 75–78.)

Based on her experiences during the 2018 football season, Plaintiff surmises in conclusory fashion that she and the other cheerleaders were presented as "sex objects," and speculates that Defendants countenanced sexual misconduct by fans because "the happier the[] men [that funded the majority of Northwestern's athletics programs] were, the more money [Northwestern] would receive from them" through donations. (*See id.* ¶ 66.) Other than vague references (i.e., "fans"), Plaintiff does not identify who committed the alleged misconduct or their connection to Defendants. She also does not allege she solicited or collected donations from these fans, nor does she identify any donation made to the University as a result of the alleged incidents.

The first time Plaintiff reported the alleged conduct to anyone other than Bonnevier was on January 8, 2019, at which time Plaintiff raised concerns regarding Bonnevier's treatment of the cheerleaders to the team's doctor during exit evaluations. (*Id.* ¶ 82.) The next day, Obering, the Associate Athletic Director for Marketing at Northwestern, proactively contacted Plaintiff to set up a meeting regarding Plaintiff's concerns. (*Id.* ¶ 83.) A few days later, Plaintiff met with Obering to tell Obering about "the incidents," although Plaintiff does not describe what specifically was discussed. (*See id.* ¶ 84.) During the meeting between Plaintiff and Obering, Obering allegedly told Plaintiff to gather testimonials and evidence to support her allegations. (*Id.* ¶ 85.) Plaintiff delivered various letters and testimonials to Obering on January 22, 2019, and on January 24, 2019, Plaintiff and a teammate met with Obering and Polisky, the Deputy Director of Athletics (External Affairs), to discuss "their concerns." (*Id.* ¶¶ 86, 88.)

On February 1, 2019, DaSilva, the Deputy Title IX Coordinator, emailed Plaintiff regarding Plaintiff's concerns, and Plaintiff responded, informing DaSilva for the first time of the

events and dates on which Plaintiff said she had been harassed. (*See id.* ¶¶ 90–91.) DaSilva told Plaintiff the Office of Equity would contact the Athletics Department to address the situation, and on February 18, 2019, DaSilva notified Plaintiff that the Office of Equity was working with Bonnevier to address Plaintiff's concerns. (*Id.* ¶¶ 91, 93.) The Office of Equity conducted training with Bonnevier that was completed on April 17, 2019, but DaSilva allegedly refused to undertake a formal investigation into Plaintiff's complaints. (*Id.* ¶ 95.) On May 28, 2019, Plaintiff had a follow-up meeting with Obering and Polisky and notified them Bonnevier was still "perpetuating the same objectifying culture." (*Id.* ¶ 96.)

Plaintiff elected to join the Cheer Team again for the 2019–2020 season because "Bonnevier had been trained and educated and [informed] that exploitation/sexual harassment would not be tolerated or continued." (*Id.* ¶ 97.) Moreover, during the 2019–2020 cheerleading season, the team was "no longer forced to tailgate." (*Id.* ¶¶ 98, 100.) Although Plaintiff alleges that she was "still sent to numerous alumni events" and was therefore "subjected to the same photo opportunities, groping, and harassment that she had previously notified Northwestern about" (*id.* ¶ 100), she does not raise any specific allegations of sexual harassment or assault after the Holiday Bowl event on or about January 1, 2019. Plaintiff's allegations make it clear that she did not complain of sexual harassment or sexual assault – not to Obering, not to Polisky, and not to DaSilva – during the 2019–2020 Cheer Team season. (*See id.* ¶¶ 101–02.)

At the conclusion of the 2019–2020 season, Plaintiff complained to the Office of Equity. (*Id.* ¶ 102.) On June 11, 2020, the Office of Equity launched an "official investigation" into Plaintiff's complaints. (*Id.* ¶ 104.) Plaintiff agreed DaSilva should take steps to protect Plaintiff's identity in the investigation, which DaSilva did by identifying Plaintiff as a witness. (*See id.* ¶ 105.) The investigation was closed a "few days" after October 7, 2020, and Bonnevier was fired

on October 31, 2020. (*Id.* ¶¶ 106, 108, 110.) On November 3, 2020, Plaintiff was notified by a Senior Equity Specialist that Northwestern took steps to address Bonnevier's behavior. (*Id.* ¶ 109.) Plaintiff subsequently learned of Bonnevier's termination. (*Id.* ¶ 110.)

## ARGUMENT

**I. The Complaint Fails to State Any Cognizable Claim Under the Trafficking Victims Protection Reauthorization Act.**

Plaintiff claims Northwestern, Obering, DaSilva, Polisky, and Bonnevier violated the Trafficking Victims Protection Reauthorization Act ("TVPRA") (Counts Three, Four, and Five) ("the TVPRA Counts") based on allegations that bar patrons and intoxicated fans at tailgating events and bars inappropriately touched her. (*See* Compl. ¶¶ 59, 61, 68, 77–78). These claims, however, have stretched beyond the outer limits of the TVPRA. Although the statute has "been traditionally used to prosecute [real sex trafficking and modern-day sexual slavery]," *Ardolf v. Weber*, 332 F.R.D. 467, 473 (S.D.N.Y. 2019), it has been increasingly relied upon to cover defendants "who have lured women, under false pretenses and with lucrative promises, for sexual purposes," *see Noble v. Weinstein*, 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018); *Ardolf*, 332 F.R.D. at 473. The TVPRA, however, was in no way intended to be employed as a catchall sexual misconduct or strict liability statute, covering the conduct of individuals who are connected only by virtue of their employment relationship. The Defendants take Plaintiff's allegations seriously, stand against human trafficking in all its forms, and condemn the inappropriate behavior by fans and bar patrons alleged in the Complaint. Plaintiff's attempt, however, to paint the Defendants as sex or labor traffickers, or participants in such trafficking, goes too far and is grounded in neither fact nor law. The TVPRA Counts in the Complaint should be dismissed with prejudice. *See Bogie v. Rosenberg*, 705 F.3d 603, 608 (7th Cir. 2013) ("Leave to amend need not be granted . . . if it is clear that any amendment would be futile."); *Jackson Ave. Subs, Inc. v. 407 Dearborn, LLC*, No.

16 C 4697, 2016 WL 4639152, at *3 (N.D. Ill. Sept. 6, 2016) (dismissing with prejudice where the claim "fail[ed] the plausibility test that requires a plaintiff to plead facts allowing a court to draw the reasonable inference that a defendant is liable for the misconduct alleged").

The TVPRA was enacted in 2003 to "combat trafficking in persons, a contemporary manifestation of slavery," as "[n]o comprehensive law exist[ed] in the United States" that "reflect[ed] the gravity of the offenses involved." 22 U.S.C. § 7101(a), (b)(14). It recognizes the harrowing realities that the sex industry often "involves sexual exploitation of persons . . . involving activities related to *prostitution, pornography, sex tourism, and other commercial services*" and that traffickers often "lure women and girls into their networks through false promises of decent working conditions at relatively good pay." *Id*. at (b)(2), (b)(4) (emphasis added). The statute emphasizes that trafficking in persons "involves grave violations of human rights." *Id*. at (b)(23).

The TVPRA does allow a victim of these grave offenses of human trafficking to "bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in [trafficking])." 18 U.S.C. § 1595(a). Section 1595 is not a standalone cause of action; it "simply grants plaintiff a private right of action to allege substantive violations" of the TVPRA. *Paguirigan v. Prompt Nursing Empl. Agency LLC*, 286 F. Supp. 3d 430, 436 n.4 (E.D.N.Y. 2017). To make out a claim under § 1595(a), therefore, a plaintiff must not only sufficiently allege she is a "victim of a violation of this chapter," but also that the defendant was either "the perpetrator" of that violation or someone who "knowingly benefit[ed], financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in" the specified form of trafficking. 18 U.S.C. § 1595(a).

Here, while the TVPRA Counts all attempt to assert a private cause of action under 18 U.S.C. § 1595(a), the underlying violation of Chapter 77 (the "trafficking chapter") for each Count is different: Count Three invokes 18 U.S.C. § 1590 (trafficking with respect to peonage, slavery, involuntary servitude, or forced labor); Count Four invokes 18 U.S.C. § 1591 (sex trafficking); and Count Five invokes 18 U.S.C. §1589 (labor trafficking). As shown below, because Plaintiff fails to plausibly plead facts sufficient to allege Defendants formed a venture, participated in the venture, knew or should have known the venture engaged in an act in violation of the TVPRA, and/or financially benefitted from the same – as required by § 1595(a) – each of the TVPRA Counts must be dismissed.[3] Even assuming Plaintiff adequately pleaded the elements for the civil cause of action, the TVPRA Counts must be dismissed as Plaintiff failed to adequately plead the underlying violations of 18 U.S.C. § 1590, § 1591, and § 1589.

### A. Because the Elements of § 1595 Are Not Met, All of Plaintiff's TVPRA Claims Fail as a Matter of Law.

The Complaint does not allege Defendants were perpetrators, *i.e.*, traffickers. Instead Plaintiff asserts Defendants knowingly benefited from participation in a venture that they knew or should have known engaged in an action in violation of the TVPRA.[4] (Compl. ¶¶ 185–87, 192, 209–11, 218–19, 228–30, 235–36.) To assert a claim under this "venture liability" prong of the

---

[3] Moreover, even if Plaintiff had adequately pleaded any of the forced labor, sex or trafficking conduct in the TVPRA Counts against any of the Individual Defendants or Bonnevier, Northwestern would not be vicariously liable for such clearly inappropriate behavior. *See Doe v. Sperlik*, No. 05 C 1277, 2005 WL 3299818, at *3 (N.D. Ill. Nov. 30, 2005) ("*Respondeat superior* liability hinges upon a finding that the employee acted in furtherance of his employer's interest when committing the acts complained of."). *Wright v. City of Danville*, 174 Ill.2d 391, 405 (Ill. 1996) ("[A]n employer is not responsible for acts which are clearly inappropriate to or unforeseeable in the accomplishment of an authorized result.").

[4] Plaintiff does not specifically identify any individual as the "perpetrator" of the alleged TVPRA violations. This failure to expressly identify a "perpetrator" is fatal to Plaintiff's claims, as there can be no trafficking without a trafficker. *See, e.g.*, *Noble v. Weinstein*, 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018) (concluding that a venture requires "factual allegations implicating [defendant] as a participant" in the *perpetrator's trafficking conduct*); *Bistline v. Parker*, 918 F.3d 849, 871 (10th Cir. 2019) ("We will first address whether plaintiffs have pleaded facts sufficient to support a claim against a primary offender, because this is a necessary element for venture liability.") This pleading deficiency is also indicative of the misapplication of the trafficking statute to the instant facts.

TVPRA, Plaintiff must allege facts – beyond mere conclusions – from which the Court may plausibly infer: (1) Defendants formed a venture; (2) Defendants participated in the venture; (3) Defendants knew or should have known that the venture engaged in an act in violation of a chapter of the TVPRA; and (4) Defendants knowingly benefited from participation in the venture. 18 U.S.C. § 1595(a). Plaintiff has not sufficiently alleged any such facts.

**1.    The Complaint Does Not Plausibly Allege That Defendants Formed or Participated in a Venture.**

As an initial matter, because the Complaint fails to allege Defendants formed – much less participated in – a venture, Plaintiff's TVPRA Counts must fail for this reason alone.

**a.    Plaintiff Does Not Allege the Formation of a Venture.**

The centerpiece of civil liability under the TVPRA is the venture. It is the venture that must have "engaged in an act in violation of this chapter," and it is the venture in which a defendant must participate and from which it must knowingly benefit. 18 U.S.C. § 1595(a). The TVPRA Counts fail because Plaintiff does not sufficiently plead the formation of a venture under the TVPRA.

Because "venture" is not defined in § 1595, the Court should interpret the term according to its ordinary meaning. *See, e.g., Bridges v. Poe,* 487 F. Supp. 3d 1250, 1260 n.4 (N.D. Ala. 2020) (stating that where a word is not defined in the statute, courts must give the word its "ordinary meaning," and "courts generally look to dictionary definitions for guidance") (citations omitted). A venture is understood to be an undertaking – generally involving risk – in which the parties to the venture agree to pursue a common purpose. One dictionary, for example, defines a venture as "[a]n undertaking that involves risk; esp., a speculative commercial enterprise." *Venture*, BLACK'S LAW DICTIONARY (11th ed. 2019). Another defines it as "[a]n enterprise of a business nature in which there is considerable risk of loss as well as chance of gain; a commercial speculation."

*Venture*, Oxford English Dictionary (2d ed. 1989); *see also United States v. Afyare*, 632 F. App'x 272, 279 (6th Cir. 2016) (per curiam) ("Cleary, each of these definitions [of 'venture'] requires an undertaking of some kind directed to some defined end.").

That a venture requires a common purpose with some risk, such as sharing in profits and losses, is also familiar in federal law. For purposes of the Sherman Act, for example, two entities that pool their capital and share the losses and profits are "participat[ing]" in a "joint venture." *See Texaco Inc. v. Dagher*, 547 U.S 1, 5–6 (2006). And for purposes of securities laws, the touchstone of an investment contract is "the presence of an investment in a *common venture premised on a reasonable expectation of profits* to be derived from the entrepreneurial or managerial efforts of others." *See SEC v. Edwards*, 540 U.S. 389, 395 (2004) (citations omitted) (emphasis added).

This understanding is consistent with the criminal sex trafficking provision of the TVPRA, which also uses the term "venture." In the criminal provision, Congress defined "venture" as "any group of two or more individuals associated in fact." 18 U.S.C. § 1591(e)(6). That "associated in fact" language alludes to the rule that an enterprise under the Racketeer Influenced and Corrupt Organizations Act ("RICO") includes a "group of individuals associated in fact" – i.e., "associated together for a common purpose of engaging in a course of conduct," *i.e.,* a criminal enterprise. *Boyle v. United States*, 556 U.S. 938, 944 (2009) (citations omitted). The most natural reading of Congress's definition of venture, therefore, is that it describes a group of persons who associate together for a common purpose. In fact, some courts have adopted the definition of a venture in § 1591(e)(6) for purposes of defining the term in § 1595. *See F.A.A. v. Cooper*, 566 U.S. 284, 292 (2012) ("[I]t is a cardinal rule of statutory construction that, when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken." (citations omitted)). The criminal sex trafficking

statute then defines participation in the venture as "knowingly assisting, supporting, or facilitating" sex trafficking – thus, the common purpose of the venture, under the TVPRA, is to receive the benefits associated with the trafficking itself (which is inherently risky). *See* 18 U.S.C. § 1591(e)(4).

Here, the TVPRA Counts should be dismissed because Plaintiff's Complaint has not alleged sufficiently the existence of a venture formed for a common purpose, let alone a risky common purpose. Instead, the Complaint asserts in a conclusory manner that "Defendants Northwestern, DaSilva, Obering, Polisky and Bonnevier formed a venture by virtue of their relationships with each other within Northwestern athletics." (Compl. ¶ 185.) The Complaint then goes only slightly further, alleging that Northwestern is the "principal" of a venture intended to increase alumni donations. (*Id.* ¶¶ 192, 218, 235.) But those allegations do not create a "venture" under the law. Plaintiff's generic reference to increasing alumni donations, coupled with her failure to even attempt to allege how the Defendants are members of that particular venture by way of their respective actions or positions, are fatal to her claim. *See H.G. v. Inter-Cont'l Hotels Corp.*, No. 19-cv-13622, 2020 WL 5653304, at *6 (E.D. Mich. Sept. 23, 2020) (requiring TVPRA allegations describe "*the particular venture in which the defendant allegedly participated*").

That there is nothing risky about working for a university or seeking alumni donations further illustrates the deficiencies in Plaintiff's "venture."[5] At best, Plaintiff alleges that "on

---

[5] If a "venture" is not defined as an undertaking involving inherent risk, the TVPRA would encompass a host of scenarios wholly unrelated to its underlying purpose. Indeed, if Plaintiff's theory is accepted, any employee of Northwestern would be part of this "venture" to increase alumni donations, regardless of her position and regardless of her role in soliciting or benefiting from donations. This is exactly why the vast majority of cases brought under the TVPRA allege an actual sex or labor trafficking venture. *See, e.g., J.B. v. G6 Hosp., LLC*, No. 19-cv-07848-HSG, 2020 WL 4901196, at *10 (N.D. Cal. Aug. 20, 2020) (alleging a sex trafficking venture); *E.S. v. Best Western Int'l, Inc.*, No. 3:20-cv-00050-M, 2021 WL 37457, at *3 (N.D. Tex. Jan. 4, 2021) (same); *United States v. Afyare*, 632 F. App'x 272, 279 (6th Cir. 2016) (same); *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 169 (S.D.N.Y. 2019) (same); *Canosa v. Ziff*, No. 18 Civ. 4115 (PAE), 2019 WL 498865, at *24 (S.D.N.Y. Jan. 28, 2019) (same); *Noble v. Weinstein*, 335 F. Supp. 3d 504, 523 (S.D.N.Y. 2018) (same); *Ricchio v. McLean*, 853 F.3d 553, 556 (1st Cir.

information and belief," increased donations resulted in "larger salary opportunities and continued employment." (Compl. ¶192.) Not only is Plaintiff's allegation wholly speculative, but even assuming its truth, it only refers to a possible upside of increasing the amount of alumni donations. There is no allegation that the Individual Defendants' salaries rise and fall along with the amount of alumni donations, and no allegation that otherwise ties the Individual Defendants to any potential profit or loss related to donation amounts. In reality, Plaintiff has done nothing more than plead that the Individual Defendants are employees of the same organization and that Northwestern is the organization that employs them. This is insufficient. *See Noble v. Weinstein*, 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018) ("[L]iability[] cannot be established by association alone.").

Further, the Complaint is completely devoid of facts alleging Defendants "associated in fact" or agreed to form the purported venture. *Cf. Bistline v. Parker*, 918 F.3d 849 (10th Cir. 2019) ("[T]he complaint recounts in great detail how defendants were responsible for creating the intricate scheme that both enabled forced labor and allowed the threats which enforced that labor to be effective . . . ."). And working for the same employer does not evidence an agreement, tacit or otherwise, to increase alumni donations. In fact, Plaintiff does not allege that Defendants associated together for *any* purpose until they coordinated to investigate her complaint. (*See* Compl. ¶¶ 90–96.)

Thus, Plaintiff alleges a purported venture that has no common purpose (to increase alumni donations or otherwise), no agreement and no risk. This cannot be what Congress intended when drafting the TVPRA, and the TVPRA Counts should be dismissed as to Defendants.

---

2017) (same); *Ratha v. Phatthana Seafood Co*., No. CV 16-4271-JFW (ASx), 2017 WL 8293174, at *4 (C.D. Cal. Dec. 21, 2017) (alleging a labor trafficking venture).

### b.     Plaintiff Fails to Allege Participation in a Venture.

Even assuming Plaintiff sufficiently alleges a venture, which she does not, Plaintiff has not alleged the Individual Defendants' participation in that venture is sufficient to trigger liability under the TVPRA.[6] 18 U.S.C. § 1595(a). Participation is commonly understood to involve an overt act to further some purpose. *Participation*, OXFORD ENGLISH DICTIONARY (2d ed. 1989) ("A taking part, association, or sharing (with others) in some action or matter."); *Participation*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("The act of taking part in something, such as a partnership, a crime, or a trial."). To "participate" thus refers to *active* engagement. *See In re S. White Transp., Inc.*, 725 F.3d 494, 497–98 (5th Cir. 2013); *Ratha v. Phatthana Seafood Co.*, No. CV 16-4271-JFW (ASx), 2017 WL 8293174, at *4 (C.D. Cal. Dec. 21, 2017) (ruling participation requires some "overt act" in furtherance of the venture, and nonfeasance is not sufficient). Construing the phrase "participation in a venture" to encompass anything less than active engagement would "create a vehicle to ensnare conduct that the statute never contemplated." *United States v. Afyare*, 632 F. App'x 272, 286 (6th Cir. 2016) (citations omitted).

This concept is supported by aiding and abetting liability and the underlying criminal sex trafficking statute. For purposes of aiding and abetting, one is an "active participant" when he "has decided to join in the criminal venture, and share in its benefits, with full awareness of its scope." *See Rosemond v. United States*, 572 U.S. 65, 77–78 (2014). "Participation" in a venture under the criminal sex trafficking statute is defined as "knowingly assisting, supporting, or facilitating a violation of subsection (a)(1) [sex trafficking]." 18 U.S.C. § 1591(e)(4).

---

[6]While this argument goes to the individual participation of the Individual Defendants, Northwestern joins in this argument because even if Plaintiff had adequately pleaded this element against any of the Individual Defendants or Bonnevier, Northwestern would not be vicariously liable for the reasons stated in *supra* note 3.

Plaintiff's Complaint, therefore, must allege Defendants affirmatively participated in the common purpose of the undertaking. It is not enough to simply allege, as Plaintiff has done, that Defendants had a "relationship[] with each other within Northwestern athletics." (Compl. ¶¶185, 209, 228); *see J.B. v. G6 Hosp., LLC*, No. 19-cv-07848-HSG, 2020 WL 4901196, at *10 (N.D. Cal. Aug. 20, 2020) (ruling TVPRA requires a showing of "interaction with a specific venture" engaged in specific violations); *Jane Doe 1 v. Red Roof Inns, Inc.*, No. 1:19-cv-03840-WMR, 2020 WL 1872335, at *3 (N.D. Ga. Apr. 13, 2020) ("Association alone cannot establish liability."). But even under Plaintiff's theory of venture, Plaintiff does not allege any involvement on the part of the Individual Defendants in increasing alumni donations. At the relevant time, DaSilva was the Deputy Title IX Coordinator in the Office of Equity, which has no connection to athletics or alumni donations. (Compl. ¶ 19.) Plaintiff does not allege differently. And there is no allegation that Polisky or Obering actively participated in increasing alumni donations – rather, Plaintiff apparently assumes that Polisky and Obering have involvement with donations by mere virtue of their positions in the Athletics Department.[7] But that simply is not sufficient – there must be an identified and active participation alleged. *See Afyare*, 632 F. App'x at 286.

In most TVPRA cases, the purported venture's common purpose is trafficking; and so participation must be an overt act in furtherance of trafficking.[8] *See id.* (holding plaintiff must

---

[7] Plaintiff also alleges that Defendants "had the purpose of blocking and covering up investigations into Bonnevier's actions relating to the Northwestern Cheerleading Team in order to avoid public criticism and to continue receiving large financial grants from donors." (Compl. ¶¶ 188, 212, 231.) However, this too fails to allege how the Individual Defendants participated in the purported venture to increase alumni donations—rather, Plaintiff only alleges that the Individual Defendants' purported actions in "covering up" the investigation are somehow tangentially related to *maintaining* donations (i.e., by upholding Northwestern's public image). Setting aside the fact that Plaintiff's specific allegations highlight the Defendants' efforts to investigate and address the problematic behavior, this does not allege participation in increasing alumni donations. (*See, e.g., id.* ¶¶ 82–83, 88–100, 102–10.)

[8] Some courts have found participation in a venture under the TVPRA need not be active. While Defendants respectfully disagree with this conclusion, even this disagreement illustrates how the Plaintiff's theory of TVPRA liability fails. In such cases, the courts found tacit agreement to the unlawful aspects of the venture sufficient to establish liability. *See Ricchio v. McLean*, 853 F.3d 553, 554–55 (1st Cir. 2017) (citing allegations that defendants knew about trafficking and "wished to reinstate" their business of renting the trafficker rooms, as evidenced by "high-fives" with the traffickers and discussion of "getting this thing going again"); *M.A. v. Wyndham Hotels & Resorts,*

prove that defendants "engage[d] in sex trafficking together" or "[a]ssociated for the purpose of furthering the sex trafficking"); *see also Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 169 (S.D.N.Y. 2019); *Canosa v. Ziff*, No. 18 Civ. 4115 (PAE), 2019 WL 498865, at *24 (S.D.N.Y. Jan. 28, 2019); *Noble v. Weinstein*, 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018); *Afyare*, 632 F. App'x at 286 (ruling that a defendant must "actually participate and commit some 'overt act' that furthers" the sex-trafficking aspect of the venture). In those instances, an individual would be rightfully included in a TVPRA claim. But here there is no allegation that any of the Individual Defendants did any such thing. The TVPRA Counts against the Defendants should thus be dismissed. *See Bogie v. Rosenberg*, 705 F.3d 603, 608 (7th Cir. 2013); *Jackson Ave. Subs, Inc. v. 407 Dearborn, LLC*, No. 16 C 4697, 2016 WL 4639152, at *3 (N.D. Ill. Sept. 6, 2016).

### 2. The Complaint Does Not Plausibly Allege That Defendants Knew or Should Have Known That the Alleged Venture Engaged in an Act in Violation of the Trafficking Chapter.

Next, the Complaint fails to plead that the Individual Defendants "knew or should have known [that the venture] has engaged in an act in violation of this chapter," as is plainly required under the statute.[9] 18 U.S.C. § 1595(a). Instead, the Complaint contains entirely conclusory allegations of knowledge as to the Individual Defendants. For example, while Plaintiff alleges that "Defendants knowingly recruited, enticed, harbored, transported, and/or obtained Plaintiff for

---

*Inc.*, 425 F. Supp. 3d 959, 970 (S.D. Ohio 2019) (holding that, in the absence of a direct association, plaintiff must allege "at least a showing of a continuous business relationship between the trafficker and the hotels such that it would appear that the trafficker and the hotels have established a pattern of conduct or could be said to have a tacit agreement"); *A.D. v. Wyndham Hotels & Resorts, Inc.*, No. 4:19cv120, 2020 U.S. Dist. LEXIS 250670, at *15–16 (E.D. Va. Sep. 21, 2020) (same); *J.B. v. G6 Hospitality, LLC*, No. 19-cv-07848-HSG, 2020 WL 4901196, at *9 (N.D. Cal., Aug. 20, 2020) (holding that plaintiff failed to adequately allege participation under the "tacit agreement standard"). But here, the venture's purpose is not an unlawful one, and so regardless of whether or not there was active participation or a "tacit agreement" to increase alumni donations, anyone employed by Northwestern could qualify as a "participant" in the venture under Plaintiff's theory – a result that defies common sense and fairness. The TVPRA was intended to prevent modern manifestations of trafficking in persons, *see* 22 U.S.C. § 7101, not lawful ventures.
[9]While this argument goes to the individual knowledge of the Individual Defendants, Northwestern joins in this argument because even if Plaintiff had adequately pleaded this element against any of the Individual Defendants or Bonnevier, Northwestern would not be vicariously liable for the reasons stated in *supra* note 3.

labor or services while knowing she would be forced to engage in commercial sexual acts" in violation of § 1591 (Compl. ¶ 202), and that they "knowingly recruited, enticed, harbored, transported, and/or obtained Plaintiff for labor or services with knowledge, or at least, reckless disregard for the fact that she would be forced to engage in commercial sex acts" in violation of § 1590 (*id.* ¶ 179), the Complaint is bereft of factual allegations supporting these bald legal conclusions. Thus, the allegations are facially insufficient to withstand a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Where the Complaint does reference the Individual Defendants, the allegations underscore their complete lack of knowledge in any purported violation of the trafficking chapter. In fact, there is no mention at all of the Individual Defendants until Plaintiff allegedly reported concerns to the team's doctor, Dr. Jain, on January 8, 2019 (seven days after the last specifically alleged sex act occurred). (*See, e.g.*, Compl. ¶¶ 26–82); *B.M. v. Wyndham Hotels & Resorts, Inc.*, No. 20-cv-00656-BLF, 2020 WL 4368214, at *6 (N.D. Cal. July 30, 2020) (finding that "the [c]omplaint fail[ed] to allege facts as to *how* . . . [defendants] . . . knew or should have known [p]laintiff was being trafficked"); *Jensen v. U.S. Tennis Ass'n*, No. 20-2422-JWL, 2020 WL 6445117, at *6 (D. Kan. Oct. 30, 2020) (ruling that knowledge for purposes of § 1589(b) could not be established where plaintiff failed to allege facts plausibly showing that defendant knew plaintiff's coach was abusing her). Plaintiff is clear in her Complaint—the Individual Defendants were not aware of the purported misconduct until at the very earliest January 8, 2019. (*See* Compl. ¶ 82–83.)

Plaintiff's allegations actually establish that the Individual Defendants were *unaware* of the alleged commercial sex acts when they took place. Indeed, according to the Complaint, once the allegations against Bonnevier were brought to the Individual Defendants' attention, there are

no specific factual allegations the alleged commercial sex acts continued.[10] To the contrary, the Individual Defendants took action to address and stop the alleged conduct from recurring. (*See, e.g.*, *id.* ¶¶ 82–110) (acknowledging that after Plaintiff met with Obering and Polisky to discuss her concerns, the team was "no longer forced to tailgate," an "official investigation" was launched, and Bonnevier was ultimately terminated from her position); *Ratha v. Phatthana Seafood Co., Ltd.*, No. CV 16-4271-JFW (ASx), 2017 WL 8293174, at *5 (C.D. Cal. Dec. 21, 2017) (finding that the evidence demonstrated not only that the defendants did not know or constructively know of the alleged human trafficking venture, but also that one defendant "returned the product it had purchased from Phatthana's factory after the allegations of worker exploitation were made public"). Plaintiff has not, and cannot, allege the Individual Defendants knew about the alleged TVPRA violations.

Nor does the Complaint plausibly allege the Individual Defendants "should have known" about any alleged violations of the trafficking chapter. The Complaint lacks even a single allegation of "red flags" or other signs that could have put the Individual Defendants on notice as to Plaintiff's alleged sex or labor trafficking. *See, e.g.*, *E.S. v. Best Western Int'l, Inc.*, No. 3:20-cv-00050-M, 2021 WL 37457, at *4 (N.D. Tex. Jan. 4, 2021) (finding that, despite allegations that plaintiff used fake IDs to check into rooms at defendants' brand hotels; plaintiff often called for extra towels, refused service, and left trash cans full of items associated with sexual activity; and there was significant foot traffic within the hotels that her trafficker frequented; the complaint did "not state how [the defendant hotel franchisors] knew or should have known that [p]laintiff was

---

[10]The last purported commercial sex act specifically alleged occurred on January 1, 2019. (*See* Compl. ¶¶ 75–78) (alleging that, during the Holiday Bowl, Plaintiff was "picked . . . up against her will" and "groped . . . while taking photos" at an "open bar mingling event"). Plaintiff later asserts that "even though the team was (finally) no longer forced to tailgate, Plaintiff was still sent to numerous alumni events as well as the Wilson Club . . . [and] [a]s such, she was subjected to the same photo opportunities, groping, and harassment that she had previously notified Northwestern about," but this conclusory allegation is insufficient to withstand a motion to dismiss. (*See id.* ¶ 100); *see Stein v. World-Wide Plumbing Supply, Inc.*, 71 F. Supp. 3d 320, 328 (E.D.N.Y. 2014).

16

being trafficked"); *A.B. v. Wyndham Hotels & Resorts, Inc.*, No. 3:19-cv-01992-IM, 2021 WL 1235241, at *7 (D. Or. Mar. 31, 2021) (finding that plaintiff failed to allege facts or information that "would have put Defendants on notice that Plaintiff was being forcibly sex trafficked" and that "the TVPRA does not impose an affirmative duty to police and prevent sex trafficking").

Likewise, even assuming the Individual Defendants were put on notice as to the alleged inappropriate sexual touching, nothing in the Complaint alleges the Individual Defendants were informed the purported conduct was the result of the alleged coercion or threats of serious harm. While Plaintiff alleges that the Cheer Team "webpage and the representations made therein were produced by Defendants Obering, Polisky, and Bonnevier" (Compl. ¶¶ 180), this in no way supports an allegation that the Individual Defendants knew (or should have known) the website was meant to entice the cheerleaders into performing "commercial sex." Additionally, while Plaintiff cites the Spirit Squad contract as an example of the threat of serious harm that kept her on the team (*see, e.g.*, *id.* ¶ 227), she fails to allege that any of the Individual Defendants knew the terms of the Spirit Squad contract would be viewed by the cheerleaders as a threatened harm were they not to engage in the alleged commercial sex. *See* 18 U.S.C. §§ 1589(a), 1591(a). Because Plaintiff's own allegations illustrate the Individual Defendants were not only unaware of the alleged commercial sex acts prior to Plaintiff's January 2019 complaint, but took action to stop the alleged conduct when Plaintiff made them aware of it, the TVPRA Counts against them should be dismissed with prejudice.

### 3. The Complaint Does Not Plausibly Allege a Knowing Benefit.

Finally, the Complaint fails to plausibly allege the Defendants "knowingly benefit[ed], financially or by receiving anything of value" from "participation in a venture which [they] knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a). To satisfy the "knowing benefit" element, "there must be a causal relationship between affirmative

conduct furthering the . . . venture and receipt of a benefit," with constructive knowledge of that causal relationship. *Geiss v. Weinstein Co. Holdings, LLC*, 383 F. Supp. 3d 156, 169 (S.D.N.Y. 2019).

First, there are insufficient allegations to support a conclusion that a financial benefit was received by the purported venture. While Plaintiff asserts that the purpose of the venture was to increase alumni donations, the Complaint is devoid of any allegations that donations were, in fact, received. Plaintiff makes passing references to donations and alumni attending football games and events, but she fails to make any connection between those actions and the knowledge or actions of the purported venture or the Defendants. The Complaint makes disembodied assertions that, "[a]fter all, the happier these men were, the more money [Northwestern] would receive from them" (*id.* ¶ 66), and that Plaintiff attended alumni events "in order to please alumni and garner donations" (*id.* ¶ 100), but at no point does the Complaint connect these statements to the purported venture that Defendants allegedly engaged in, nor does the Complaint ever tie a donation to any Defendant, the cheerleading program, or the alleged activities set forth in the Complaint.

In addition, even assuming that donations were made in exchange for commercial sex acts, to which there is absolutely no allegation, the Complaint does not allege the Defendants knew that fact. A knowing benefit is more than a mere benefit. The phrase "knowingly benefits . . . from" requires the defendant to have known all of the circumstances underlying satisfaction of the other two §1595(a) elements and received (and retained) a benefit that the defendant knows to be tied to those circumstances. *See Knowingly*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also Geiss*, 383 F. Supp. 3d at 169 (requiring a "causal relationship"). Otherwise, mere receipt of a benefit alone would threaten to transform § 1595(a) into a strict liability statute. As explained above, the

Complaint has not sufficiently alleged either of the other two § 1595(a) elements. It therefore follows that the Complaint has also not sufficiently alleged a knowing benefit.[11]

Finally, Plaintiff has not alleged any facts that show the Defendants received any benefit personally. At best, Plaintiff surmises that they received the speculative possibility of increased salaries and continued employment, which cannot be sufficient to state a claim. (*See, e.g.*, Compl. ¶ 192.) For these reasons, the TVPRA Counts should be dismissed with prejudice.

**B.      The Complaint Does Not Sufficiently Allege a Violation of the Trafficking Chapter as to Counts Three, Four, and Five.**

In addition to the fact that Plaintiff has failed to plead the elements for a civil remedy under § 1595, she has also failed to plausibly allege the underlying criminal TVPRA elements for the Trafficking Counts. This deficiency is also fatal to her claims. *See Paguirigan v. Prompt Nursing Empl. Agency LLC*, 286 F. Supp. 3d 430, 436 n.4 (E.D.N.Y. 2017).

**1.      Under Count Four, the Complaint Has Not Plausibly Alleged the Required Elements of § 1591.**

Plaintiff failed to plead the required elements for the underlying claim for Count Four, sex trafficking in violation of 18 U.S.C § 1591, rendering her ineligible for corresponding civil remedies under the TVPRA. Section 1591(a) reads in relevant part:

Whoever knowingly—

---

[11]Some courts have rejected the reasoning that there must be a causal relationship between the alleged facilitation of the underlying TVPRA violation and the benefit received, but respectfully, those cases are wrongly decided. *See, e.g., M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 964–65, 970 (S.D. Ohio 2019) (rejecting a "specific definition of 'benefit'" and holding that rental of a hotel room "constitutes a financial benefit from a relationship with the trafficker" sufficient to meet the "knowing benefit" element). This reasoning does not comport with the ordinary meaning of the words used within the statute. *See, e.g., Fierro v. Taylor*, No. 11 Civ. 8573 (BSJ), 2012 WL 13042630, at *3 (S.D.N.Y. July 2, 2012) ("If a term is not defined within the statute, then courts use the ordinary meaning of the word."). The word "knowing" means "[h]aving or showing awareness or understanding" or "Deliberate; conscious." *Knowing*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also Knowingly*, BLACK'S LAW DICTIONARY (11th ed. 2019). And the word "from" connotes a causal relationship. *See, e.g., From*, MERRIAM-WEBSTER ONLINE DICTIONARY ("a function word to indicate the source, cause, agent, or basis"). The best understanding of the "knowingly benefits . . . from" element is therefore that a defendant must know all of the circumstances underlying satisfaction of the § 1595(a) elements—that is, that the defendant participated in a venture that he knew or should have known engaged in a violation of the trafficking chapter—and have received a benefit that the defendant knows to be tied to his participation in the alleged venture.

(1)     in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

(2)     benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

    knowing, or . . . in reckless disregard of the fact, that means of force, threats of force, fraud, coercion . . . or any combination of such means will be used to cause the person to engage in a commercial sex act . . . shall be punished as provided in subsection (b).

Accordingly, to establish a claim under Section 1591, Plaintiff must plausibly plead force, fraud and/or coercion, which causes a "commercial sex act." The Complaint has failed to demonstrate a commercial sex act, and it also lacks the necessary showing of force, fraud, or coercion. As such, Count Four must be dismissed.

> **a.    The Complaint Does Not Plausibly Allege a "Commercial Sex Act" Under § 1591.**

Plaintiff does not adequately allege the existence of a *commercial* sex act. A "commercial sex act" is defined as "any sex act, *on account of which anything of value is given to or received by any person.*" 18 U.S.C. § 1591(e)(3) (emphasis added). As described above, Plaintiff does not allege anything of value was given or received on account of the fans' alleged inappropriate touching of the cheerleaders. The Complaint is devoid of any allegations that donations were, in fact, exchanged, and Plaintiff does not (and cannot) allege that any other thing of value was given or received as a result of the inappropriate behavior. Rather, Plaintiff alleges she was touched or groped by fans at tailgating events and by patrons at a bar (who may or may not even be affiliated with Northwestern in any way). (Compl. ¶¶ 59, 68, 77–78.) Plaintiff does not assert that Northwestern received an alumni donation or grant, much less that any Defendant received any benefit of any kind, because fans and bar patrons groped Plaintiff.

In the majority of cases asserting a violation of § 1591, the "commercial" element of the sex act is clear. *See, e.g., A.B. v. Wyndham Hotels & Resorts, Inc.*, No. 3:19-cv-01992-IM, 2021 WL 1235241, at *1 (D. Or. Mar. 31, 2021) ("From approximately November 2012 through March 2013, Plaintiff alleges she was sold by her trafficker for sex at four different hotels . . . ."); *Ardolf v. Weber*, 332 F.R.D. 467, 478 (S.D.N.Y. 2019) ("Defendant's alleged fondling of Plaintiffs' genitals was commercial in nature because he offered them valuable career advancement, including future modeling jobs, to allow it to happen."); *Noble v. Weinstein*, 335 F. Supp. 3d 504, 521 (S.D.N.Y. 2018) ("The opportunity . . . for the actress to sit down with that producer in a private meeting to review her film reel and discuss a promised film role carries value that is career-making and life-changing."). Here, there is no similar showing and Plaintiff's claim under § 1591 must therefore be dismissed.

   **b.** **The Complaint Does Not Plausibly Allege "Force, Fraud, [or] Coercion" Under § 1591.**

Section 1591 also requires that "means of force, threats of force, fraud, [or] coercion" caused the commercial sex act*, see* 18 U.S.C. § 1591(a), another element insufficiently plead by Plaintiff. Plaintiff does not plead force, threats of force, or fraud, and instead alleges she was coerced. "Coercion" is defined as "(A) threats of serious harm to or physical restraint against any person; (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or (C) the abuse or threatened abuse of law or the legal process." 18 U.S.C. § 1591(e)(2). Correspondingly, "serious harm" refers to physical or nonphysical (psychological, financial, or reputational) harm "sufficiently serious" under the totality of the circumstances "to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity." 18 U.S.C. § 1591(e)(5).

According to the Complaint, Plaintiff remained on the Cheer Team despite the alleged sexual harassment and touching because she did not want to lose her position on the team and because she would have potentially incurred financial liability from her cheerleading expenses and lost cheerleading scholarships. (Compl. ¶ 207.) Plaintiff's desire to stay on the team does not pass muster, and the financial harm alleged here is not so "sufficiently serious" as to "compel" a reasonable person to engage in "commercial sex acts."

This is not to say financial coercion is not a powerful tool used against many victims of human trafficking. "Women in desperate circumstances [may] find themselves in situations where they are without homes, in need of drugs or food or protection and must make difficult decisions." *United States v. Carson*, 870 F.3d 584, 594 (7th Cir. 2017). However, here, the financial concerns do not rise to the level of effectively compelling Plaintiff's actions as is required under the statute. While unfortunate, potentially losing scholarship money that Plaintiff did not have when she decided to attend Northwestern cannot be compared to the financial concern experienced by victims in trafficking cases routinely seen by this Court. As to repayment of the travel costs incurred – the only allegation made by Plaintiff that would result in an out-of-pocket loss – no actual amount is listed. And where courts have found coercion with smaller dollar amounts at issue, there have been additional serious and compelling circumstances that are not present in this case. *See, e.g.*, *United States v Dann*, 652 F.3d 1160, 1171 (9th Cir. 2011) (concluding that a reasonable juror could find coercion where an employer threatened that a nanny would owe $8,000 if she quit work, where the victim was an "immigrant without access to a bank account and not a dollar to her name" and otherwise lacked "money to leave or live"); *Javier v. Beck*, No. 13cv2926, 2014 WL 3058456, at *6 (S.D.N.Y. July 3, 2014) (concluding that there were sufficiently serious allegations of coercion where an employer (1) forced an immigrant worker to sign a confession of

judgment for $15,000, which represented six months' of his gross wages, (2) frequently warned him that if he left their employment for any reason he would be forced to pay under said legal agreement, and (3) threatened to withdraw their H-1B petition if he questioned their conduct or refused to work as assigned). Here, there are no similar allegations to compound the seriousness of Plaintiff's financial situation. Count Four should be dismissed against the Defendants.

### 2. Under Counts Three and Five, the Complaint Has Not Plausibly Alleged the Necessary Elements of § 1590 and § 1589.

Plaintiff has not sufficiently alleged a claim of forced labor under § 1589 because there has been no showing of serious harm that induced the provision of services, as is required by the statute.[12] In order to state a claim under § 1589, Plaintiff must allege that Defendants "obtain[ed] the labor or services of a person . . . (1) by means of force, threats, of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." 18 U.S.C. § 1589(a).

Under the TVPRA, the term "serious harm" means "any harm, whether physical or nonphysical . . . that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2). In

---

[12]Just as the Complaint's claims under § 1589 fail, its claims under § 1590 supporting Count Three must also fail. Section 1590 states that "whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter shall be [fined, imprisoned, or both]." 18 U.S.C. § 1590(a). As argued above, Plaintiff has not sufficiently alleged that Defendants were part of a venture involving forced labor under § 1589. Therefore, Plaintiff has also failed to plausibly alleged the underlying requirements of § 1590. *Cf. Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 790 F. Supp. 2d 1134, 1147 (C.D. Cal. 2011) (explaining that plaintiffs' ability to establish a violation of § 1589 thereby established a violation of § 1590 because of the interaction of the forced labor component under these two TVPRA provisions).

other words, if a defendant "knowingly obtains the labor or services" of someone by using "any scheme, plan, or pattern" intended to cause that person to believe that they would encounter serious harm or physical restraint should they not perform such labor or services, that will suffice even without the use or threat of actual physical force or restraint. *See* 18 U.S.C. § 1589(a)(4). "[C]ourts have recognized that Congress enacted Section 1589 at least in part 'to address the increasingly subtle methods of traffickers' who do not use physical violence or injury to induce their victims but instead preclude a victim's access to a passport; require her to work for 15 or more hours every day of the week without days off; decline to allow her to leave the home without supervision; limit her contact with her family; and isolate her from others in the community, all the while limiting or denying her compensation." *Mouloki v. Epee*, 262 F. Supp. 3d 684, 696 (N.D. Ill. 2017) (citations omitted).

Plaintiff asserts that Defendants secured her participation on the Cheer Team through threats of serious harm, namely, "forcing her to attend various alumni and tailgating events" (Compl. ¶ 226), or risk paying back her cheerleading expenses and losing her cheerleading scholarship, per the provisions of her Spirit Squad contract and Bonnevier's representations, (*id.* ¶ 227). Plaintiff's allegations, however, do not constitute "serious harm" and, in any event, Plaintiff has failed to allege that the Defendants "intended to cause" Plaintiff to believe that she would suffer "serious harm."

First, Plaintiff's circumstances do not fall within the category of "serious harm[s]" that the TVPRA intends to address. Plaintiff's alleged "serious harm" is that she would have potentially incurred financial liability from her cheerleading expenses and lose her cheerleading scholarship, which would "impact her ability to obtain her education." (*Id.*) However, the financial harm alleged here is not so "sufficiently serious" that it would "compel a reasonable person" to engage

in the unlawful services alleged, *i.e.*, submit to commercial sex acts. *See* 18 U.S.C. § 1589(c)(2); *see also Alvarado v. Universidad Carlos Albizu*, No. 10–22072–CIV, 2010 WL 3385345, at *4 (S.D. Fla. Aug. 25, 2010) (noting that "[t]ypical § 1589 cases involve use of force, threats of violence, fraud, and coercion that prevent the employee/traffickee from having viable exit options"). Congress intended the threat of harm to be serious, involving cases "where traffickers threaten harm to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence." H.R. Conf. Rep. No. 106–939 (2000), 2000 WL 1479163, at *91–92; *see, e.g.*, *Muchira v. Al-Rawaf*, 850 F.3d 605, 618 (4th Cir. 2017) ("Typically, therefore, 'forced labor' situations involve circumstances such as squalid or otherwise intolerable living conditions, extreme isolation (from family and the outside world), threats of inflicting harm upon the victim or others (including threats of legal process such as arrest or deportation), and exploitation of the victim's lack of education and familiarity with the English language, all of which are 'used to prevent [vulnerable] victims from leaving and to keep them bound to their captors.'" (citations omitted)). Plaintiff's situation simply does not rise to the level of "serious harm" required to state a claim under § 1589.

Second, Plaintiff has not alleged any facts indicating that the Defendants intended for Plaintiff to fear "serious harm" of any kind. *See United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011) ("The linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the employer intended the victim to believe that such harm would befall her."); *see also United States v. Calimlim*, 538 F.3d 706, 711 (7th Cir. 2008) (discussing § 1589's express scienter requirement, as well as the "second" scienter requirement of § 1589(a)(4)). Plaintiff alleges that the allegations of serious harm were made by "means of the cheerleading contract and Bonnevier's representations to Plaintiff." (Compl. ¶ 227.) Plaintiff makes no

allegations that either of these "means" involved the Defendants, or that the Defendants "intended to cause" Plaintiff to believe that "serious harm" would result if Plaintiff did not attend various alumni and tailgating events. Plaintiff must not only allege that serious harm was threatened, but must also allege that Defendants "intended the [Plaintiff] to believe that such harm would befall her" if she failed to carry out the labor or services. *See Muchira*, 850 F.3d at 618. Plaintiff has failed to do so with respect to the Defendants, and thus Plaintiff's § 1589 and § 1590 claims must be dismissed.

For the above reasons, Plaintiff's TVPRA Counts should be dismissed.

## II.     Plaintiff's Breach of Contract Claim Against Northwestern Should Be Dismissed.

In the Sixth Count of her Complaint, Plaintiff contends that Northwestern is liable for breach of contract because she was dissatisfied with the school's application of certain internal policies. Specifically, Plaintiff claims that she became party to various contracts with Northwestern upon her matriculation to the university in 2018 (Northwestern's Student Handbook ("Handbook"), Policy on Discrimination & Harassment ("Harassment Policy") and Comprehensive Policy on Sexual Misconduct ("Sexual Misconduct Policy"), and that Northwestern breached its contractual obligations by failing to address her concerns regarding the alleged environment on the Cheer Team in the manner she desired. (Compl. ¶¶ 111–26, 238–43.) True and correct copies of the versions of Northwestern's Sexual Misconduct Policy during the relevant time period are attached as Exhibits A and B.

To state a claim for breach of contract under Illinois law, Plaintiff must show: (1) the existence of a valid and enforceable contractual promise; (2) a breach of that promise; (3) that she performed her contractual obligations; and (4) resultant damages. *Doe v. Columbia College Chi.*, 933 F. 3d 849, 858 (7th Cir. 2019). Plaintiff's claim fails on multiple fronts.

**A.** **Plaintiff's Breach of Contract Claim Should Be Dismissed Insofar as It Pertains to the Handbook and Harassment Policy Because Plaintiff Fails to Allege Any Facts Whatsoever with Respect to such Documents.**

In her Complaint, Plaintiff makes passing reference to Northwestern's Handbook and Harassment Policy. (Compl. ¶ 111 ("Upon Plaintiff's matriculation at Northwestern, Plaintiff and Northwestern became mutually bound by the . . . Handbook, . . . Harassment Policy, . . . and Sexual Misconduct Policy.")); (*id.* ¶ 239 ("[A] contractual relationship existed between Northwestern and Plaintiff through Northwestern's policies and procedures, including but not limited to the Student Handbook and sexual misconduct policies.")). She does not, however, allege any fact whatsoever that actually pertains to the Handbook or Harassment Policy. The Complaint does not identify what provision(s) of the Handbook or Harassment Policy may be at issue, nor does it allege how such provisions were purportedly breached. (*See id.* ¶¶ 115–26, 241–43 (relying entirely on the Sexual Misconduct Policy with no reference to Handbook or Harassment Policy)). As a result, Plaintiff's contract claim should be dismissed to the extent such claim is based on the Handbook or Harassment Policy. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Columbia College Chi.*, 933 F. 3d at 858 (holding that, under Illinois law, a plaintiff must plead a specific promise, the circumstances of the breach, her performance under the contract, and resultant damages).

**B.** **Plaintiff's Breach of Contract Claim Should Be Dismissed Because the Sexual Misconduct Policy Does Not Create Any Binding Promise.**

A student cannot state a claim for breach of contract against a private university unless she can identify a specific contractual promise. *Abrams v. Ill. Coll. of Podiatric Med.*, 77 Ill. App. 3d 471, 476–78 (Ill. App. Ct. 1979). Aspirational statements, policies that are subject to change at the school's discretion, and single-sided obligations fall far short of the mark. Courts applying Illinois law, therefore, have dismissed contract claims where the school maintained the right to change the

policy at issue, and where the school's handbook's provision was "more in the nature of an unenforceable expression of intention, hope or desire" and "was not communicated to the plaintiff in such a way as to invite the payment of tuition in reliance thereon." *Id.* at 476–78; *see also Gociman v. Loyola Univ. of Chi.*, No. 20 C 3116, 2021 WL 243573, at *4–5 (N.D. Ill. Jan. 25, 2021) (granting motion to dismiss where plaintiffs claimed university materials created an enforceable promise for in-person instruction); *Eisele v. Ayers*, 63 Ill. App. 3d 1039, 1044–45 (Ill. App. Ct. 1978).

In *Mulvey v. Carl Sandburg High School*, 66 N.E.3d 507, 510 (Ill. App. Ct. 2016), student athletes and their parents brought a breach of contract claim against the school and their coaches, alleging that the defendants failed to comply with certain school policies aimed at preventing bullying. The students in that case alleged that – though they performed all duties as required under the student and athletic handbooks – the school failed to meet its obligations to address bullying, intimidation and harassment. *Id.* at 511. The Illinois Appellate Court roundly rejected this claim, holding there was no enforceable promise "to act in any particular way in response to a specific set of circumstances," or to "enforce violations . . . in any particular manner." *Id*. at 514.

Similarly, in *Liu v. Northwestern University*, 78 F. Supp. 3d 839, 847 (N.D. Ill. 2015), a former law student attempted to bring a breach of contract claim against Northwestern on the grounds that it failed to "promptly investigate or resolve [the student's] discrimination grievance as required by its policies." The court dismissed the claim with prejudice on the grounds that Northwestern's statement(s) of intent with regard to investigations could not be converted into an enforceable contract. *Id.* at 848, 852.

Here, Plaintiff's breach of contract claim fares no better. The statements on which she relies are aspirational statements intended to convey Northwestern's single-sided intent and expectation

– *i.e.*, "Northwestern is committed to fostering an environment in which all members of our community are safe" (Compl. ¶ 119); "community members and [Northwestern] are expected to take an active role in upholding this policy" (*id.* ¶ 120) – or statements of Northwestern's general intent with regard to investigations. (*See id.* ¶¶ 111–26; 238–43.) Moreover, both versions of the Sexual Misconduct Policy during the relevant time period make expressly clear that the parameters of the investigation process are subject to change and belie any notion of an enforceable promise. Specifically, in both versions, Sexual Misconduct Policy Section III(A) states: "Because allegations of sexual misconduct can sometimes raise challenging new issues, the University reserves discretion to take reasonable actions to address those issues in a manner consistent with the spirit of the applicable policies and these guidelines . . . ." (Exs. A & B.) Because she cannot point to any contractual promise by Northwestern, nor does she make any attempt to allege a reciprocal obligation on her behalf, Plaintiff's contract claim should be dismissed.

C.     **Plaintiff Fails to Meet the Standard Required for a Student to State a Breach of Contract Claim Against a University.**

Even if Plaintiff had sufficiently plead a promise, breach, performance and damages, her claim would fail because Illinois law requires more. Under Illinois law – in addition to the *prima facie* elements for a standard breach of contract claim – a student attempting to bring a breach of contract claim against a private university must establish that the school's action was arbitrary and capricious. *E.g.*, *Seitz-Partridge v. Loyola Univ. of Chi.*, 409 Ill. App. 3d 76, 82–86 (Ill. App. Ct. 2011); *Bilut v. Northwestern Univ.*, 269 Ill. App. 3d 125, 135–36 (Ill. App. Ct. 1994); *Frederick v. Northwestern Univ. Dental Sch.*, 247 Ill. App. 3d 464, 471–72 (Ill. App. Ct. 1993); *Holert v. Univ. of Chi.*, 751 F. Supp. 1294, 1301 (N.D. Ill. 1990) ("[I]t is not the court's function to . . . select the appropriate punishment for transgressions of an educational institution's ethical or academic standards."). This burden is a heavy one, and courts "have adopted this deferential

standard because of a reluctance to interfere with the academic affairs and regulation of student conduct in a private university." *Holert*, 752 F. Supp. at 1301.

In *Doe v. Columbia College Chicago*, 933 F. 3d 849, 858 (7th Cir. 2019), a male student attempted to bring a claim against the college on the grounds that the college "violated its own policies and procedures by failing to provide him with an impartial investigation and adjudication." The Seventh Circuit rejected this argument and affirmed the dismissal of his claim because the pleadings showed the school responded to and investigated his complaint, even if not in the manner he preferred. *Id.* (explaining that the school "would not be liable even if [the court] find[s] it exercised its academic judgment unwisely" unless plaintiff could establish that the school's decision was "without any rational basis").

Here, Plaintiff wholly fails to meet the arbitrary and capricious standard. According to the Complaint, Northwestern contacted Plaintiff the day after she first raised concerns to the Cheer Team's doctor (Compl. ¶¶ 82–83); Northwestern met with Plaintiff multiple times over the course of the following three weeks to collect information about her concerns (*id.* at ¶¶ 84, 86–89); the individuals to whom Plaintiff complained contacted the Office of Equity (*id.* at ¶ 90–91); the Office of Equity worked with others at the University to address the situation by, among other things, immediately ending the participation in tailgating and ultimately mandating training for Bonnevier (*id.* at ¶¶ 91–95, 100); Northwestern continued to meet with Plaintiff (*id.* at ¶ 96); Northwestern investigated Plaintiff's 2020 complaint to the Office of Equity (*id.* at ¶¶ 102–104); Northwestern provided Plaintiff the opportunity to proceed anonymously in the 2020 complaint, which she accepted (*id.* at ¶ 105); and Northwestern took steps to address Bonnevier's behavior as a result of the investigation (*id.* at ¶¶ 109–110).

Northwestern's conduct in this regard was clearly rational. That Plaintiff may have desired a quicker response, access to additional information, or a different outcome does not make Northwestern's actions arbitrary or capricious. Therefore, her claim must fail.

## III. Plaintiff's Estoppel and Reliance Claims Against Northwestern Should Be Dismissed.

Plaintiff's Seventh Count for "estoppel and reliance" against Northwestern also fails. "To bring a successful claim of promissory estoppel under Illinois law, a plaintiff must prove (and at the pleading stage, allege) that (1) defendants made an unambiguous promise to plaintiff, (2) plaintiff relied on that promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment." *Doe v. Columbia Coll. Chi.*, 299 F. Supp. 3d 939, 960–62 (N.D. Ill. 2017) (dismissing promissory estoppel claim purportedly based on college's promise to adjudicate complaints in accordance with its policies); *see also Eisele v. Ayers*, 63 Ill. App. 3d 1039, 1045 (Ill. App. Ct. 1978) (affirming dismissal of promissory estoppel claim where plaintiff students failed to establish clear promise by school). The case of *Doe v. University of Chicago*, No. 16 C 08298, 2017 WL 4163960, at *10–11 (N.D. Ill. Sept. 20, 2017) is illustrative. There, the student plaintiff raised a claim for promissory estoppel based on the university's promises "to protect [his] educational experience from unlawful harassment," to "adjudicate complaints in a fair and impartial manner," to conduct "prompt, fair, impartial and thorough" investigations of sexual misconduct complaints, and to implement its policies in a manner consistent with applicable law. *Id.* at *10. The court dismissed the student's claim on the grounds that such general promises are insufficient to state a claim for promissory estoppel. *Id.* at *10–11; *see also Kyung Hye Yano v. City Colls. of Chi.*, No. 08 C 4492, 2009 WL 855977, at *6 (N.D. Ill. Mar. 30, 2009) (dismissing claims for breach of contract and promissory estoppel based on school policies purportedly promising equal and fair treatment). Further, the court held that there could be no estoppel claim where the policies at issue expressly warned that implementation

may vary. *Doe v. Univ. of Chi.*, 2017 WL 4163960, at \*10. Finally, the court drew a distinction between "specific promises made in the employment context" – which may be sufficient to state a claim for promissory estoppel – and "general claims made by [a] University in its manuals and policies," which are not. *Id.*

Here, Plaintiff alleges that "Northwestern made express promises that it would provide a safe environment free from discrimination and harassment, and that it would provide a thorough and equitable process to resolve any alleged violation of Northwestern's Policies" and she "relied on those promises when she made the decision to enroll and remain at Northwestern." (Compl. ¶ 246.) As explained above, these are precisely the types of allegations courts routinely reject. Moreover, the Sexual Misconduct Policy makes expressly clear that the parameters of the investigation process are subject to change and belies any notion of an enforceable promise. Specifically, Sexual Misconduct Policy Section III(A) states: "Because allegations of sexual misconduct can sometimes raise challenging new issues, the University reserves discretion to take reasonable actions to address those issues in a manner consistent with the spirit of the applicable policies and these guidelines . . . ."[13] (Exs. A & B). Because Plaintiff does not allege any promise sufficient to state a promissory estoppel claim under Illinois law, this claim should be dismissed.

IV.     **Plaintiff's IIED Claim Against the Individual Defendants Should Be Dismissed.**

In Count Eight, Plaintiff claims that Defendants Obering, Polisky and DaSilva "engaged in extreme and outrageous conduct by sexually exploiting Plaintiff and other members of the Northwestern cheerleading team for [Northwestern's] financial gain." (Compl. ¶ 252.) Plaintiff relies upon bald conclusions in an attempt to state a claim for this intentional tort against the Individual Defendants. When the conclusions and rhetoric are stripped away, all Plaintiff has

---

[13]Defendants again note that they took multiple steps to address Plaintiff's concerns. *See supra* Section IV(B)(2).

alleged as to the Individual Defendants is: (1) Obering, Polisky and DaSilva did not believe Plaintiff's complaints; (2) Obering and Polisky accused Plaintiff of falsifying evidence; (3) DaSilva conducted only an informal, rather than a formal, investigation of Plaintiff's complaint; and (4) DaSilva convinced Plaintiff to be a witness rather than a complainant to protect Plaintiff's anonymity. (Compl. ¶ 252(e) –(i.).)

As an initial matter, Plaintiff's IIED claim against Obering and Polisky is time-barred and should be dismissed for this reason alone. Furthermore, as explained below, Plaintiff's IIED claim against all of the Individual Defendants should be dismissed because Plaintiff's factual allegations do not state a claim for IIED.

### A. Plaintiff's IIED Claim Against Defendants Obering and Polisky Should Be Dismissed Because It is Time-Barred.

Plaintiff's IIED claim against Obering and Polisky is time-barred. The statute of limitations for an IIED claim is two years. 735 ILCS 5/13-202; *Dahl v. Fed. Land Bank Ass'n*, 213 Ill. App. 3d 867, 872 (3d Dist. 1991) (735 ILCS 5/13-202's two-year limitations period applies to claims for IIED). But Plaintiff alleges that Obering and Polisky caused Plaintiff emotional distress more than two years before Plaintiff filed her complaint on January 29, 2021.

Specifically, Plaintiff alleges she met with Obering a "few days" after January 9, 2019 to report sexual harassment. (Compl. ¶ 84.) Plaintiff alleges Obering did not believe Plaintiff's allegations and told Plaintiff to gather additional evidence and testimonials from other cheerleaders. (*Id.* ¶¶ 84–85.) On January 22, 2019, Plaintiff delivered the additional evidence to Obering in the form of anonymous letters. (*Id.* ¶ 86.) Obering and Polisky met with Plaintiff on January 24, 2019 to discuss her concerns. (*Id.* ¶¶ 88–89.) During the meeting, Obering and Polisky allegedly accused Plaintiff of writing the anonymous letters herself and questioned her credibility. (*Id.* ¶ 88.) After the meeting, Obering and Polisky forwarded Plaintiff's concerns to

Northwestern's Office of Equity. (*See id.* ¶ 90.) January 24, 2019 is the last date on which Plaintiff alleges Obering or Polisky caused her emotional distress. (*Id.* ¶¶ 88–89.)

Plaintiff filed her Complaint on January 29, 2021, which is more than two years after January 24, 2019. As such, Count Eight against Obering and Polisky should be dismissed with prejudice. *See Behn v. Kiewit Infrastructure, Co.*, No. 17 C 5241, 2017 WL 5152346, at *2–3 (N.D. Ill. Nov. 7, 2017) (applying Illinois law and dismissing pursuant to Rule 12(b)(6) plaintiff's IIED claim, with prejudice, because it was filed outside the mandatory two-year limitations period).

### B. Plaintiff's IIED Claim Against All of the Individual Defendants Should Be Dismissed Because Plaintiff Fails to Plead Facts Sufficient to Give Rise to IIED.

To plead a claim for IIED, a plaintiff must plead facts that show: (1) the defendant's conduct was extreme and outrageous; (2) the defendant intended to inflict severe emotional distress, or knew there was at least a high probability that her conduct would inflict severe emotional distress; and (3) the defendant's conduct did, in fact, cause severe emotional distress. *Cook v. Winfrey*, 141 F.3d 322, 330 (7th Cir. 1998) (applying Illinois law). A plaintiff's failure to allege facts to support any one of these elements is fatal to an IIED claim. *See Zvunca v. Motor Coach Indus. Int'l, Inc.*, No. 08 C 4507, 2009 U.S. Dist. LEXIS 15408, at *19 (N.D. Ill. Feb. 26, 2009). Here, Plaintiff fails to state facts that plausibly support any of these elements, much less all three. Accordingly, Plaintiff's IIED claim against the Individual Defendants should be dismissed with prejudice.

### 1. Plaintiff Fails to Allege the Individual Defendants Engaged in Extreme and Outrageous Conduct.

The first element of an IIED claim requires that the defendant's conduct be extreme and outrageous. *Cook*, 141 F.3d at 330. Under this standard, "liability [for IIED] has been found only

where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of human decency." *Id.* at 331 (affirming dismissal of plaintiff's IIED claim). Courts consistently have found university officials' alleged errors or biases in response to a student's Title IX complaint – even if sufficient to state a violation of Title IX – insufficient to state an IIED claim because the conduct was not extreme and outrageous. *See Doe v. Columbia Coll. Chi.*, 299 F. Supp. 3d 939, 964–65 (N.D. Ill. 2017) (dismissing a student's IIED claim); *Doe v. Trs. of the Univ. of Pa.*, 270 F. Supp. 3d 799, 827 (E.D. Pa. 2017) (same); *Doe v. Ind. Wesleyan Univ.*, No. 1:20-CV-00039-HAB, 2020 U.S. Dist. LEXIS 84209, at \*26, \*28 (N.D. Ind. May 12, 2020) (dismissing a student's IIED claim against the university and university official because "numerous cases similar to the one here hold that a university's investigation, even if objectionable or unfair, does not rise to the level of extreme and outrageous conduct that goes beyond all possible bounds of decency"); *Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 375 (S.D.N.Y. 2016) (dismissing a student's IIED claim where the student alleged university officials mishandled his sexual assault case and failed to protect him); *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 617 (D. Mass. 2016) (dismissing an IIED claim because allegations that the university used unfair and unreasonable procedures in a disciplinary hearing and improperly branded the student as a sexual predator were insufficient).

For example, in *Doe v. Trustees of the University of Pennsylvania*, the student plaintiff was accused of sexual assault, and the university officials conducted a Title IX investigation. 270 F. Supp. 3d at 806. The student plaintiff alleged that during the investigation, the university and its officials ignored his evidence, improperly attacked his credibility, issued an unfair sanction, and wrongfully labeled him a rapist. *Id.* at 827. In granting the motion to dismiss, the court held that even if plaintiff's allegations were true – *i.e.*, even if the defendants distorted facts, made improper

credibility determinations, and were ultimately wrong in their conclusions – such conduct is not extreme and outrageous and does not support an IIED claim. *Id.*

Likewise, in *Doe v. Columbia College Chicago*, the student plaintiff alleged, among other things, that the university minimized the plaintiff's concerns, failed to include facts the plaintiff submitted in the investigation report, failed to provide the plaintiff with the full investigatory file, failed to update the plaintiff on the status of the investigation, removed evidence favorable to the plaintiff from the investigation file, violated its Title IX policies, and improperly found the plaintiff was not credible. 299 F. Supp. 3d at 946–47. Dismissing the IIED claim, the *Columbia College* court held that, even if the plaintiff's allegations were true, the "allegations do not state that [the university's] conduct was extreme or outrageous or that it was intended to inflict emotional harm on [the plaintiff]." *Id.* at 964.

Plaintiff's allegations against each of the Individual Defendants fall far short of the allegations in these cases. Plaintiff alleges that over the course of two meetings in January 2019, Obering and Polisky initially questioned her credibility, told her to collect additional information, and accused her of falsifying anonymous letters. (*See* Compl. ¶¶ 84–89, 252(e)–(g).) Plaintiff alleges Obering and Polisky forwarded her complaint to the Office of Equity following the second meeting. (*Id.* ¶ 90.) As shown in the *University of Pennsylvania* case, questioning the credibility of a plaintiff, asking for additional evidence, or even reaching the wrong conclusion is not extreme or outrageous conduct and does not support a claim for IIED. *See* 270 F. Supp. 3d at 827. Obering and Polisky's alleged conduct falls far short of extreme and outrageous conduct required to state an IIED claim.

Plaintiff alleges DaSilva investigated the 2019 complaint forwarded to the Office of Equity. (Compl. ¶ 90.) Plaintiff complains DaSilva minimized her January 2019 complaint by conducting

training for Bonnevier instead of a "formal investigation" (*id.* ¶¶ 94–96), and minimized Plaintiff's

role in the May 2020 investigation – after which Bonnevier's termination shortly followed (*id.* ¶

110) – by treating Plaintiff as a witness, (*see id.* ¶ 252(g)–(i)). As shown in the *Columbia College*

case, failing to conduct an investigation the way the student plaintiff wishes, and even failing to

follow university policies is also not extreme or outrageous conduct sufficient to state a claim for

IIED. *See* 299 F. Supp. 3d at 964–65. DaSilva's alleged conduct falls far short of extreme and

outrageous conduct required to state an IIED claim.

Moreover, a closer examination of Plaintiff's allegations reveals they actually undermine

Plaintiff's conclusion that the Individual Defendants did not believe her or take her complaints

seriously. *See supra* Section I(A)(2). Even if questioning her credibility was actionable, which it

is not, Plaintiff's own allegations show that the Individual Defendants took action on Plaintiff's

complaints. Such conduct certainly does not go "beyond all possible bounds of human decency."

*See Cook*, 141 F.3d at 330. Plaintiff plainly has not pleaded the kind of "extreme and outrageous

conduct" that is required to sustain a claim of IIED against any of the Individual Defendants, and

for this reason alone, Plaintiff's claim should be dismissed.

> **2. Plaintiff Also Fails to Allege the Individual Defendants Intended to Inflict Severe Emotional Distress on Plaintiff.**

The second element of an IIED claim mandates that defendants intended to inflict severe

emotional distress on Plaintiff, or knew there was a high probability their conduct would inflict

severe emotional distress on Plaintiff. *Cook*, 141 F.3d at 330. In purported support of this element,

Plaintiff alleges that the Individual "Defendants knew that Plaintiff's emotional distress would be

furthered by their inadequate response" to her complaints about Bonnevier.[14] (Compl. ¶ 254.) That

---

[14]Plaintiff alleges that by telling the team to "just take it," Bonnevier recognized that the alleged sexual harassment had a high probability of causing emotional distress. (Compl. ¶ 253(c).) Even if such an allegation were sufficient to support a claim, which it is not, it has nothing to do with Defendants Obering, Polisky or DaSilva.

the Individual Defendants' response fell short of what Plaintiff expected does not plausibly support the conclusion that the Individual Defendants acted with the intent to inflict emotion distress upon Plaintiff.

To the contrary, Plaintiff's allegations demonstrate each of the Individual Defendants took steps to address and respond to Plaintiff's complaint. For instance, Plaintiff alleges Obering and Polisky forwarded Plaintiff's complaint to the Office of Equity. *(See id.* ¶ 90.) Plaintiff alleges DaSilva conducted training for Bonnevier in 2019 so that Bonnevier would be expressly educated on the point that exploitation and sexual harassment would not be tolerated and that subsequently the cheerleading team was "no longer forced to tailgate." *(Id.* ¶¶ 94, 95, 97, 98, 100.) In fact, far from such conduct causing Plaintiff severe emotional distress, these actions instead caused Plaintiff to decide "to remain on the cheerleading team for the 2019 season." (*Id.* ¶ 97.) The Individual Defendants had no reason to believe, much less a high probability to believe, that forwarding Plaintiff's complaint and DaSilva conducting her investigation in 2019 would cause Plaintiff severe emotional distress. *See Columbia Coll. Chi*, 299 F. Supp. 3d at 964–65.

Plaintiff also alleges, that with respect to the 2020 investigation, DaSilva encouraged Plaintiff to be a witness rather than a complainant. (*See* Compl. ¶¶ 104–105.) Plaintiff complains her decision to be a witness deprived her of receiving a copy of the report and being kept informed. (*Id.* ¶¶ 106, 110.) Those allegations do not suggest DaSilva was intending to cause severe emotional harm to Plaintiff. To the contrary, a plausible inference from these allegations is DaSilva believed anonymity was important to Plaintiff and was acting to protect Plaintiff. (*See id.* ¶ 105.)

In short, none of the allegations against DaSilva, Obering or Polisky support the conclusion that any of the Individual Defendants intended to inflict emotional distress upon Plaintiff. Rather, the allegations show the Individual Defendants not only took steps to address Plaintiff's

complaints, but took action as a result of the investigations into Plaintiff's complaints. None of those actions were intended to, or did, cause Plaintiff severe emotional distress. For this additional reason, the IIED claim should be dismissed with prejudice.

### 3. Plaintiff Fails to Allege She Suffered Severe Emotional Distress Because of the Individual Defendants.

The third and final element of a claim for IIED is that the defendant's conduct did, in fact, cause extreme emotional distress. *Cook*, 141 F.3d at 330. Illinois courts have long instructed that to give rise to liability, emotional distress must be severe. *See, e.g.*, *Alex v. City of Chi.*, 2016 U.S. Dist. LEXIS 25292, at *27–28 (N.D. Ill. Feb. 29, 2016). In fact "[t]he law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." *Id.* at *27 (citations omitted). In *Alex*, the plaintiff alleged that he experienced "many sleepless nights, headaches, upset stomach, loss of appetite, emotional and mental distress, and continued worrying." *Id.* at *28. The *Alex* court concluded that such allegations were not sufficient to support an IIED claim. *Id.*

Here, Plaintiff alleges she suffered depressive episodes, panic attacks, and was prescribed medication *as a result of the alleged sexual exploitation and sexual harassment*. (*See* Compl. ¶¶ 254–55.) However, Plaintiff does not allege the Individual Defendants sexually harassed her or sexually exploited her. (*See id.* ¶ 254.) Rather, all Plaintiff alleges as to Obering and Polisky is they received her complaint, did not believe it, but forwarded it to the Office of Equity for investigation anyway. *(Id.* ¶¶ 84–90.) Similarly, Plaintiff's only allegations as to DaSilva is Plaintiff did not like DaSilva's investigative process. *(Id.* ¶¶ 102–110.) At best, such allegations support the conclusion that the Individual Defendants may have caused Plaintiff some disappointment, frustration, or worry. However, "[a]lthough fright, horror, grief, shame, humiliation, worry, etc., may fall within the ambit of the term 'emotional distress,' these mental

conditions alone are not actionable." *Alex*, 2016 U.S. Dist. LEXIS 25292, at *28. Plaintiff's allegation that the Individual Defendants' "inadequate response" to her complaints caused her severe emotional distress is not plausible, and as such Plaintiff fails to state a claim for IIED.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss Counts Three through Eight of Plaintiff's Complaint.

Dated: April 30, 2021                                    Respectfully submitted,

/s/ *Anneliese Wermuth*                          /s/ *LaKeisha C. Marsh*
Anneliese Wermuth                                  Amy Graham Doehring
Alan M. Pittler                                         Jamel A. Greer
COZEN                                                  LaKeisha C. Marsh
O'CONNOR                                             AKERMAN LLP
123 North Wacker Drive, Suite 1800         71 S. Wacker Drive
Chicago, IL 60606                                   Chicago, IL 60606
312-474-7900                                         312-634-5700
awermuth@cozen.com                            amy.doehring@akerman.com
apittler@cozen.com                               jamel.greer@akerman.com
*Attorneys for Defendant*                        lakeisha.marsh@akerman.com
*Northwestern University*                        *Attorneys for Defendant*
                                                           *Amanda Dasilva*


/s/ *Kerryann M. Haase*                         /s/ *Bethany K. Biesenthal*
Kerryann M. Haase                                 Bethany K. Biesenthal
Brian P. Paul                                         Jordan M. Matthews
Michael K. Chropowicz                          Emma J. Lanzon
MICHAEL BEST & FRIEDRICH LLP         JONES DAY
444 West Lake Street, Suite 3200           77 West Wacker Drive, Suite 3500
Chicago, IL 60606                                   Chicago, IL 60601
312-222-0800                                         312-782-3939
kmhaase@michaelbest.com                     bbiesenthal@jonesday.com
bppaul@michaelbest.com                        jmatthews@jonesday.com
mkchropowicz@michaelbest.com            elanzon@jonesday.com
*Attorneys for Defendant*                        *Attorneys for Defendant*
*Heather Van Hoegarden*                        *Michael Polisky*

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on April 30, 2021, she electronically filed the foregoing **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS NORTHWESTERN UNIVERSITY, DASILVA, OBERING, AND POLISKY'S MOTION TO DISMISS UNDER RULE 12(b)(6)** with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record.

*/s/ Anneliese Wermuth*
Anneliese Wermuth
COZEN O'CONNOR
123 North Wacker Drive, Suite 1800
Chicago, IL  60606
312-382-3100
awermuth@cozen.com
*Attorneys for Defendant*
*Northwestern University*