**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| **HAYDEN RICHARDSON,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:21-CV-00522 |
| | ) | |
| **NORTHWESTERN UNIVERSITY,** | ) | The Honorable Judge Edmond E. |
| **AMANDA DASILVA, HEATHER VAN** | ) | Chang |
| **HOEGARDEN OBERING, MICHAEL** | ) | |
| **POLISKY, and PAMELA BONNEVIER,** | ) | |
| | ) | |
| Defendants. | ) | |

**PAMELA BONNEVIER'S RULE 12(B)(6) MOTION TO DISMISS
COUNTS III, IV, V AND VIII OF PLAINTIFF'S COMPLAINT**

Christopher C. Kendall (ARDC No. 6209003)
Sara Siegall (ARDC No. 6297622)
Lena Shapiro (ARDC No. 6321499)
CHAPMAN SPINGOLA, LLP
190 S. LaSalle Street, Suite 3850
Chicago, Illinois 60603
(312) 606-8752
ckendall@chapmanspingola.com
ssiegall@chapmanspingola.com
lshapiro@chapmanspingola.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

PLAINTIFF'S ALLEGATIONS ............................................................................................. 3

   I.   2018: Plaintiff Transfers to NU as a Sophomore and Joins the Spirit Squad .................... 3

   II.  In Late 2018, Plaintiff Is Inappropriately Touched or Spoken to By Unidentified "Creepy Fans" and "Elderly Men" at Four NU-Sanctioned Events ................................... 4

   III. Bonnevier Allegedly Demeans Female Spirit Squad Members and Trivializes Plaintiff's Concerns about Harassment ................................................................................ 5

   IV. January-October 2020: Plaintiff Reports Concerns Regarding Bonnevier to NU, and Eventually Learns that Bonnevier Had Been Terminated ........................................... 6

ARGUMENT ........................................................................................................................... 7

   I.   Plaintiff Has Failed to Allege any TVPRA Claim Against Bonnevier .............................. 7

       A.  Plaintiff Fails to Plead the Existence of Any Commercial Sex Act ............................ 7

       B.  Plaintiff Does Not Allege that Bonnevier Knowingly Benefitted from Any Sex Trafficking Venture ........................................................................................... 8

       C.  Plaintiff Does Not Allege Facts Reflecting that She Was Coerced into Engaging in Any Commercial Sex Act Under Threat of Serious Harm ..................... 9

   II.  Plaintiff's IIED Claim Against Bonnevier is Time-Barred and Insufficiently Pled ......... 12

       A.  The IIED Claim Against Bonnevier is Time-Barred Because of All of Her Conduct on Which the Claim is Based Occurred Before January 29, 2019 ............. 12

       B.  Plaintiff Does Not Sufficiently Plead Any Element of An IIED Claim .................... 12

           i.   Bonnevier's Alleged Conduct Is Not "Extreme and Outrageous" .................... 12

           ii.  The Allegations do not Reflect that Bonnevier Intended or Knew of a High Probability that Her Conduct Would Cause Severe Emotional Distress ........................................................................................................... 15

           iii. Plaintiff is Not Alleged to Have Suffered Severe Emotional Distress Because of Bonnevier ........................................................................................ 16

CONCLUSION....................................................................................................................... 16

# TABLE OF AUTHORITIES

## Cases

*Boutros v. Park Plaza Nw. Home for the Aged*,
    No. 16 CV 5133, 2016 WL 6995568 (N.D. Ill. Nov. 30, 2016) .............................................. 15

*Davis v. Palos Health*,
    No. 18 C 4345, 2019 WL 214916 (N.D. Ill. Jan. 16, 2019).............................................. 13, 15

*Doe 1 v. Red Roof Inns, Inc.*,
    No. 1:19-CV-03840-WMR, 2020 WL 1872335 (N.D. Ga. Apr. 13, 2020)................................ 8

*Esparza v. S.R. Barnum, Inc.*,
    2021 WL 1784755 (May 5, 2021)........................................................................................... 14

*Feltmeier v. Feltmeier*,
    207 Ill. 2d 263 (2003) ........................................................................................................... 12

*Freeman v. Holy Cross Hosp.*,
    No. 10 C 4157, 2011 WL 1559208 (N.D. Ill. Apr. 25, 2011)................................................ 13

*Geiss v. Weinstein Co. Holdings LLC*,
    383 F. Supp. 3d 156, 169 (S.D.N.Y. 2019) ............................................................................. 9

*Gross v. Chapman*,
    475 F. Supp. 3d 858 (N.D. Ill. 2020) .................................................................................... 12

*Hall v. Nat'l Collegiate Athletic Ass'n*,
    985 F. Supp. 782 (N.D. Ill. 1997) ........................................................................................... 3

*Honaker v. Smith*,
    256 F.3d 477 (7th Cir. 2001)................................................................................................. 15

*Kelsey v. Goldstar Est. Buyers Corp.*,
    No. 3:13-CV-00354-HU, 2014 WL 1155253 (D. Or. Mar. 21, 2014)................................... 10

*Knysak v. Shelter Life Ins. Co.*,
    273 Ill. App. 3d 360 (5th Dist. 1995).................................................................................... 16

*Kolbek v. Twenty First Century Holiness Tabernacle Church, Inc.*,
    No. 10-CV-4124, 2013 WL 6816174 (W.D. Ark. Dec. 24, 2013)........................................... 7

*Kolegas v. Heftel Broad. Corp.*,
    154 Ill. 2d 1 (1992)............................................................................................................... 12

*Miller v. Equitable Life Assur. Soc. of the U.S.*,
    181 Ill. App. 3d 954 (1989).................................................................................................. 13

*Mohiuddin v. Nw. Med. Cent. DuPage Hosp.*,
   No. 18 C 313, 2019 WL 918479 (N.D. Ill. Feb. 25, 2019) ..................................................... 15

*Muchira v. Al-Rawaf*,
   No. 1:14-CV-770 AJT/JFA, 2015 WL 1787144 (E.D. Va. Apr. 15, 2015) ............................. 10

*Petrovic v. Am. Airlines, Inc.*,
   No. 13 C 246, 2014 WL 683640 (N.D. Ill. Feb. 21, 2014) .................................................... 14

*Public Finance Corp. v. Davis*,
   66 Ill.2d 85 (1977) ............................................................................................................... 13

*Rudis v. Nat'l Coll. of Educ.*,
   191 Ill. App. 3d 1009 (1989) ................................................................................................ 14

*Sanders v. Chicago Transit Auth.*,
   No. 19-CV-04656, 2020 WL 5253867 (N.D. Ill. Sept. 3, 2020) ........................................... 13

*Slaughter v. Waubonsee Cmty. Coll.*,
   No. 94 C 2525, 1994 WL 663596 (N.D. Ill. Nov. 18, 1994) .................................................. 14

*Whitehead v. AM Int'l, Inc.*,
   860 F. Supp. 1280 (N.D. Ill. 1994) ....................................................................................... 13

*Woods v. Clay*,
   No. 01 C 6618, 2005 WL 43239 (N.D. Ill. Jan. 10, 2005) ..................................................... 16

*Wrenn v. Exelon Generation, LLC*,
   No. 18 C 2524, 2019 WL 11660918 (N.D. Ill. Mar. 5, 2019) ............................................... 13

**Statutes**

18 U.S.C. § 1589 .......................................................................................................................... 1

18 U.S.C. § 1591 ................................................................................................................. 2, 7, 10

18 U.S.C. § 1595 .......................................................................................................................... 9

735 ILCS 5/13-202 ..................................................................................................................... 12

**Other Authorities**

*Cost of Attendance*, Northwestern,
   https://web.archive.org/web/20180529172307/http://undergradaid.northwestern.edu/aid
   -basics-eligibility/cost-of-attendance.html. ....................................................................... 11

Mohamed Abdelfattah, *Hayden Richardson wins Truman Scholarship*,
   Northwestern Now (Apr. 15, 2020),

https://news.northwestern.edu/stories/2020/04/hayden-richardson-wins-truman-scholarship./.................................................................................................................... 4

## INTRODUCTION

In her Complaint, Plaintiff Hayden Richardson describes her decision to transfer from The University of Nebraska to Northwestern University ("NU") as a sophomore, in fall 2018, as a double major in political science and legal studies. (Compl. ¶¶ 47-48.) Upon arriving, Plaintiff quickly became involved in NU activities and assumed leadership positions, as a member of NU's academic integrity appeals committee, Chair of the Political Science Undergraduate Board, and treasurer of the coed legal fraternity, Phi Alpha Delta. (*Id*. ¶ 48.) Plaintiff also "looked into" NU's Spirit Squad, sent an audition tape to the squad's coach, Defendant Pamela Bonnevier, and was immediately accepted. (*Id*. ¶ 50.)

Plaintiff also describes the negative attention and criticism NU received over several years preceding Plaintiff's decision to transfer there, for allegedly mishandling charges of on-campus rape and sexual assault unrelated to NU's athletic department or cheerleading program. (*Id*. ¶¶ 26-44.) Plaintiff then pivots to alleging that, as a Spirit Squad member, she was subjected to "harassment and sexual assault from fans," including being inappropriately touched while taking photos, or lifted off the ground, at four events in late 2018. (*Id*. ¶¶ 57, 61, 65.)

According to Plaintiff, because Bonnevier "sent" Plaintiff and her teammates to these NU-sanctioned events, which were generally attended by unidentified NU donors and fans, Bonnevier and her NU athletic department colleagues were running a "sex trafficking venture" in violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1589, *et seq.* (Counts III, IV and V). Plaintiff also claims that Bonnevier's allegedly unkind and sexist behavior towards Plaintiff renders Bonnevier liable for the Illinois common law tort of intentional infliction of emotional distress ("IIED") (Count VIII).

For the record, Bonnevier denies engaging in unlawful or improper conduct of any kind. However, even accepting the truth of Plaintiffs' allegations, as required for purposes of a Rule

12(b)(6) Motion to Dismiss, Plaintiff's allegations come nowhere close to pleading valid causes of action against Bonnevier for violating the TVPRA or for IIED.

As to Counts III, IV and V, Plaintiff does not allege the predicate "commercial sex act," defined as "any sex act, on account of which anything of value is given to or received by any person" necessary to support any TVPRA claim. 18 U.S.C. § 1591(e)(3). The conclusory allegation that the events at which Plaintiff was harassed were attended by elderly male donors does not establish that anyone ever donated to NU "on account of" engaging in a "sex act" with Plaintiff (or any other cheerleader for that matter). (*See infra*, Arg. Sec. I(A).) Similarly, the Complaint contains no facts raising a plausible inference that Bonnevier knew or should have known that her coaching salary was supported by donations made to NU in exchange for inappropriately touching Plaintiff or her teammates at NU events. (*See infra*, Arg. Sec. I(B).) Likewise, even if the Spirit Squad could be characterized as a "sex trafficking venture" (it cannot), Plaintiff's purported concerns that quitting the team might compromise her modest Spirit Squad scholarships or require her to reimburse certain unquantified travel expenses, does not demonstrate that she lacked "free will" to leave the Spirit Squad, as required to state a claim under TVPRA Sec. 1589. (*See infra*, Arg. Sec. I(C).)

As to Count VIII, Plaintiff's IIED claim is not only barred by the applicable two-year statute of limitations, but it also fails to plead that Bonnevier engaged in "extreme and outrageous conduct," or that her conduct was intended to and did cause Plaintiff to suffer the "severe" degree of emotional distress for which the law provides a remedy. (*See infra*, Arg. Sec. II.)

There is certainly room to call out and criticize the improper conduct of those men who inappropriately touch women, especially as exemplified by the "creepy fan" interactions Plaintiff allegedly endured. But neither the TVPRA nor Illinois common law on IIED impose civil liability

on cheerleading coaches for the reprehensible behavior of some intoxicated football fans. Counts III, IV, V, and VIII against Bonnevier are deficient and should be dismissed.

**PLAINTIFF'S ALLEGATIONS**

### I.     2018: Plaintiff Transfers to NU as a Sophomore and Joins the Spirit Squad

During her freshman year at University of Nebraska, Plaintiff was accepted by and decided to transfer to NU for her sophomore year, in the fall of 2018. (Compl. ¶¶ 47-48.) The cost of full-time tuition and on campus living expenses for NU's 2018-2019 academic year was $75,753.[1]

Upon arriving at NU, Plaintiff, who had "been involved with the sport of cheerleading for much of her life," began looking into NU's cheerleading program. (*Id.* ¶¶ 45, 49.) Plaintiff then contacted NU's cheerleading coach, Pamela Bonnevier, regarding joining the team, submitted videos in support of her application, and was accepted. (*Id.* ¶ 50.) During the 2018-2019 preseason, Plaintiff signed a "'Spirit Squad" contract, requiring Plaintiff to attend home games, tournaments, and "any other events prescribed by the coaching staff." (*Id.* ¶ 55.) This contract also provided that a cheerleader who quit or was terminated from the Spirit Squad would be responsible for reimbursing the University for all fees and expenses associated with attending Spirit Squad events, including travel, food, equipment and camp expenses. (*Id.*) The Complaint contains no allegations as to whether this Spirit Squad contract was ever enforced or threatened to be enforced against Plaintiff or any other cheerleader, or how much the aforementioned "fees and expenses" were.

In 2019 and 2020, Plaintiff was awarded scholarships of $5,500 and $4,041, respectively, for participating on the Spirit Squad. (*Id.* ¶ 51.) The scholarships were relatively modest in

---

[1]     *See Cost of Attendance*, Northwestern, https://web.archive.org/web/20180529172307/http://undergradaid.northwestern.edu/aid-basics-eligibility/cost-of-attendance.html. This Court can take judicial notice of this fact. *Hall v. Nat'l Collegiate Athletic Ass'n*, 985 F. Supp. 782, 793 (N.D. Ill. 1997) (in denying motion for temporary restraining order requiring university to reinstate athletic scholarship, taking "judicial notice that student loans are the common means of financing a college education").

3

comparison to (i) the overall cost of attending NU as noted above, and (ii) the $30,000 Harry S. Truman Scholarship that Plaintiff received in 2020, in recognition of her "plan to pursue a career in public service."[2] (*Id.* ¶ 52.) Plaintiff's Spirit Squad scholarships are not alleged to have been conditioned on anything other than general participation on the squad, or subject to revocation had Plaintiff decided to leave the squad at any point.

## II.    In Late 2018, Plaintiff Is Inappropriately Touched or Spoken to By Unidentified "Creepy Fans" and "Elderly Men" at Four NU-Sanctioned Events

During her time on the Spirit Squad, Plaintiff and other cheerleaders were sent to football games, tailgates and other fundraising events wearing "skimpy" cheerleading uniforms. (*Id.* ¶¶ 57-59.) During these events, Plaintiff felt "demoralized" from what she generally describes as "harassment and sexual assault" from fans. (*Id.*) Specifically, Plaintiff points to interactions with unidentified "fans" at four events in late 2018:

- **September 8, 2018**: Plaintiff was "sent out to mingle with fans," some of whom made statements such as "can you dance for me," and "we will have fun together tonight." (*Id.* ¶ 59.)

- **September 15, 2018**: During a football game, intoxicated fans "shouted at Plaintiff" throughout the game that she was "too fine" and that they would "find [her] after the game, baby." (*Id.* ¶ 61.) Plaintiff also claims that Bonnevier told those fans Plaintiff's name and declined Plaintiff's request to switch sides of the football field to distance herself from those fans. (*Id.* ¶¶ 61-62.)

- **November 3, 2018**: During a tailgating event, Plaintiff was "picked up by a fan during a photo opportunity and touched inappropriately on her buttocks." (*Id.* ¶ 68.) When Plaintiff told Bonnevier of this incident after-the-fact, Bonnevier "smirked" and said "Go Cats." (*Id.* ¶ 69.) During the football game following this tailgating event, "a dildo was thrown at the [Spirit Squad] from the stands." (*Id.*)

---

[2] The dollar amount of the Harry Truman Scholarship is not alleged in the Complaint but reported online and subject to this Court's judicial notice. Mohamed Abdelfattah, *Hayden Richardson wins Truman Scholarship*, Northwestern Now (Apr. 15, 2020), https://news.northwestern.edu/stories/2020/04/hayden-richardson-wins-truman-scholarship/.

- **January 1, 2019**: At an "open bar mingling event" in downtown San Diego, Plaintiff was "hit on" by numerous "male fans," including one who picked her up and refused Plaintiff's request to be put down. (*Id*. ¶77.) Another fan at this event "groped Plaintiff, grabbing her behind." (*Id*. ¶ 78.)

Plaintiff claims generally that Bonnevier instructed her and her teammates to attend "alumni events," in their uniforms and to "flirt, and take pictures with the elderly men," who would "slyly touch[] them inappropriately on their lower backs and behinds while taking photos." (*Id*. ¶65.) Plaintiff does not identify any specific "elderly man" who behaved in this manner.

Likewise, Plaintiff does not allege that Bonnevier knew or had any control over the unidentified "fans" or "elderly men" who spoke to or touched Plaintiff inappropriately. Similarly, Plaintiff concludes that NU and Bonnevier were presenting her and her teammates as "sex objects," because the "happier these men [at alumni events] were, the more money the University would receive from them." (*Id*. ¶ 66.) However, Plaintiff does not allege that any fan or "elderly man" who engaged in inappropriate behavior made a donation to NU in exchange for that interaction.

## III. Bonnevier Allegedly Demeans Female Spirit Squad Members and Trivializes Plaintiff's Concerns about Harassment

Plaintiff claims that, during her time on the Spirit Squad, Plaintiff and her teammates were subject to Bonnevier's "degrading and shameful treatment" such as: (i) "being told that they were not attractive or skinny enough" (*Id*. ¶ 53); (ii) telling them they could not eat before or during an away-game in Minnesota, and requiring them to throw away food given to them by the Minnesota cheerleading coach (*Id*. ¶¶ 71-73); (iii) at the same Minnesota game, causing them to change clothes on the bus where passers-by could see in the windows (*Id*. ¶ 74); (iv) at a January 1, 2019 Bowl parade in San Diego, requiring them to wear crop tops, without coats, despite cold and rainy weather, "yelling at" them, not providing access to a bathroom for hours, and then forcing them to change clothes in a public bathroom (*Id*. ¶¶ 79-81).

Bonnevier also allegedly sent Plaintiff and her teammates into tailgates and events alone to mingle and take photographs with fans. (*Id*. ¶¶ 57, 78.) At a preseason meeting in 2018, Bonnevier discussed "dealing with creepy fans" at these events and advised that if those fans "place[d] their hand too low or act[ed] uncomfortable" while taking a photograph, the cheerleaders should just "take the picture and move on." (*Id*. ¶ 56.) Plaintiff claims that this advice "reaffirmed" an "ideology of 'just take it'" that "permeated the [Spirit Squad] culture." (*Id*.)

## IV.   January-October 2020: Plaintiff Reports Concerns Regarding Bonnevier to NU, and Eventually Learns that Bonnevier Had Been Terminated

On January 8, 2019, during an exit evaluation with Spirit Squad team doctor, Dr. Jain, Plaintiff "raised concerns regarding Bonnevier's treatment, including forcing Plaintiff and the cheerleading team to participate in events where they were subjected to sexual harassment, exploitation and sexual assault so the University could profit." (*Id*. ¶ 82.) From January 8, 2019 through May 28, 2019, Plaintiff met and communicated with various University officials, including defendants DaSilva, Obering, and Polisky, whom Plaintiff claims disregarded and/or minimized her concerns. (*Id*. ¶¶ 82-96.)

In June 2020, NU's Title IX office informed Plaintiff that it had opened an "official investigation" into her complaints regarding Bonnevier. (*Id*. ¶ 104.) However, because Plaintiff was deemed a "witness" rather than a "complainant," NU would not share the details of that investigation with Plaintiff, except to inform her that the "case was closed" on October 7, 2020. (*Id*. ¶¶ 104-109.)

In November 2020, Plaintiff learned from defendant Polisky that NU terminated Bonnevier's employment on October 31, 2020. (*Id*. ¶ 110.) NU would not inform Plaintiff of the reason for Bonnevier's termination or for the gap in time between her termination and the closure of NU's investigation. (*Id*.)

6

Bonnevier is not alleged to have been aware of Plaintiff's complaints or to have had any knowledge of or involvement in NU's actions in response. The Complaint also does not identify any inappropriate sexual language or conduct, by anyone, after January 1, 2019.

In fact, the only conduct attributed to Bonnevier after January 1, 2019, is her alleged statement to the Spirit Squad during the 2019 preseason that, since NU cancelled their appearance at tailgates," the Spirit Squad "would not have food to eat."[3] (*Id*. ¶ 99.) Plaintiff responded to Bonnevier by stating "that is fine, I don't trade sexual harassment for food." (*Id*.)

**ARGUMENT**

## I. Plaintiff Has Failed to Allege any TVPRA Claim Against Bonnevier

The NU Memorandum raises numerous deficiencies with Plaintiff's TVPRA Claims, which apply equally to Bonnevier and which Bonnevier incorporates herein. (NU Memorandum, §§ I(A)(1), I(A)(3), I(B). Bonnevier focuses in this Memorandum on further pleading deficiencies that were not included in the NU Memorandum and/or are specific to Bonnevier.

### A. Plaintiff Fails to Plead the Existence of Any Commercial Sex Act

To state a TVPRA claim, plaintiffs must allege facts sufficient to raise a plausible inference that they were forced, defrauded, or coerced into engaging in a "commercial sex act." "Commercial sex act" is defined in TVPRA Section 1591(e)(3) as "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3). Courts have interpreted this definition to require a "causal relationship between the sex act and an exchange of an item of value." *Kolbek v. Twenty First Century Holiness Tabernacle Church, Inc.*, No. 10-CV-4124, 2013 WL 6816174, at *16 (W.D. Ark. Dec. 24, 2013). In *Kolbek*, for example, there was no dispute that plaintiffs, as members of a Christian ministry, went on ministry-sponsored trips during which they

---

[3] This allegation is inconsistent with earlier allegation that Bonnevier would not permit female Spirit Squad members to eat before games at all. (*See id.* ¶ 71.)

were sexually abused by the ministry's leader. *Id*. However, plaintiffs' TVPRA claims were disposed of on summary judgment because plaintiffs "offered [no] evidence showing that [their] living expenses were paid as some sort of *quid pro quo* for the sex acts that occurred." *Id*.

Similarly here, Plaintiff alleges in a conclusory fashion that she and the other cheerleaders "were being presented as sex objects to titillate the men that funded the majority of NU's athletics programs," but does not identify a causal connection between any "sex act" and any donation or other "item of value." (Compl. ¶ 66.) Plaintiff's descriptions of unidentified fans inappropriately touching her during brief photo opportunities, making unwanted sexual comments or picking Plaintiff up at an event, even if sufficient to constitute "sex acts", are only half of the required elements of a commercial sex act. (*Id*. ¶¶ 59, 68, 75-78.) There are no allegations that anyone donated to NU or otherwise gave any "item of value" in exchange for those encounters, and therefore those acts are not "commercial sex acts."[4] Without any "commercial sex act," Plaintiffs' TVPRA claims are deficient, and must be dismissed.

### B. Plaintiff Does Not Allege that Bonnevier Knowingly Benefitted from Any Sex Trafficking Venture

Even if Plaintiff somehow pled that NU engaged in a sex trafficking venture as defined by the TVPRA, Bonnevier is not a proper defendant because there are no facts demonstrating that she knowingly benefitted from such a venture. "Unlike direct perpetrators of sex trafficking, aiders and abettors of sex trafficking are liable under the TVPRA only if they knowingly '*benefit*[ ], financially or by receiving anything of value, from participation in a venture which has engaged

---

[4] Since Plaintiff does not allege that any "commercial sex act" occurred, it follows that Bonnevier also could not have had the requisite knowledge that she was "assisting, supporting or facilitating" trafficking, as required to state a claim against her. *Doe 1 v. Red Roof Inns, Inc.*, No. 1:19-CV-03840-WMR, 2020 WL 1872335, at *3 (N.D. Ga. Apr. 13, 2020) (internal quotations omitted) (granting motion to dismiss TVPRA claim against hotel franchisors and stating that "[a]ssociation alone cannot establish liability; instead, knowledge and some participation in the sex trafficking act itself must be shown").

in" sex trafficking.'" *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 169 (S.D.N.Y. 2019) (quoting 18 U.S.C. §§ 1591(a)(2), 1595(a)) (emphasis added) (granting motion to dismiss TVPRA claims against officers and directors of The Weinstein Company, because there were no allegations demonstrating that they were compensated "because of [their] facilitation of H. Weinstein's sexual misconduct"). "The participation giving rise to the benefit must be participation *in a sex-trafficking venture*, not participation in other activities engaged in by the sex traffickers that do not further the sex-trafficking aspect of their venture." *Id*. (emphasis in original). Stated differently, "there must be a causal relationship between affirmative conduct furthering the sex-trafficking venture and receipt of a benefit, with actual or, in the civil context, constructive knowledge of that causal relationship." *Id*. at 169.

Plaintiff's only attempt to satisfy the "knowing benefit" element of a TVPRA claim is her conclusory allegation that "Bonnevier formed a venture with NU for the purpose of increasing donations to NU, which on information and belief allowed for larger salary opportunities and continued employment." (Compl. ¶ 192.) However, no facts are alleged reflecting Bonnevier's actual or constructive knowledge that her salary or continued employment was contingent on fans making donations to NU in exchange for sexual encounters with Plaintiff or other cheerleaders.

In sum, even more so than the Weinstein Company officers and directors against whom TVPRA claims were dismissed in *Geiss*, Plaintiff's Complaint "pleads no facts that would plausibly support [the] conclusion" that Northwestern provided benefits to Bonnevier "because of [Bonnevier's] facilitation of [football fans'] sexual misconduct." *Geiss*, 383 F. Supp. 3d at 169.

## C. Plaintiff Does Not Allege Facts Reflecting that She Was Coerced into Engaging in Any Commercial Sex Act Under Threat of Serious Harm

Bonnevier adopts and incorporates the NU Defendants' argument that Plaintiff has not alleged any facts demonstrating that Plaintiff was forced, defrauded or coerced into engaging in

any commercial sex act. (NU Memorandum, § I(B)(1)(b).) As noted in the NU Memorandum, "Coercion" is defined by the TVPRA, among other ways, as "threats of **serious harm**" or "any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in **serious harm**." 18 U.S.C. § 1591(e)(2) (emphasis added). "[T]he critical inquiry for the purposes of the TVPRA is whether a person provides [the subject] services free from a defendant's physical or psychological coercion that as a practical matter eliminates the ability to exercise free will or choice." *Muchira v. Al-Rawaf*, No. 1:14-CV-770 AJT/JFA, 2015 WL 1787144, at *6 (E.D. Va. Apr. 15, 2015), *aff'd*, 850 F.3d 605 (4th Cir. 2017), *as amended* (Mar. 3, 2017) (granting summary judgment in defendant's favor as to TVPRA claims where there was no evidence of any threat of "serious harm").

Courts have dismissed TVPRA claims where the "serious harm" element was pled only in a conclusory fashion. *See, e.g., Kelsey v. Goldstar Est. Buyers Corp.*, No. 3:13-CV-00354-HU, 2014 WL 1155253, at *1 (D. Or. Mar. 21, 2014) (barebones allegation that defendant "compelled compliance by instilling a fear that he would withhold from Plaintiffs the necessities of life, such as food, shelter, money, and/or continued employment" was insufficient to plead coercion).

The Complaint comes nowhere close to demonstrating that Bonnevier (or any defendant) "eliminated [Plaintiff's] ability to exercise free will or choice" to refrain from engaging in any activities that she perceived to constitute commercial sex acts or leave the Spirit Squad altogether. *Muchira*, 2015 WL 1787144, at *6. Plaintiff's only attempt to fulfill this pleading requirement is by (i) referencing her receipt of Spirit Squad scholarships that represented a small percentage of total tuition—$5,500 in 2019 and $4,041 in 2020; and (ii) pointing to the 2018-2019 Spirit Squad contract under which Plaintiff was obligated, upon quitting or being terminated from the Spirit

Squad, to "reimburs[e] the University for all fees and expenses associated with attending [Spirit Squad] events, including travel, food, equipment and camp expenses." (Compl. ¶ 55.)

These facts are insufficient to establish the required threat of "serious harm." In 2018, when Plaintiff elected to attend NU and joined the Spirit Squad, the annual cost of attendance was $70,746 ($54,120 tuition plus $16,626 room/board). There are no facts alleged in the Complaint raising the slightest inference that Plaintiff's financial ability to attend NU, or generally receive a college education, was contingent on her receipt of these scholarships, covering less than 8% of attendance. Nor does Plaintiff allege any facts demonstrating that these scholarships were contingent on her engaging in any commercial sex acts, or even that these scholarships would have had to have been repaid had she quit the Spirit Squad after receiving them.

Similarly, the mere existence of the Spirit Squad contract, without more, is insufficient to demonstrate a threat of "serious harm." No facts are alleged demonstrating the amount of "fees and expenses" for which a departing Spirit Squad member might be held responsible under this contract, or whether this contract was ever actually enforced, or threatened (by Bonnevier or anyone else) to be enforced against Plaintiff.

Simply put, the Complaint is devoid of facts raising a plausible inference that Plaintiff's Spirit Squad scholarships or the 2018-2019 Spirit Squad contract created such serious financial consequences to have deprived Plaintiff of her free will to decline to participate in any unidentified commercial sex act, or to leave the Spirit Squad altogether. The TVPRA claims should be dismissed on this additional ground.

## II.     Plaintiff's IIED Claim Against Bonnevier is Time-Barred and Insufficiently Pled

### A.     The IIED Claim Against Bonnevier is Time-Barred Because of All of Her Conduct on Which the Claim is Based Occurred Before January 29, 2019

As the NU Defendants set forth in their Memorandum (at Sec. IV(A)), the two-year statute of limitations for an IIED claim bars Plaintiff from bringing an IIED claim arising from any actions taking place prior to January 29, 2019. 735 ILCS 5/13-202.

Plaintiff's IIED claim must be dismissed as to Bonnevier because all of her alleged conduct on which Count VIII is based (*i.e.*, various statements and actions occurring at (i) a team meeting preceding the 2018-2019 football season, (ii) a September 2018 football game at NU; (iii) a November 2018 football game in Minneapolis, and (iv) a January 1, 2019 event in San Diego) are outside the two-year statutory window. (*Id.* ¶¶ 61-62, 73, 252.)

### B.     Plaintiff Does Not Sufficiently Plead Any Element of An IIED Claim

Even if Bonnevier's pre-January 29, 2019 conduct could be considered for purposes of Plaintiff's IIED claim, Count VIII should still be dismissed because Plaintiff fails to allege facts sufficient to demonstrate any of the required elements: "that (1) [Bonnevier's] conduct was truly extreme and outrageous; (2) [Bonnevier] intended to inflict severe emotional distress (or knew that there was at least a high probability that its conduct would cause severe emotional distress); and (3) [Bonnevier's] conduct did in fact cause severe emotional distress." *Gross v. Chapman*, 475 F. Supp. 3d 858, 863 (N.D. Ill. 2020) (citing *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 268–69 (2003)) (granting Rule 12(b)(6) motion to dismiss IIED claim).

#### i.     Bonnevier's Alleged Conduct Is Not "Extreme and Outrageous"

"Extreme and outrageous" conduct sufficient to support an IIED claim must be "so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community." *Kolegas v. Heftel Broad. Corp.*, 154 Ill. 2d 1, 21 (1992). Accordingly, satisfying the

"extreme and outrageous conduct" element of an IIED claim "require[es] a heightened level of egregiousness in comparison to other intentional torts such as assault and battery." *Whitehead v. AM Int'l, Inc.*, 860 F. Supp. 1280, 1290 (N.D. Ill. 1994) (citing *Public Finance Corp. v. Davis,* 66 Ill.2d 85, 89 (1977)) (granting motion to dismiss).

Even misconduct sufficient to support sexual harassment claims does not necessarily rise to the level of "extreme and outrageous" conduct required to plead and prove an IIED claim. *See, e.g., Sanders v. Chicago Transit Auth.*, No. 19-CV-04656, 2020 WL 5253867, at *5 (N.D. Ill. Sept. 3, 2020) (allegations that plaintiff's supervisor made unwelcome sexual advances and, after plaintiff refused, caused coworkers and managers to bully plaintiff, and then fired plaintiff for reporting his behavior to the EEOC, while sufficient to support Title VII claims, did not rise to the level of "extreme and outrageous conduct" needed to state an IIED claim); *Wrenn v. Exelon Generation, LLC*, No. 18 C 2524, 2019 WL 11660918, at *10 (N.D. Ill. Mar. 5, 2019) (stating that "a claim for IIED requires more than what is required for a Title VII sexual harassment claim," and dismissing IIED claim based on defendant co-worker's alleged unwelcome pursuit of plaintiff in text messages, on social media, and at her front door).[5]

Similarly, courts have routinely dismissed IIED claims brought by a student against a teacher or other school official based on alleged conduct that, even if "vulgar and reprehensible," was not sufficiently "extreme and outrageous." *Slaughter v. Waubonsee Cmty. Coll.*, No. 94 C

---

[5] *See also, e.g.*, *Freeman v. Holy Cross Hosp.*, No. 10 C 4157, 2011 WL 1559208, at *2 (N.D. Ill. Apr. 25, 2011) (IIED claim not stated where plaintiff alleged that defendant-supervisor "made comments of a sexual nature, asked her out on dates, sent sexually suggestive and explicit links to her personal email account, treated her differently than other employees, failed to investigate her harassment claims, attempted to grab her buttocks, and rubbed his hands on her thighs"); *Miller v. Equitable Life Assur. Soc. of the U.S.*, 181 Ill. App. 3d 954, 956 (1989) (affirming dismissal of IIED claim arising from allegations that plaintiff "was subject to an offensive touching by one [of defendant's] employee[s], subject to vulgar remarks and encouraged by a district manager to use sex to sell insurance policies").

2525, 1994 WL 663596, at *3–4 (N.D. Ill. Nov. 18, 1994) (dismissing IIED claim arising from professor allegedly seeking "sexual favors in exchange for" giving plaintiff a higher grade, and then repeatedly asking her not to disclose his behavior); *see also Rudis v. Nat'l Coll. of Educ.*, 191 Ill. App. 3d 1009, 1011–12 (1989) (university administrators allegedly expelling student and falsely accusing her of (i) engaging in "hanky panky" including "grade fixing and computer hacking", and (ii) stealing the school's official letterhead and using it to commit federal mail fraud, did not qualify as "extreme and outrageous" conduct sufficient to support an IIED claim).

The above-cited cases in which IIED claims were dismissed involved alleged misconduct far worse than Bonnevier's alleged actions here: (i) telling the Cheerleading team that they were not "attractive enough or skinny enough," (ii) giving Plaintiff's name to a group of intoxicated fans who were taunting Plaintiff at a football game; (iii) laughing when Plaintiff asked to switch sides of the football field to distance herself from those fans; (iv) advising that, if "creepy fans . . . place their hands too low or act uncomfortable" while taking a photograph, Plaintiff should just "take the picture and move on;" and (v) dissuading Plaintiff from eating prior to or during football games. (*See* Compl. ¶¶ 11, 53, 56, 62, 71-73, 252.)

These allegations fall well-below the "extreme and outrageous" threshold that must be met to state an IIED claim. *See, e.g.*, *Esparza v. S.R. Barnum, Inc*., 2021 WL 1784755 (May 5, 2021) (defendant-employer's "laughing off" plaintiff's reports of harassment and "refusing to acknowledge" plaintiff's on-the-job allergic reaction which put plaintiff into a coma, amounted to "indignities and insults insufficient that [were] insufficient for an IIED claim"); *Petrovic v. Am. Airlines, Inc.*, No. 13 C 246, 2014 WL 683640, at *2 (N.D. Ill. Feb. 21, 2014) (denying motion for leave to amend IIED claim on grounds of futility, and noting that "a mocking laugh from a supervisor is not actionable because it is no more than a mere insult or indignity").

**ii.** **The Allegations do not Reflect that Bonnevier Intended or Knew of a High Probability that Her Conduct Would Cause Severe Emotional Distress**

To satisfy the *scienter* element of an IIED claim (i.e., that the defendant *intended* or *knew of a high probability* that her actions would cause severe emotional distress), a plaintiff must allege that "defendant's actions, by their very nature, were likely to cause severe distress," or that the defendant "knew that a plaintiff was particularly susceptible to such distress and that, because of this susceptibility, the defendant's actions were likely to cause it to occur." *Boutros v. Park Plaza Nw. Home for the Aged*, No. 16 CV 5133, 2016 WL 6995568, at \*7 (N.D. Ill. Nov. 30, 2016); *Davis v. Palos Health*, No. 18 C 4345, 2019 WL 214916, at \*5 (N.D. Ill. Jan. 16, 2019) ("a person cannot intend to cause severe emotional distress if her conduct would not objectively produce such results").[6] Allegations of negligent or even willful conduct, without more, are insufficient to demonstrate that a defendant acted "with the required scienter." *Mohiuddin v. Nw. Med. Cent. DuPage Hosp.*, No. 18 C 313, 2019 WL 918479, at \*3 (N.D. Ill. Feb. 25, 2019) (dismissing IIED claim where plaintiff did not allege facts demonstrating the defendant's conduct, even if extreme or outrageous, was intended to cause severe emotional distress).

As noted above, Bonnevier is alleged, at most, to have made offensive comments to Plaintiff and/or minimized Plaintiff's concerns about drunken or inappropriate fans encountered at football games. The case law shows that this conduct is not, by its "very nature," likely to cause severe emotional distress. Likewise, Plaintiff does not allege that she was ever "particularly susceptible" to severe emotional distress, let alone that she told Bonnevier that she had such special susceptibility. Plaintiff's IIED claim fails on the scienter element as well.

---

[6] *Cf. Honaker v. Smith*, 256 F.3d 477, 493 (7th Cir. 2001) (allegations that mayor told plaintiff that he should "get [his] stuff and get out of town" or else mayor would "burn [him] out," and that mayor then caused plaintiff's home to be nearly destroyed in a fire, if proven, would be sufficient to demonstrate the intent element of an IIED claim).

### iii. Plaintiff is Not Alleged to Have Suffered Severe Emotional Distress Because of Bonnevier

Bonnevier concurs with and adopts herein the NU Defendants' argument that Plaintiff has failed to allege that she suffered any distress "so severe that no reasonable man could be expected to endure it," as required to state an IIED claim. (NU Memorandum, Sec. IV(B)(3).) Plaintiff's lone allegation relating to this element, that she "suffered depressive episodes, panic attacks, and was even prescribed medication," is not sufficient to demonstrate that she suffered "severe emotional distress." *Knysak v. Shelter Life Ins. Co.*, 273 Ill. App. 3d 360, 371 (5th Dist. 1995) (allegation that defendant's conduct caused plaintiff to be "very upset, very nervous, and very depressed" did not reflect "severe emotional distress" required to plead an IIED claim); *Woods v. Clay*, No. 01 C 6618, 2005 WL 43239, at *17 (N.D. Ill. Jan. 10, 2005) (allegations that plaintiffs suffered "humiliation, shame, guilt and embarrassment," as well as "sleepless nights, panic and anxiety," insufficient to support the "severe emotional distress" element of IIED claim).

Even if Plaintiff's alleged "depressive episodes," "panic attacks," and prescription for unspecified medications were sufficient to reflect "severe emotional distress," there are no allegations establishing a causal connection between those purported symptoms and Bonnevier's alleged conduct. Accordingly, Plaintiff fails to allege any element of an IIED claim and Count VIII should be dismissed against Bonnevier.

### CONCLUSION

For the foregoing reasons, Pam Bonnevier respectfully requests that the Court dismiss her from Counts III, IV, and VIII of Plaintiff's Complaint.

Respectfully submitted,

PAMELA BONNEVIER

By: /s/ Sara Siegall
    One of Her Attorneys

Christopher C. Kendall (ARDC No. 6209003)
Sara Siegall (ARDC No. 6297622)
Lena Shapiro (ARDC No. 6321499)
**CHAPMAN SPINGOLA, LLP**
190 South LaSalle Street, Suite 3850
Chicago, Illinois 60603
(312) 630-9202 (Telephone)
(312) 630-9233 (Facsimile)
rchapman@chapmanspingola.com
ckendall@chapmanspingola.com
lshapiro@chapmanspingola.com
wdickmann@chapmanspingola.com

### CERTIFICATE OF SERVICE

I, Sara L. Siegall, an attorney, hereby certify that on June 16, 2021, I caused the foregoing to be electronically filed with the Clerk of the Court by using the CM/ECF electronic filing system, which will send a notice of electronic filing to counsel of record.

/s/ Sara Siegall