**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

_____

**HAYDEN RICHARDSON,**

                           **Plaintiff,**

      **v.**

                                              **Case No.: 1:21-cv-00522**

**NORTHWESTERN UNIVERSITY,
AMANDA DASILVA, HEATHER VAN
HOEGARDEN OBERING, MICHAEL
POLISKY, and PAMELA
BONNEVIER.**

                         **Defendants.**

_____

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' RULE 12(b)(6) MOTIONS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iii

INTRODUCTION ................................................................................................... 1

APPLICABLE LEGAL STANDARDS ................................................................... 5

PLAINTIFF'S ALLEGATIONS .............................................................................. 6

    I.      Plaintiff's Background ................................................................. 6

    II.     Northwestern Cheerleading's Culture of Exploitation ........................................... 6

          A.     The Spirit Squad Contract ........................................................... 7

          B.     Bonnevier's Systematic Abuse of Northwestern's Cheerleaders ............... 7

          C.     Tailgating Events ........................................................... 8

          D.     Appearances at the Exclusive Wilson Club ................................. 9

          E.     Alumni Events ........................................................... 9

    III.    Top Athletics Department Officials Attempt to Silence and Discredit Ms. Richardson ................................................................. 10

          A.     Polisky's Background ................................................................. 10

          B.     Obering's Background ................................................................. 11

          C.     The Shaming of Ms. Richardson ............................................... 11

          D.     DaSilva Keeps the Complaint Within the Athletics Department ............. 12

    IV.    The Abuse and Harassment Continues in the 2019-2020 Season ........................ 13

ARGUMENT ........................................................................................................ 14

    I.      Ms. Richardson Alleged Plausible Trafficking and Forced Labor Claims Against Bonnevier as the Perpetrator of the Acts in Question ............................ 14

    II.     Ms. Richardson Alleged Plausible Forced Labor and Trafficking Claims Against the University, Polisky, Obering and DaSilva ...................................... 22

          A.     Ms. Richardson's Allegations Satisfy 18 U.S.C. §1595 ......................... 24

i

1. Defendants Participated in a Venture ............................................. 24

2. Defendants "Knew or Should Have Known" That the
Venture Engaged in Acts That Violated the TVPA...................... 28

3. Defendants Knowingly Benefitted from Participation in
the Venture...................................................................................... 31

B. Ms. Richardson Alleged A Plausible Claim Under 18 U.S.C. § 1591 ..... 32

1. Ms. Richardson Has Alleged A "Commercial Sex Act" .............. 32

2. Ms. Richardson Alleged Serious Harm ........................................ 34

C. Ms. Richardson Alleged A Plausible Claim Under 18 USC § 1589(b).... 35

D. The University May Be Held Vicariously Liable ..................................... 36

III. Ms. Richardson Alleged a Breach of Contract Claim Against the University ..... 38

IV. Ms. Richardson Alleged A Plausible IIED Claim Against Bonnevier ................. 41

CONCLUSION....................................................................................................... 45

# TABLE OF AUTHORITIES

Cases

*A.B. v. Marriott Int'l, Inc.*,
    455 F. Supp. 3d 171 (E.D. Pa. 2020) ..................................................................... 27, 30, 34, 37

*A.C. v. Red Roof Inns Inc.*,
    2020 WL 3256261 (S.D. Ohio June 16, 2020) ......................................................... 24

*Aguilera v. Aegis Comm'ns Group, LLC*,
    72 F. Supp. 3d 975 (W.D. Mo. 2014) ........................................................... 23, 28, 31

*Ali v. Khan*,
    336 F. Supp. 3d 901 (N.D. Ill. 2018) ..................................................................... 24, 32

*Alvarado v. Universidad Carlos Abizu*,
    2010 WL 3385345 (S.D. Fla. Aug. 25, 2010) .......................................................... 35

*Am. Safety Cas. Ins. Co. v. City of Waukegan*,
    2009 WL 855795 (N.D. Ill. 2009) ............................................................................ 5

*Ardolf v. Weber*,
    332 F.R.D. 467 (S.D.N.Y. 2019) ..................................................................... passim

*B.M. v. Wyndham Hotels & Resorts, Inc.*,
    2020 WL 4368214 (N.D. Cal. July 30, 2020) ......................................................... 30

*Barry Aviation Inc. v. Land O'Lakes Municipal Airport Comm'n.*,
    377 F.3d 682 (7th Cir. 2004) ................................................................................... 6

*Bilut v. Northwestern Univ.*,
    645 N.E.2d 536 (Ill. App. Ct. 1994) ....................................................................... 41

*Bridges v. Poe*,
    487 F. Supp. 3d 1250 (N.D. Ala. 2020) .......................................................... 21, 28

*Bristow v. Drake St. Inc.*,
    41 F.3d 345 (7th Cir. 19994) ................................................................................... 45

*Canosa v. Ziff*,
    2019 WL 498865 (S.D.N.Y. 2019) ................................................................. 23, 25

*Carter v. Paschall Truck Lines, Inc.*,
    324 F. Supp. 3d 900 (W.D. Ky. 2018) .................................................................... 19

*Cook Cnty. Rep. Party v. Pritzker*,
  487 F. Supp. 3d 705 (N.D. Ill. 2020) ....................................................... 6

*David v. Weinstein Co.*,
  431 F. Supp. 3d 290 (S.D.N.Y. 2019) ............................................... 16, 22

*DiPerna v. The Chicago School of Prof'l Psych.*,
  2015 WL 361902 (N.D. Ill. Jan. 27, 2015) ...................................... 38, 40

*Doe v. Columbia College Chicago*,
  933 F.3d 849 (7th Cir. 2019) ...................................................................... 41

*Doe v. Moravian Coll.*,
  2021 WL 843603 (E.D. Pa. Mar. 5, 2021) ............................................... 43

*Doe v. Rickey Patel, LLC*,
  2020 WL 6121939 (S.D. Fla. Sept. 30, 2020) ...................................... 27, 28

*Doe v. Sperlik*,
  2005 WL 3299818 (N.D. Ill. 2005) ........................................................... 37

*Doe v. St. Clair Cnty.*,
  2018 WL 3819102 (S.D. Ill. Aug. 19, 2018) ........................................... 37

*E.S. v. Best Western Int'l, Inc.*,
  2021 WL 37457 (N.D. Tex. Jan. 4, 2021) ............................................ 25, 30

*Eisele v. Ayers*,
  63 Ill. App. 3d 1039 (Ill. App. Ct. 1978) ................................................ 40

*Feltmeier v. Feltmeier*,
  207 Ill. 2d 263 (2003) ........................................................................... 41, 42

*Frederick v. Northwestern Univ. Dental Sch.*,
  617 N.E.2d 382 (Ill. App. Ct. 1993) ....................................................... 41

*Geiss v. Weinstein Co. Holdings LLC*,
  383 F. Supp. 3d 156 (S.D.N.Y. 2019) ................................................ 25, 31

*Gilbert v. U.S. Olympic Comm.*,
  423 F. Supp. 3d 1112 (D. Colo. 2019) ............................................ passim

*Gilbert v. U.S. Olympic Comm.*,
  2019 WL 1058194 (D. Colo. Mar. 6, 2019) ...................................... 28, 30

iv

*Gilbert v. USA Taekwondo, Inc.*,
   2020 WL 2800748 (D. Colo. May 29, 2020) ........................................................... 31

*Gociman v. Loyola Univ. of Chicago*,
   2021 WL 243573 (N.D. Ill. Jan. 25, 2021) ............................................................. 40

*Golbert v. Aurora Chicago Lakeshore Hosp., LLC*,
   2021 WL 952528 (N.D. Ill. Mar. 11, 2021) ............................................................ 37

*H.H. v. G6 Hospitality, LLC*,
   2019 WL 6682152 (S.D. Ohio Dec. 6, 2019) ............................................... 25, 28, 31

*Holert v. Univ. of Chicago*,
   751 F. Supp. 1294 (N.D. Ill. 1990) ......................................................................... 41

*Honaker v. Smith*,
   256 F.3d 477 (7th Cir. 2001) .................................................................................. 44

*J.B. v. G6 Hosp., LLC*,
   2020 WL 4901196 (N.D. Cal. Aug. 20, 2020) ......................................................... 25

*J.C. v. Choice Hotels Int'l, Inc.*,
   2020 WL 6318707 (N.D. Cal. Oct. 28, 2020) ..................................................... 25, 26

*Jansen v. Packaging Corp. of America*,
   123 F.3d 490 (7th Cir. 1997) .................................................................................. 37

*Jean-Charles v. Perlitz*,
   937 F. Supp. 2d 276 (D. Conn. 2013) ............................................................... passim

*Jensen v. U.S. Tennis Ass'n*,
   2020 WL 6445117 (D. Kan. Oct. 30, 2020) ............................................................ 30

*Kelsey v. Goldstar Estate Buyers Corp.*,
   2014 WL 1155253 (D. Or. Mar. 21, 2014) .............................................................. 18

*Knysak v. Shelter Life Ins. Co.*,
   273 Ill. App. 3d 360 (1995) .................................................................................... 45

*Kolbek v. Twenty-First Century Holiness Tabernacle Church, Inc.*,
   2013 WL 6816174 (W.D. Ark. Dec. 24, 2013) ....................................................... 22

*Liu v. Northwestern Univ.*,
   78 F. Supp. 3d 839 (N.D. Ill. 2015) ........................................................................ 39

*M.A. v. Wyndham Hotels & Resorts, Inc.*,
    425 F. Supp. 3d 959 (S.D. Ohio 2019) ............................................................. passim

*M.L. v. Craigslist Inc.*,
    2020 WL 6434845 (W.D. Wa. Apr. 17, 2020) ........................................... 26, 27, 33

*M.L. v. Craigslist Inc.*,
    2020 WL 5494903 (W.D. Wa. Sept. 11, 2020) ................................................. 26, 27

*McGrath v. Fahey*,
    533 N.E.2d 806 (Ill. Sup. Ct. 1988) ............................................................ 42, 43, 44

*Milton v. Illinois Bell Telephone Co.*,
    101 Ill. App. 3d 75 (1981) ......................................................................................... 43

*Mouloki v. Epee*,
    2016 WL 910496 (N.D. Ill. Mar. 10, 2016) ...................................................... 5, 35

*Muchira v. Al-Rawaf*,
    2015 WL 1787144 (E.D. Va. Apr. 15, 2015) ................................................... 19, 35

*Mulvey v. Carl Sandburg High Sch.*,
    66 N.E.3d 507 (Ill. App. Ct. 2016) ......................................................................... 39

*Naem v. McKesson Drug Co.*,
    444 F.3d 593 (7th Cir. 2006) ........................................................................... 45, 46

*NCAA v. Alston*,
    141 S.Ct. 2141 (2021) .............................................................................................. 34

*Noble v. Weinstein*,
    335 F. Supp. 3d 504 (S.D.N.Y. 2018) ............................................................. passim

*Nunag-Tanedo v. East Baton Rouge Parish Sch. Bd.*,
    790 F. Supp. 2d 1134 (C.D. Cal. 2011) ................................................................. 35

*Nunago-Tanedo v. East Baton Rouge Parish Sch. Bd.*,
    2012 WL 5378742 (C.D. Ca. Aug. 27, 2012) ....................................................... 35

*O'Driscoll v. Argosy Univ.*,
    2014 WL 714023 (N.D. Ill. Feb. 25, 2014) .......................................................... 40

*Paguirigan v. Prompt Nursing Empl't Agency*,
    286 F. Supp. 3d 430 (E.D.N.Y. 2017) ............................................................. 19, 36

*Paguirigan v. Prompt Nursing Empl't Agency*,
    2020 WL 122704 (E.D.N.Y. Jan. 9, 2020) .............................................................. 36

*Pavilon v. Kaferly*,
    204 Ill. App. 3d 235 (1990) .................................................................................... 42

*Pavlik v. Kornhaber*,
    326 Ill. App. 3d 731 (2001) .................................................................................... 42

*Ratha v. Phathana Seafood Co.*,
    2017 WL 8293174 (C.D. Cal. Dec. 21, 2017) ........................................................ 25

*Reed v. Palmer*,
    906 F.3d 540 (N.D. Ill. 2018) .............................................................................. 5, 24

*Ricchio v. McLean*,
    853 F.3d at 553 (1st Cir. 2017) ............................................................................... 25

*Roe v. Howard*,
    2018 WL 284977 (E.D. Va. 2018) ........................................................................... 33

*Ross v. Jenkins*,
    325 F. Supp. 3d 1141 (D. Kansas 2018) ............................................. 19, 20, 35, 36

*Rudis v. Nat'l Coll. Of Ed'n*,
    191 Ill. App. 3d 1009 (1989) ................................................................................... 43

*S.J. v. Choice Hotels Int'l*,
    473 F. Supp. 3d 147 (E.D.N.Y. 2020) ................................................................ 25, 28

*Sanders v. Chicago Transit Auth'y*,
    2020 WL 5253867 (N.D. Ill. Sept. 3, 2020) ........................................................... 44

*Seitz-Partridge v. Loyola Univ. of Chicago*,
    948 N.E.2d 219 (Ill. App. Ct. 2011) ....................................................................... 41

*Slaughter v. Waubonsee Comm'y Coll.*,
    1994 WL 663596 (N.D. Ill. Nov. 18, 1994) ........................................................... 43

*Smith v. Convergent Outsourcing, Inc.*,
    2021 WL 1648119 (N.D. Ill. Apr. 27, 2021) ......................................................... 5, 6

*Stein v. World-Wide Plumbing Supply, Inc.*,
    71 F. Supp. 3d 320 (E.D.N.Y. 2014)......................................................................... 30

*U.S. v. Afyare*,
    632 F. App'x 272 (6th Cir. 2016) ........................................................................... 25

*U.S. v. Carson*,
    870 F.3d 584 (7th Cir. 2017)................................................................................... 35

*U.S. v. Dann*,
    652 F.3d 1160 (9th Cir. 2011)................................................................................. 35

*U.S. v. Koech*,
    992 F.3d 686 (8th Cir. 2019) .................................................................................. 15

*U.S. v. Walls*,
    784 F.3d 543 (9th Cir. 2015)................................................................................... 15

*Vaughan v. Aegis Comm'ns Grp., LLC*,
    49 F. Supp. 3d 613 (W.D. Mo. 2014)..................................................................... 35

*Woods v. Clay*,
    2005 WL 43239 (N.D. Ill. 2005).............................................................................. 45

*Wrenn v. Exelon Generation*,
    2019 WL 11660918 (N.D. Ill. Mar. 5, 2019) ......................................................... 44

*Wright v. City of Danville*,
    174 Ill. 2d 391 (1996)............................................................................................... 38

## Statutes

18 U.S.C. § 1589................................................................................................ passim
18 U.S.C. § 1590................................................................................................ 15, 16, 35
18 U.S.C. § 1591................................................................................................ passim
18 U.S.C. § 1595................................................................................................ passim

## Rules

Fed. R. Civ. P. 12............................................................................................... 1, 5, 25

## INTRODUCTION

Plaintiff Hayden Richardson ("Plaintiff" or "Ms. Richardson") respectfully submits this brief in opposition to (i) the Rule 12(b)(6) motion submitted by Defendant Pamela Bonnevier ("Bonnevier") (ECF No. 47), which seeks dismissal of Counts III-V (forced labor and trafficking) and Count VIII (intentional infliction of emotional distress ("IIED")) of the Complaint;[1] and (ii) the Rule 12(b)(6) motion submitted by Defendants Northwestern University ("Northwestern" or the "University"), Amanda DaSilva ("DaSilva"), Michael Polisky ("Polisky") and Heather Van Hoegarden Obering ("Obering") (collectively the "NW Defendants") (ECF No. 42), which seeks dismissal of Counts III-V, VI (breach of contract against the University), VII (estoppel and reliance against the University) and VIII (IIED against Polisky, Obering and DaSilva).[2] The University ***has not*** moved to dismiss Ms. Richardson's Title IX claims, alleged in Counts I and II of the Complaint.

As fully discussed *infra* **Point I**, that portion of Bonnevier's motion which seeks to dismiss Ms. Richardson's trafficking and forced labor claims fails to address Bonnevier's role as the alleged perpetrator, or trafficker, of Ms. Richardson, instead relying on inapt theories concerning venture liability. *See* 18 U.S.C. § 1595. Bonnevier's apparent strategy in moving to dismiss the counts against her is to blame Ms. Richardson for the abuse, sexual harassment and sexual assault that Ms. Richardson suffered while attending cheerleading events mandated by Bonnevier. Bonnevier also ineffectually attempts to deflect from her role as Northwestern's former head cheerleading coach by arguing that she had no control over the behavior of fans and donors at University events—ignoring that she knowingly and enthusiastically placed Ms. Richardson in

---

[1] Bonnevier's motion to dismiss is cited herein as "Bonnevier MTD."
[2] The NW Defendants' motion to dismiss is cited herein as "NWMTD."

dangerous and exploitative situations and expressly directed Ms. Richardson to accept such abuse as part and parcel of being a cheerleader.

Ms. Richardson has plausibly alleged that Bonnevier's intentional acts led Ms. Richardson to believe that she had no choice but to remain on the cheerleading team and subject herself to continuing harassment and sexual assault. Bonnevier disputes that Ms. Richardson has alleged the "serious harm" required to maintain a sex trafficking claim, focusing solely on the financial harm that would befall Ms. Richardson if she resigned from the cheerleading team. Bonnevier incredibly argues that the loss of thousands of dollars in scholarship money, and the forced repayment of all monies expended by the University (including travel to out of state events) for participation on the team, was not a serious enough threat to coerce Ms. Richardson to remain on the team. The "facts" relied on by Bonnevier fail to contradict Ms. Richardson's allegations. Bonnevier also ignores the psychological harm that Ms. Richardson suffered as a result of Bonnevier's acts, which also constitutes "serious harm" under Section 1591.

Ms. Richardson has also adequately alleged a "commercial sex act" for purposes of Section 1591. Under the statute, a plaintiff need only plead that *anything* of value was given to or received by *any* person. Ms. Richardson has alleged that a number of persons, including Bonnevier, received something of value as a result of Bonnevier knowingly placing Ms. Richardson in situations in which she would be exploited, sexually harassed and sexually assaulted by Northwestern fans and donors. Despite Bonnevier's assertion to the contrary, actual causation is not required to violate Section 1591, and a commercial sex act need not even occur for a defendant to be held liable.

As discussed *infra* **Point II**, the NW Defendants likewise attempt to minimize the harm suffered by Ms. Richardson, arguing that the grave misconduct alleged against Northwestern and

its employees was not contemplated by the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595. The NW Defendants ignore that a number of recent judicial opinions have rejected the cabining of trafficking and forced labor claims to reach only those allegations which describe archetypal sex trafficking.

As discussed *infra* **Point II.A**, Ms. Richardson has plausibly alleged a TVPRA claim against the NW Defendants, grounded in venture liability. The NW Defendants participated in the venture known as "Chicago's Big Ten" Athletics and they were responsible for marketing and promoting the venture, raising money and ensuring fan satisfaction. *See* Pt. II.A.1. The NW Defendants urge the Court to apply principles of criminal law, including RICO, when evaluating this element of a TVPRA claim. This approach has been rejected by a number of courts and would undermine the broad remedial purpose of Section 1595.

Ms. Richardson also alleged that the NW Defendants ***knew*** that Bonnevier was exploiting Ms. Richardson and subjecting her to sexual harassment and sexual assault. *See* Pt.II.A.2. The NW Defendants blocked and covered up any investigation in order to protect Northwestern Athletics. The NW Defendants nonsensically argue that Ms. Richardson's allegations concerning what they knew, and when, are "conclusory." Ms. Richardson clearly alleged when and what she told Polisky, Obering and DaSilva, and that *inter alia* they shamed her and failed to undertake a formal investigation of her allegations for ***nearly one and a half years***. Ms. Richardson need not have alleged that the NW Defendants knew about the sexual misconduct in real time in order for them to be held liable.

Ms. Richardson further alleged that each of the NW Defendants knowingly benefitted from participation in the venture. *See* Pt.II.A.3. In order to satisfy this requirement, a plaintiff ***need not***,

as the NW Defendants argue, allege a causal relationship between the benefit received and the alleged trafficking or forced labor.

As discussed *infra* **Point II.B**, like Bonnevier, the NW Defendants mistakenly assert that Ms. Richardson need allege a *quid pro quo*, and the exchange of money, to plausibly allege a sex trafficking claim. The NW Defendants also nonsensically argue that the "commercial" element of the alleged sex acts is not present in this case. However, there is nothing more commercial than the marketing and promotion of "Chicago's Big Ten" teams to fans and donors with deep pockets. Like Bonnevier, the NW Defendants callously, and perversely, argue that Ms. Richardson failed to allege serious harm because, in their opinion, the potential loss of thousands of dollars is simply not that much for a college student to lose. They also fail to address the psychological harm inflicted on Ms. Richardson.

As discussed *infra* **Point II.C**, Ms. Richardson has alleged a plausible claim for forced labor under 18 U.S.C. § 1589(b). The NW Defendants erroneously assert that Ms. Richardson was required to allege that they intended for her to fear serious harm. But venture liability does not hinge on any allegation that the NW Defendants directly participated in obtaining forced labor or services from Ms. Richardson.

As discussed *infra* **Point II.D**, Northwestern may be held vicariously liable for the acts of Bonnevier, Polisky, Obering and DaSilva.

As discussed *infra* **Point III**, Ms. Richardson has alleged a breach of contract claim against the University, grounded in specific breaches of the Sexual Misconduct Policy, resulting from the NW Defendants' arbitrary, capricious and bad faith conduct.

4

As discussed *infra* **Point IV**, Ms. Richardson has plausibly alleged a claim for IIED against Bonnevier. Ms. Richardson hereby withdraws her IIED claims against Polisky, Obering and DaSilva.

## APPLICABLE LEGAL STANDARDS

To survive a 12(b)(6) challenge, a complaint must allege sufficient factual matter, accepted as true, to state a claim that is plausible on its face. *Mouloki v. Epee*, 2016 WL 910496, at *1 (N.D. Ill. Mar. 10, 2016). Plausibility does not mean probability. *Id.* A court reviewing a 12(b)(6) motion "must ask itself, **could** these things have happened, not **did** they happen. The standard simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence supporting the allegations." *Id.* (emphasis in original) (quotation omitted). In other words, the plaintiff need only allege "enough details about the subject-matter of the case to present a story that holds together." *Reed v. Palmer*, 906 F.3d 540, 548 (N.D. Ill. 2018) (quotation omitted). As detailed below, the Complaint more than adequately meets this standard.

In resolving a Rule 12(b)(6) motion, the Court may consider documents that are critical to the complaint, information that is subject to proper judicial notice and additional facts set forth in the plaintiff's opposition to the motion, so long as those additional facts are consistent with the pleading. *Smith v. Convergent Outsourcing, Inc.*, 2021 WL 1648119, at *1 (N.D. Ill. Apr. 27, 2021). Ms. Richardson respectfully requests that the Court take judicial notice of Exhibits 1-10, appended to the Declaration of Kara L. Gorycki, dated June 23, 2021 (printouts from Northwestern's official website) because they are not reasonably subject to dispute. *See Am. Safety Cas. Ins. Co. v. City of Waukegan*, 2009 WL 855795, at *8 (N.D. Ill. 2009).[3] The facts set forth

---

[3] While, as detailed herein, Defendants' motions to dismiss should be denied, these exhibits further demonstrate that, in the event the Court elects to dismiss Ms. Richardson's trafficking and forced labor claims as against the NW Defendants, they should be dismissed **without prejudice**. *See*, *e.g.*, NWMTD, at 5 (requesting dismissal of TVPRA claims with prejudice). As held by the Seventh Circuit, leave to amend shall be freely given and is "*especially*

therein are also consistent with Ms. Richardson's pleading. *Smith*, 2021 WL 1648119, at \*1. Ms. Richardson also requests that the Court take judicial notice of certain news reports, cited *infra* at footnotes 5, 7-9. *See Cook Cnty. Rep. Party v. Pritzker*, 487 F. Supp. 3d 705, 713 & n. 3 (N.D. Ill. 2020).

## PLAINTIFF'S ALLEGATIONS

### I. <u>Plaintiff's Background</u>

Ms. Richardson matriculated at Northwestern in the fall of 2018 as a political science and legal studies double major. Compl. ¶ 48. She graduated in June 2021. In spring 2020, Ms. Richardson was awarded the highly competitive Harry S. Truman Scholarship, which is awarded to college juniors to support graduate education for students who plan to pursue a career in public service. *Id.* ¶ 52. At the time the lawsuit was filed, she served as Chair of the Political Science Undergraduate Board, treasurer of Phi Alpha Delta, and was a member of Northwestern's academic integrity appeals committee. *Id.* ¶ 48. Ms. Richardson is a staunch advocate for ending human trafficking, improving sex education and gender equality. *Id.* ¶¶ 45-46.

### II. <u>Northwestern Cheerleading's Culture of Exploitation</u>

Ms. Richardson has been involved in the sport of cheerleading for much of her life. *Id.*¶ 45. After she transferred to Northwestern from University of Nebraska-Lincoln, seeking a sense of community at a new school, she was interested in becoming a Northwestern cheerleader. *Id.* ¶¶ 47, 49. Northwestern's webpage, upon which Ms. Richardson relied, boasted a prosperous non-competitive team with dozens of happy, successful team members and countless benefits that came along with cheering "on the most beautiful campus in the world." *Id.* ¶¶ 49, 203-205. Northwestern's misrepresentations about the glamour and fame of cheerleading hid its dark side—

---

*advisable* when such permission is sought after dismissal of the first complaint." *Barry Aviation Inc. v. Land O'Lakes Municipal Airport Comm'n*., 377 F.3d 682, 687 (7th Cir. 2004) (emphasis added).

that being a cheerleader was conditioned on pleasing wealthy donors and intoxicated fans in order to raise money for Northwestern Athletics. *Id.* ¶ 205.

Ms. Richardson contacted Bonnevier about joining the team. After Bonnevier viewed Ms. Richardson's stunting videos, she immediately asked Ms. Richardson to join the team. *Id.* ¶¶ 50, 55. Ms. Richardson received a scholarship for her participation on the team, in the amount of $5,500 in 2019 and $4,041 in 2020. *Id.* ¶ 51.

### A. The Spirit Squad Contract

As a condition of joining Northwestern's cheerleading team, Ms. Richardson was required to sign a "Spirit Squad" contract, which required her to attend home games, tournaments and "any other events prescribed by the coaching staff." *Id.* ¶ 55. If Ms. Richardson quit or was terminated, she would be responsible for reimbursing Northwestern for all fees and expenses associated with her team membership, including travel, food, equipment and camp expenses. *Id.* She would also have to repay her scholarship. *Id.* ¶¶ 5, 55, 101.

### B. Bonnevier's Systematic Abuse of Northwestern's Cheerleaders

At the first team meeting that Ms. Richardson attended, Bonnevier told the cheerleaders that their number one priority was to be "fun girls" and to keep Northwestern fans happy. *Id.* ¶ 56. Bonnevier normalized sexual harassment and inappropriate behavior, telling the cheerleaders to take it and move on. *Id.* The ideology of "just take it" permeated the team culture and was consistently reaffirmed by Bonnevier in the seasons to come. *Id.* Bonnevier treated Northwestern's cheerleaders as commodities, to be used to keep fans and donors happy. *Id.* ¶ 63.

Throughout the 2018-2019 and 2019-2020 cheerleading seasons, Bonnevier routinely abused members of the cheerleading team, the purpose of which was to mold the young women into enticing sex objects that Northwestern could exploit for financial gain. *Id.* ¶ 54. Team

7

members, including Ms. Richardson, were constantly told that they were not attractive or thin enough. *Id.* ¶¶ 53, 92. Bonnevier ordered the team not to eat before games, so that they would look thin as opposed to being appropriately fueled for physical activity. *Id.* ¶ 71. On one trip, Bonnevier prohibited Ms. Richardson from joining her and the football team for breakfast. *Id.* ¶ 72. Bonnevier also forced cheerleaders, including Ms. Richardson, to throw out food provided to them by an opposing team, because eating was "unprofessional." *Id.* ¶ 73. Many of Ms. Richardson's teammates developed eating disorders. *Id.* ¶ 53.

Bonnevier humiliated and degraded the cheerleaders, including Ms. Richardson, by failing to procure a changing room for them at away games. On one occasion, the team was forced to change on a bus with fans looking in the windows. *Id.* ¶ 74. On another occasion, the team was forced to change clothes in an open concession stand area or common area in a public bathroom. *Id.* ¶ 81. Bonnevier also forced the team, including Ms. Richardson, to stand outside in cold, rainy conditions in crop-top uniforms, rather than wearing weather appropriate rain gear or their coats because that was not "what the fans wanted to see." *Id.* ¶¶ 79-80.

### C. Tailgating Events

Bonnevier told the team to split up, mingle and flirt with intoxicated fans at tailgating lots before home games. *Id.* ¶ 57. They were required to wear their skimpy cheerleading uniforms and were provided no security. *Id.* While she walked the tailgate lots, fans often badgered Ms. Richardson to drink alcohol though she was underage, made lewd comments and placed their hands on her buttocks and breasts while taking pictures with her. *Id.* ¶ 58. By way of example:

- On September 8, 2018, Bonnevier instructed Ms. Richardson to take photos with fans who were making sexually charged comments to her. *Id.* ¶ 59.

- On September 15, 2018, Ms. Richardson was sexually harassed by fans at a tailgate, and they used photo opportunities as an excuse to grope her. *Id.* ¶ 61. On this occasion, Bonnevier provided Ms. Richardson's name to a group of intoxicated fans, who

sexually harassed her throughout the entire football game at which she was cheering by yelling at her across the field. *Id.* When Ms. Richardson asked Bonnevier to switch sides to be away from the shouting fans, Bonnevier laughed and denied her request. *Id.* ¶ 62.

- On November 3, 2018, while forced to roam a tailgate by herself in uniform, Ms. Richardson was physically picked up by a fan during a photo opportunity and he groped Ms. Richardson's buttocks. *Id.* ¶ 68. Ms. Richardson told Bonnevier about this incident and that she was uncomfortable being handled in that way. *Id.* In response, Bonnevier smirked and said "Go 'Cats." *Id.* Later on, Bonnevier was amused when fans threw a dildo at the cheerleaders from the stands. *Id.* ¶ 70. Bonnevier gleefully recounted this incident in a subsequent staff meeting. *Id.*

### D. **Appearances at the Exclusive Wilson Club**

Bonnevier frequently sent Ms. Richardson to the Wilson Club as a "splash of color," to flirt with wealthy, elderly donors. *Id.* ¶ 57. The Wilson Club is a private space open only to fans who hold courtside, loge or Wilson Club tickets. *Id.* It is named after Stephen R. and Susan K. Wilson, who donated $10 million towards the construction of the new Welsh-Ryan Arena.[4] Ex. 2. One can only access Wilson Club seating by making a minimum "Wildcat Excellence Fund" gift of $6,000. Exs. 1, 3. Gifts to the Wildcat Excellence Fund are the "most impactful contributions to [Northwestern] Athletics." Ex. 4.

Ms. Richardson was required to attend events at the Wilson Club, in uniform, throughout the 2018-2019 and 2019-2020 cheerleading seasons. *Id.* ¶¶ 57, 100. While at the Wilson Club, she was subjected to the same forms of sexual harassment and groping during photo opportunities that she experienced at the tailgate lot. *Id.* ¶ 100.

### E. **Alumni Events**

The cheerleading team was required to attend Northwestern alumni events un uniform and parade around men old enough to be their fathers and even grandfathers. *Id.* ¶ 64. These men would

---

[4] When the Welsh-Ryan Arena opened in Fall 2018, preferred seating depended on the amount of one's donation. Ex. 1. Unless otherwise specified, all exhibits cited herein are appended to the Gorycki Declaration.

slyly touch the cheerleaders, including Ms. Richardson, on their lower backs and buttocks while taking photos with them. *Id.* ¶ 65. It became clear to Ms. Richardson that Northwestern was using her, and the team, as sex objects to titillate the men that funded Northwestern's athletics programs. *Id.* ¶ 66. During the timeframe at issue in this action, Northwestern opened the new Welsh-Ryan Arena and was in the midst of a multi-year fundraising campaign for Northwestern Athletics which, to date has raised at least $458 million. Exs. 5-7.

In or around January 1, 2019, Ms. Richardson was forced to attend "an open bar mingling event" in downtown San Diego as part of the Holiday Bowl festivities. *Id.* ¶¶ 75-78. During the event, Bonnevier separated Ms. Richardson from her teammates, told her "do your job" and forced her to mingle with intoxicated fans. *Id.* At the event, Ms. Richardson was propositioned by a number of fans. *Id.* One man physically picked her up against her will and refused to put her down. *Id.* A second man grabbed Ms. Richardson's behind. *Id.* Bonnevier did nothing. *Id.*

### III.    Top Athletics Department Officials Attempt to Silence and Discredit Ms. Richardson

In January 2019, Ms. Richardson met with Polisky and Obering about the culture of sexual exploitation that pervaded Northwestern Cheerleading. *Id.* ¶¶ 84-89. Ms. Richardson asked to meet with Northwestern's famed Athletic Director, Jim Phillips ("Phillips"), but Polisky refused her request. *Id.* ¶ 87.

#### A.    Polisky's Background

At the time this lawsuit was filed, Polisky served as the Deputy Director of Athletics for Northwestern. *Id.* ¶ 21. In May 2021, he took over for Phillips as Northwestern's Athletic Director. Ex. 8. Polisky was responsible for, among other things, the transformation of the Wildcats' public-facing brand and strategy, ticket sales, fan experience and public relations. *Id.* Polisky created the first comprehensive marketing campaign in the history of Northwestern Athletics, "Chicago's Big

Ten Team." His "wide-ranging brand strategy" produced "dramatic gains in awareness, sales and fan interest." *Id.* Recent news reports state that Polisky has a close relationship with Northwestern "mega-donor" Pat Ryan, who has given "more than $200 million to the school."[5] As reported, Ryan's close friend, Kevin O'Brien (now deceased), was Polisky's father-in-law.[6] It has recently been reported that Polisky was Ryan's choice to replace Phillips as Athletic Director.[7] On May 12, 2021, Polisky resigned. Ex. 9.

### B.  Obering's Background

Obering is Northwestern's Associate Athletic Director for Marketing. *Id.* ¶ 20. In this role, she "is responsible for the marketing of the football and men's basketball programs, including advertising and branding initiatives, gameday presentation and fan experience." Ex. 10. "During her time at Northwestern, Obering has helped produce record ticket sales and attendance numbers for those programs." *Id.* She also "works with the Northwestern Cheer…program[]." *Id.*

### C.  The Shaming of Ms. Richardson

On January 8, 2019, Ms. Richardson raised concerns to the team doctor, Dr. Jain, about the sexual harassment, sexual assault and exploitation she and her teammates suffered. Compl. ¶ 82. On January 9, 2019, Obering contacted Ms. Richardson about these concerns. *Id.* ¶ 83. Ms. Richardson met with Obering a few days later, at a basketball game. *Id.* ¶ 84. Obering did not believe Ms. Richardson, and shamed and re-traumatized her, telling her that she needed to provide evidence to support her allegations before they would even be acknowledged. *Id.* ¶ 85. This violated Northwestern's Sexual Misconduct Policy and federal Title IX guidance. *Id.*

---

[5] https://deadspin.com/turns-out-northwestern-s-controversial-new-ad-has-close-1846871625
[6] *Id.*
[7] https://deadspin.com/northwestern-doesn-t-take-women-seriously-1846811139?utm_source=twitter&utm_medium=SocialMarketing&utm_campaign=dlvrit&utm_content=deadspin

On January 22, 2019, Ms. Richardson provided Obering with letters and testimonials from members of the cheerleading team. *Id.* ¶ 86. On January 24, 2019, Ms. Richardson and one of her teammates met with Obering and Polisky, who accused Ms. Richardson of fabricating the evidence. *Id.* ¶ 88. Polisky then questioned whether the evidence sufficiently corroborated Ms. Richardson's claims. *Id.* This was a burden that should not have been placed on Ms. Richardson, a victim of sexual harassment and sexual assault, under Northwestern's Sexual Misconduct Policy and federal Title IX guidance. *Id.* ¶¶ 88.[8] Ms. Richardson told Obering and Polisky that the issues with Bonnevier were deeply embedded in Northwestern's cheerleading culture and that Bonnevier would be unwilling to make the necessary changes to remedy the damage that had already occurred. *Id.* ¶ 89.

### D. DaSilva Keeps the Complaint Within the Athletics Department

On February 1, 2019, DaSilva, then a Deputy Title IX Coordinator, sent Ms. Richardson an email which mischaracterized Ms. Richardson's concerns, documenting a single instance of harassment with "one fan." *Id.* ¶¶ 19, 90. In response, Ms. Richardson informed DaSilva that there had been multiple events in which she had been harassed and assaulted and provided specifics. *Id.* ¶ 91. DaSilva dismissed the allegations, informing Ms. Richardson that the Office of Equity ("Title IX Office") would reach out to the Athletics Department to address the situation. *Id.* ¶ 91. A few days later, Ms. Richardson informed Obering that Bonnevier continued to make derogatory comments to members of the team and exhibited concerning behavior. *Id.* ¶ 92.

---

[8] Local news reported that, the day before his resignation, Polisky told student athletes and staff in a private meeting that he had "regrets about how he reacted when cheerleaders came to him with allegations of sexual harassment two years ago." Polisky stated, "My reaction, I think, might have been not as sympathetic as they deserved it to be." https://www.wbez.org/stories/former-northwestern-athletic-director-admitted-wishing-he-were-more-empathetic-to-sexual-harassment-claims/ff85e420-8967-4e0a-be9e-8e911138bf3f

On February 18, 2019, DaSilva notified Ms. Richardson that the Title IX Office was "still working with" Bonnevier. No further details were provided. *Id.* ¶ 93. Though Ms. Richardson made repeated requests for a formal investigation, DaSilva refused, even though a formal investigation was required under the Sexual Misconduct Policy. *Id.* ¶¶ 95, 122. In March 2019, DaSilva informed Ms. Richardson that her colleagues were conducting "training" with Bonnevier. *Id.* On May 28, 2019, Ms. Richardson had a follow-up meeting with Obering and Polisky, at which she told them that Bonnevier was perpetuating the same objectifying culture. No action was taken against Bonnevier at that time. *Id.* ¶ 96. Obering, Polisky and DaSilva blocked and covered up any investigation into Bonnevier's misconduct in order to avoid public criticism and to continue fundraising. *Id.* ¶¶ 6-11, 82-103, 188, 212, 231.

## IV.    The Abuse and Harassment Continues in the 2019-2020 Season

The "training" that Bonnevier received had no impact and she suffered no repercussions, continuing on as head coach of Northwestern's cheerleading team for the 2019-2020 season. *Id.* ¶ 97. Though Bonnevier had been informed that the cheerleaders could no longer be forced to attend tailgating events, she continued to pressure and threaten them, saying that she was going to find out who "ruined tailgating." *Id.* ¶ 98. She told the team that if they did not tailgate they would not eat, reinforcing that if Ms. Richardson did not perform to Bonnevier's expectations, there would be serious consequences. *Id.* ¶ 99. While Ms. Richardson was not forced to tailgate during the 2019-2020 season, she was still required to attend events at the Wilson Club, and alumni events, during which she was subjected to the same photo opportunities, groping and harassment about which she had previously complained. *Id.* ¶ 100. At all times, Ms. Richardson felt that if she did not perform, and succumb to the abuse, sexual harassment and sexual assault, she would suffer serious consequences. If she quit the team, she would have to repay her cheerleading scholarship

and any expenses incurred by Northwestern on her behalf during each cheerleading season. *Id.* ¶ 5, 15, 55, 101.

By the end of the 2019-2020 season, Ms. Richardson decided to again raise her concerns to the Title IX office. *Id.* ¶ 102. On June 11, 2020—***almost a year and a half after she first reported Bonnevier***—the Title IX office finally agreed to launch a formal investigation. *Id.* ¶ 104. DaSilva excluded Ms. Richardson from fully participating in the investigation, however, by relegating her role to witness rather than complainant. In that role, Ms. Richardson was denied access to the investigation report and the outcome and had no right to appeal. *Id.* ¶¶ 103-107. In October 2020, DaSilva informed Ms. Richardson that the case was closed. *Id.* ¶ 108. In or around November 2020, Polisky told Ms. Richardson that Bonnevier was fired on October 31, 2020. *Id.* ¶ 110. In news reports which post-date the filing of this lawsuit, a Northwestern spokesperson stated that the University did not renew Bonnevier's contract after she was found to have violated the University's discrimination and harassment policy.[9]

Northwestern, Polisky, Obering and Da Silva knew about, and allowed the abuse, harassment, assault and exploitation of Ms. Richardson to continue for almost a year and half after Ms. Richardson complained because they all benefitted from its continuation, and the large alumni donations which funded Northwestern Athletics and Defendants' salaries. *Id.* ¶¶ 188-93, 212-19, 231-36.

## ARGUMENT

## I.    Ms. Richardson Alleged Plausible Trafficking and Forced Labor Claims Against Bonnevier as the Perpetrator of the Acts in Question

Ms. Richardson has alleged civil claims against Bonnevier pursuant to 18 U.S.C. § 1595(a), which states that "[a]n individual who is a victim of a violation of this chapter may bring a civil

---

[9] *See, e.g.*, https://www.nytimes.com/2021/05/14/sports/ncaafootball/northwestern-athletic-director-resigns.html.

action against the perpetrator." *Id.* As alleged throughout the Complaint, and more specifically in Counts III-V—but not addressed in her motion to dismiss[10]—Bonnevier is the ***perpetrator***[11] of the forced labor and trafficking of Ms. Richardson, in violation of the TVPRA and Trafficking Victims Protection Act ("TVPA").[12]

Bonnevier's motion expressly addresses Count IV of the Complaint, which alleges a sex trafficking claim pursuant to 18 U.S.C. §1591.[13] Bonnevier MTD, at 7-11. Section 1591(a)(1) is actionable against "Whoever knowingly…in or affecting interstate…commerce, recruits, entices…transports, provides … by any means a person…." In enacting the TVPA, Congress found that the trafficking of persons has an aggregate economic impact on interstate commerce. *U.S. v. Walls*, 784 F.3d 543, 548 (9th Cir. 2015). Consequently, any individual instance of conduct regulated by the TVPA need only have a ***de minimis*** effect on interstate commerce. *Id.* An act or transaction that is economic in nature and affects the flow of money in the stream of commerce to any degree affects interstate commerce. *Id. See also U.S. v. Koech*, 992 F.3d 686, 693 (8th Cir. 2019); *Ardolf v. Weber*, 332 F.R.D. 467, 473 (S.D.N.Y. 2019). Here, Ms. Richardson has alleged that she was enticed and/or recruited via the internet (Compl. ¶ 49, 203-205); sexually assaulted and harassed at a mandatory cheerleading event in San Diego (*Id.* ¶¶ 75-81, 217); at games and events held at the University for which fans paid money (*Id.* ¶¶ 59, 61, 63, 65, 68-69); and at the exclusive Wilson Club where access was dependent on making a substantial donation to the

---

[10] Since Bonnevier is the alleged perpetrator, her argument concerning whether she "knowingly benefitted" from participating in a venture is irrelevant. Bonnevier MTD, at 8-9.

[11] Ignoring Bonnevier's role, the NW Defendants incorrectly assert that Ms. Richardson failed to identify any perpetrator of the alleged TVPRA violations. NWMTD, at 7, n. 4.

[12] To be clear, Ms. Richardson has alleged civil claims against the Defendants pursuant to the TVPRA. However, since 18 U.S.C. §§ 1589, 1590 and 1591 are part of the TVPA, this Act shall be referred to as relevant herein.

[13] Bonnevier has incorporated the NW Defendants' TVPRA arguments by reference. Bonnevier MTD, at 7. However, the NW Defendants, as participants in a venture with Bonnevier, are positioned very differently. To the extent that the Court finds the NW Defendants' arguments applicable to Bonnevier, then Ms. Richardson also asserts the arguments set forth in Point II in opposition to Bonnevier's motion.

University (*Id.* ¶¶ 57, 100; Exs. 1, 3). These allegations satisfy the TVPA's "in or affecting interstate commerce" requirement.

"[A] defendant is liable under the TVPA for a single act of enticement or recruitment if it is successful." *Ardolf*, 332 F.R.D. at 474-75. Enticement "means that the perpetrator attracts the victim by offering something that arouses hope or desire." *Id.* at 474. *See David v. Weinstein Co.*, 431 F. Supp. 3d 290, 300-301 (S.D.N.Y. 2019); *Noble v. Weinstein*, 335 F. Supp. 3d 504, 517 (S.D.N.Y. 2018). Recruit "means that the perpetrator somehow secured the services of the victims." *Ardolf*, 332 F.R.D. at 474. Ms. Richardson has alleged that she was enticed and recruited. Compl. ¶¶ 49-51, 203-205.[14] She has further alleged that she was "obtained" "provided" and "transported." *Id.* ¶ 55 (obtained); ¶¶ 56-69, 76-81, 100 (provided); ¶¶ 71, 75, 217 (transported). As the head coach of Northwestern's cheerleading team, Bonnevier knowingly engaged in the required acts. *Id.* ¶ 22. Pursuant to the Spirit Squad contract, she mandated Ms. Richardson's attendance at events. *Id.* ¶ 55.[15]

Section 1591(a)(1) also requires that an alleged perpetrator act knowingly or in reckless disregard of the fact "that means of force, fraud, coercion…or any combination of such means will be used to cause the person to engage in a commercial sex act." This requires the pleader to allege "awareness, at the initial recruitment or enticement stage, that certain prohibited means will be

---

[14] While there is a direct link between Bonnevier as the head coach and the enticement/recruitment of Ms. Richardson it is also likely that Obering, and perhaps Polisky, who were responsible for marketing and promoting Northwestern Athletics were involved in recruiting students for the cheerleading team. Exs. 8, 10; Compl. ¶ 203.

[15] These allegations also support a claim for trafficking under 18 U.S.C. § 1590. Bonnevier puts forth no arguments specific to Section 1590. Bonnevier MTD, at 7-11. As set forth *infra*, footnote 40, the NW Defendants likewise make no independent arguments concerning Section 1590, violations of which are alleged in Count III of the Complaint. While Count III includes an allegation which defines "commercial sex act," (Compl. ¶176), Section 1590 does not require proof that a commercial sex act occurred. 18 U.S.C. § 1590. *Cf.* 18 U.S.C. § 1591. *Gilbert v. U.S. Olympic Comm.*, 423 F. Supp. 3d 1112, 1133-34 (D. Colo. 2019) (Section 1590 imposes separate and distinct liability for human trafficking). In any event, as detailed *infra*, Ms. Richardson has plausibly alleged a "commercial sex act."

employed to achieve a perverse end goal: a commercial sex act." *Noble*, 335 F. Supp. 3d at 518. Ms. Richardson has plausibly alleged that Bonnevier acted with such knowledge.

Bonnevier accepted Ms. Richardson onto the team. Compl. ¶ 50. Ms. Richardson was required to sign the Spirit Squad contract as a condition of joining the team, and Bonnevier mandated which events Ms. Richardson would attend. *Id.* ¶ 55. Ms. Richardson could not quit the team, or risk getting kicked off, because she would have to reimburse the University for all travel, food, equipment and camp expenses. *Id.*[16] The Spirit Squad contract was, accordingly, one means through which Ms. Richardson was coerced into subjecting herself to repeated sexual harassment and sexual assault at mandatory team events.[17] Bonnevier's knowledge is, further, evident in her advice to team members at the very first preseason meeting, that they always needed to be "fun girls" and should acquiesce to the sexual advances of "creepy fans." Compl. ¶ 56.

Section 1591 defines coercion as "threats of serious harm to…any person" or any "scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to…any person." 18 U.S.C. §1591(e)(2)(A-B). The statute defines "serious harm" as:

> any harm, whether physical or nonphysical, including psychological, financial or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm. 18 U.S.C. § 1591(e)(5).

---

[16] While the University is in exclusive possession of information concerning the actual cost of the cheerleading team's travel during the relevant time period, the cost associated with flying back and forth to the Holiday Bowl in San Diego, as well as the associated lodging costs, during peak holiday season in December 2018/January 2019 would have been substantial. Compl. ¶ 75. A search on Expedia for round-trip tickets in December 2021/January 2022 (post-pandemic) showed that tickets are close to $500. Ex. 11. Hotels in the area of SDCCU Stadium, where the Holiday Bowl was held on December 31, 2018, can cost between $100 and $200 per night. Ex. 12. Thus, a conservative estimate for the cost of this one trip with the cheerleading team is $1,000.00. *Cf.* Bonnevier MTD, at 11.

[17] Indeed, there could be no other purpose for the financial threat in the Spirit Squad contract than to keep students on the team. The very existence of this provision is coercive.

Ms. Richardson has plausibly alleged that she was coerced by Bonnevier and stayed on the team in order to avoid serious harm. At all times, Ms. Richardson remained on the team, and attended events mandated by Bonnevier because she feared having to pay back all expenses incurred while on the team, as well as having to repay her scholarship money, which totaled $9,591.00. Compl. ¶¶ 5, 51, 55, 60, 101, 206. Bonnevier systematically abused Ms. Richardson and her teammates, even depriving them of food and proper attire so that they would look enticing to fans and donors. *Id.* ¶¶ 57, 64, 71-74, 79-81, 99, 100. When Bonnevier witnessed, or Ms. Richardson told her about, the sexual harassment and sexual assault, Bonnevier told Ms. Richardson to grin and bear it, mocked her, encouraged the fan harassment and told her to do her job. *Id.* ¶¶ 58-63, 69-70, 76, 132.[18] Bonnevier refused to stop, or prevent, the repeated sexual assault of Ms. Richardson. *Id.* ¶¶ 57, 58, 65, 69, 78, 89, 128. Bonnevier isolated Ms. Richardson so that the sexual harassment and sexual assault would continue. *Id.* ¶¶ 76-78. As a result of Bonnevier's actions and omissions, Ms. Richardson suffered severe emotional distress and trauma including panic attacks, depressive episodes and insomnia. *Id.* ¶¶ 132-35.

These allegations are hardly, as Bonnevier asserts, "barebones."[19] Bonnevier further relies on a summary judgment decision to argue that Ms. Richardson has not alleged "serious harm." Bonnevier MTD, at 10.[20] Whether Ms. Richardson suffered serious harm that would "compel a

---

[18] These allegations contradict Bonnevier's assertion that Ms. Richardson failed to allege that Bonnevier knew or had any control over the unidentified fans or elderly men. Bonnevier MTD, at 5. As the head coach, Bonnevier certainly had the ability to change the manner in which her team engaged with fans and donors. Her attempt to blame the behavior of others—when the responsibility for her team fell squarely on her shoulders—is illogical. It is also belied by the fact that, as a Northwestern employee, she was required to report incidents of sexual misconduct to the University's Title IX Office. Compl. ¶ 121. She did not do so.

[19] Unlike the present case, the pleading at issue in *Kelsey v. Goldstar Estate Buyers Corp.*, 2014 WL 1155253, at *1 (D. Or. Mar. 21, 2014), which had already been amended, did not allege any specific incidents. There was no allegation that the plaintiffs, who were former employees of one defendant, would face any consequences, financial or otherwise, if they quit their at-will employment. Certain plaintiffs were employed for a matter of a few days or months before they resigned. In any event, the court granted leave to replead the forced labor and sex trafficking claims. *Id.* at *6.

[20] The summary judgment opinion Bonnevier relies on, *Muchira v. Al-Rawaf*, 2015 WL 1787144, at *7 (E.D. Va. Apr. 15, 2015), is also distinguishable because the plaintiff put forth no evidence that she "thought she was, prohibited… from terminating her employment, [or] that Defendants ever threatened her with consequences" if she did.

18

reasonable person of the same background and in the same circumstances to perform or to continue performing" raises questions of fact that cannot be decided now. When assessing whether harm is sufficiently serious to satisfy the TVPA, "the vulnerabilities and characteristics of the specific victim become extremely important because one individual could be impervious to some types of coercion that cause another to acquiesce." *Ross v. Jenkins*, 325 F. Supp. 3d 1141, 1164 (D. Kansas 2018). It is also irrelevant whether a trafficking victim actually had the opportunity to escape. *Id.* Instead, the relevant inquiry is whether the defendant intentionally caused the oppressed person to believe, ***given her special vulnerabilities***, that she had no alternative but to remain in involuntary service. *Id. See also Carter v. Paschall Truck Lines, Inc.*, 324 F. Supp. 3d 900, 916 (W.D. Ky. 2018) (intent assessed from vantage point of victim); *Paguirigan v. Prompt Nursing Empl't Agency*, 286 F. Supp. 3d 430, 438-39 (E.D.N.Y. 2017) (same). The facts set forth above plausibly allege that Bonnevier's intentional acts led Ms. Richardson to believe that she had no choice but to remain on the cheerleading team and subject herself to continuing sexual harassment and sexual assault.[21]

Bonnevier incredibly argues that Ms. Richardson could not have suffered serious harm because her cheerleading scholarships covered less than 8% of what Bonnevier estimates to be the cost of Ms. Richardson's attendance at the University. Bonnevier MTD, at 10-11. 8% is not an insignificant sum. It seems that Bonnevier has lost her perspective on the value of the dollar to the average university student (and perhaps the average person). Bonnevier's "analysis" in no way relates to Ms. Richardson's individual experience.[22] *See Ross*, 325 F. Supp. 3d at 1141. As alleged

---

[21] These allegations also satisfy the "serious harm" and "intent" requirements set forth in 18 U.S.C. 1859(a), pursuant to which a claim has been alleged in Count V of the Complaint. 18 U.S.C. § 1589(a)(2), (a)(4), (c)(2).

[22] Bonnevier disingenuously argues that the cheerleading scholarships received by Ms. Richardson were "relatively modest" in comparison to her Truman scholarship. Bonnevier MTD, at 3-4. The very source that Bonnevier cites clearly states that the Truman scholarship will fund Ms. Richardson's ***graduate*** studies. Whether or not Ms. Richardson received other scholarships, and the value thereof, is also irrelevant to her fears over losing her cheerleading scholarships, or nearly $10,000 in additional monies towards her costly tuition. Bonnevier also included

in the Complaint (and ignored by Bonnevier), Ms. Richardson was "trapped in her degrading, dehumanizing and exploitative role as a sex object" because she would lose her cheerleading scholarships. Compl. ¶ 5. In "order to avoid financial liability…under her cheerleading scholarships," all she could do was smile and say "happy gameday." *Id.* ¶ 58. Ms. Richardson "could not afford the financial liability attendant to quitting the team or being terminated." *Id.* ¶ 60. If Ms. Richardson "quit the team, she would have to repay her cheerleading scholarship, which would impact her ability to obtain her education." *Id.* ¶¶ 101, 216. *Cf.* Bonnevier MTD, at 11. Tellingly, Bonnevier fails to address the psychological harm that she inflicted on Ms. Richardson, which also constitutes "serious harm" under Section 1591. *See* 18 U.S.C. § 1591(e)(5).

A "commercial sex act" is defined as "any sex act,[23] on account of which ***anything*** of value is given to or received by ***any*** person." 18 U.S.C. 1591(e)(3) (emphasis added). Despite Bonnevier's assertion to the contrary, (Bonnevier MTD, at 7-8), actual causation is not required to violate Section 1591, and a commercial sex act need even not occur for a defendant to be held liable. *Ardolf*, 332 F.R.D. at 476; *Noble*, 335 F. Supp. 3d at 519.[24] "Anything of value" need not be financial and can include promises made to the victim that something positive will happen in the future. *See Ardolf*, 332 F.R.D. at 478 (offer of valuable career advancement was something of value).

---

"on campus living expenses" in her analysis of Ms. Richardson's education costs though the Complaint does not allege that Ms. Richardson lived on campus.

[23] Bonnevier questions, but does not go so far as to contest, whether the alleged sexual misconduct constitutes a "sex act." Bonnevier MTD, at 8. Bonnevier's employer defined the acts alleged in the Complaint as sexual misconduct which violates federal law. Compl. ¶¶ 117-18. Liability under Section 1591 also hinges on "any sex act." *See Ardolf*, 332 F.R.D. at 477-78 (broadly defining sex act); *Noble*, 335 F. Supp. 3d at 321-22 (defining "sex act" under § 1591 as "an act performed with another for sexual gratification").

[24] Bonnevier asserts that Ms. Richardson's claims fail because she did not identify "any specific 'elderly man' who groped her." Bonnevier MTD, at 5. This ridiculously presumes that the men engaging in sexual misconduct at University events took a moment to introduce themselves before assaulting Ms. Richardson. This would further mean that even in an archetypal sex trafficking case a victim would be required to provide a list of individuals with whom she was forced to engage in sexual activity in order to hold her trafficker responsible. Such specificity is not required. *See, e.g.*, *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 972 (S.D. Ohio 2019).

20

Ms. Richardson alleged that a number of persons received something of value: i) Ms. Richardson was promised a number of opportunities attendant to being a "Big Ten" cheerleader, including scholarship money and all-expense-paid travel to "the most storied stadiums in college athletics" (Compl. ¶¶ 49, 51, 55, 203-204, 213); ii) Northwestern fans and donors who harassed and assaulted Ms. Richardson were titillated and gratified by her presence at events, the purpose of which was to promote ticket sales and garner donations to Northwestern Athletics (Compl. ¶¶ 2-3, 56-57, 59, 61-66, 68, 76-77, 100, 205-206, 212, 215); iii) Bonnevier derived pleasure from the exploitation and sexual abuse of Ms. Richardson and her power over Ms. Richardson (*Id.* ¶¶ 56-59, 61-62, 69-72, 76, 78, 80, 89, 100);[25] iv) Bonnevier's salary was funded by Northwestern Athletics which, in turn, was funded by large alumni donations (*Id.* ¶ 215); iv) upon information and belief, Bonnevier's continued employment and opportunities for a higher salary were contingent on fundraising for Northwestern Athletics vis-à-vis the performance of the cheerleading team (*Id.* ¶¶ 56-57, 61, 63, 71, 80, 218); v) the University received a financial benefit from Bonnevier's exploitation of Ms. Richardson, and the cheerleading team, in the form of large alumni donations which funded Northwestern Athletics (Compl. ¶¶ 3, 7, 57, 64, 66, 75, 77-78, 129, 215; Exs. 1-7); and vi) Polisky, Obering and DaSilva likewise benefited from larger salaries and continued employment as a result of increased donations to Northwestern Athletics (*Id.* ¶ 218, Exs. 1-8, 10).[26]

*Kolbek v. Twenty-First Century Holiness Tabernacle Church, Inc.*, 2013 WL 6816174, at *16 (W.D. Ark. Dec. 24, 2013), a summary judgment opinion, is inapposite. Bonnevier MTD, at

---

[25] *See Bridges v. Poe*, 487 F. Supp. 3d 1250, 1262 (N.D. Ala. 2020) (benefit conferred on defendant was viewing of abuse on video monitor).

[26] The precise details about the individual defendants' salaries, employment contracts and any related sales, fundraising or marketing goals, and the amount of money raised at events attended by Ms. Richardson, are exclusively in the possession of the University.

7-8. Unlike the plaintiffs in *Kolbek*, Ms. Richardson has alleged a causal connection between the "items of value" detailed above and the sexual abuse that Bonnevier knowingly subjected her to at Northwestern Athletics events and fundraisers. For example, Ms. Richardson received cheerleading scholarships, traveled to "storied" stadiums, and had all expenses covered in exchange for attending events mandated by Bonnevier, and at which Bonnevier placed Ms. Richardson in situations where Bonnevier knew she would be subjected to sexual assault and harassment. *See David*, 431 F. Supp. 3d at 304 n. 5. Unlike the plaintiffs in *Kolbek*, Ms. Richardson's receipt of these benefits was dependent on her attending all events or she would be indebted to the University for thousands of dollars. Thus, assuming *arguendo* that Ms. Richardson were required to plead a *quid pro quo*, she has done so.

## II.    Ms. Richardson Alleged Plausible Forced Labor and Trafficking Claims <u>Against the University, Polisky, Obering and DaSilva</u>

The NW Defendants attempt to minimize the extent of the sexual abuse and harassment experienced by Ms. Richardson as part of Northwestern's fundraising efforts for "Chicago's Big Ten" teams to ineffectually argue that the grave misconduct alleged against Northwestern and its employees was not contemplated by the TVPRA. NWMTD, at 5-6. This weak challenge to Ms. Richardson's well-pled claims belies the NW Defendants' assertion that they "stand against human trafficking in all its forms." *Id.* at 5.

The NW Defendants contend that the exploitation, sexual harassment and sexual assault of Ms. Richardson while under threat of emotional, physical and financial harm is simply not serious enough to fall within the purview of the TVPRA, which, in their opinion, is reserved for "grave violations of human rights" such as prostitution and sex tourism. *Id.* at 6. In so arguing, they ignore a number of recent opinions which reject the cabining of trafficking and forced labor claims to reach only those allegations which describe archetypal sex trafficking. *Gilbert*, 423 F. Supp. 3d at

22

1112 (Olympic athletes who were repeatedly sexually assaulted by coach pled TVPRA claims against Olympic Committee and tae kwondo governing body); *Canosa v. Ziff*, 2019 WL 498865, at *1, 23 (S.D.N.Y. 2019) (TVPRA did not exclude repeated sexual assault, intimidation and harassment of movie producer under guise of business meetings and promoting her career); *Noble*, 335 F. Supp. 3d at 512 (claim alleging sexual assault of actress who was promised movie role was actionable under TVPRA); *Aguilera v. Aegis Comm'ns Group, LLC*, 72 F. Supp. 3d 975, 979 (W.D. Mo. 2014) (employee who was forced to continue participation in employer's work study program alleged forced labor claim pursuant to TVPRA); *Jean-Charles v. Perlitz*, 937 F. Supp. 2d 276, 288 (D. Conn. 2013) (TVPRA claim permitted to proceed against university and its employee who oversaw residential school where children were sexually abused). Section 1595 is a remedial provision which does not lend itself to restrictive interpretation. *Canosa*, 2019 WL 498865, at *23. Accordingly, Ms. Richardson's forced labor and trafficking claims against Defendants "comfortably fall" within the scope of the TVPRA and the corresponding provisions of the TVPA pursuant to which she has alleged those claims. *Id.*

The NW Defendants further argue that Ms. Richardson's forced labor and trafficking claims are not "grounded in fact," apparently misconstruing the applicable motion to dismiss standard as requiring evidence as opposed to plausible allegations. NWMTD, at 5. Ms. Richardson's allegations, which must be taken as true at this stage of the action, provide more than enough "details about the subject-matter of the case to present a story that holds together." *Reed*, 906 F.3d at 548. *See also Ali v. Khan*, 336 F. Supp. 3d 901, 909 (N.D. Ill. 2018) (TVPA claims are governed by the plausibility standard in Rule 8, not the heightened pleading standard in Rule 9). Accordingly, the Court should deny the NW Defendants' motion to dismiss Counts III-V of the Complaint.

### A.    Ms. Richardson's Allegations Satisfy 18 U.S.C. §1595[27]

Pursuant to Section 1595(a):

> An individual who is a victim of this chapter may bring a civil action against …whoever knowingly benefits, financially or receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter.

*See Red Roof Inns*, 2020 WL 3256261, at *5.[28] As detailed below, Ms. Richardson has satisfied the statute and her trafficking and forced labor claims should proceed to discovery.

### 1.    Defendants Participated in a Venture

Section 1595 does not define the term "venture" and the courts of the Seventh Circuit have adopted no definition in this regard. Section 1595 likewise fails to define "participation in a venture." *Jean-Charles v. Perlitz* proves instructive in providing meaning to these undefined terms. 937 F. Supp. at 288. In *Jean-Charles*, the court held that a residential school with the stated purpose of assisting impoverished children in Haiti ("PPT"), co-founded by Fairfield University ("Fairfield") and overseen by its employee, was a venture covered by Section 1595. *Id.* The plaintiffs alleged that the head of PPT sexually abused children who stayed at the school. *Id.* Fairfield hired the abuser. *Id.* at 280. Fairfield's employee ignored the abuse and helped conceal it. *Id.* At the motion to dismiss stage, the court upheld the plaintiff's sex trafficking claim against

---

[27] The NW Defendants aver that Section 1595 does not provide for a standalone cause of action. In cases involving the civil liability of hotels for sex trafficking, courts have found that standalone claims can be alleged under Section 1595. *See, e.g., A.C. v. Red Roof Inns Inc.*, 2020 WL 3256261, at *4 (S.D. Ohio June 16, 2020) (holding that defendants need not have committed underlying criminal act of sex trafficking in order to be held liable under § 1595(a)).

[28] The NW Defendants have added an element to their Section 1595 analysis which is not required to be pled—that Defendants "formed" a venture with a common purpose. NW MTD, at 8, 11. Plaintiff found no cases which required a victim of trafficking or forced labor to plead when or how the venture was formed (indeed most victims are trafficked well after a venture has been formed), or the specifics of any agreement to enter into a venture. NWMTD, at 8. In *M.A. v. Wyndham Hotels*, the court found that Section 1595's "knew or should have known" element does not require allegations which suggest a direct agreement between a trafficker and the participants in the venture. 425 F. Supp. 3d at 966.

Fairfield and its employee as participants in a venture which they knew or should have known engaged in acts that violated 18 USC § 1591. *Id.* at 288-89.

Like *Jean Charles*, a number of courts have held that liability under Section 1595 attaches when a defendant participates in a venture that ***is not specifically*** a trafficking venture and participation ***is not direct participation*** in trafficking. *S.J. v. Choice Hotels Int'l*, 473 F. Supp. 3d 147, 153-54 (E.D.N.Y. 2020) (relying on *Jean Charles*); *M.A. v. Wyndham Hotels*, 425 F. Supp. 3d at 969 (same); *H.H. v. G6 Hospitality, LLC*, 2019 WL 6682152, at *4 (S.D. Ohio Dec. 6, 2019) (same). *See J.C. v. Choice Hotels Int'l, Inc.*, 2020 WL 6318707, at *7 (N.D. Cal. Oct. 28, 2020) (plaintiff not required to allege overt act in furtherance of sex trafficking venture); *Gilbert*, 423 F. Supp. 3d at 1138-39 (Section 1589(b) does not require a member of a venture to have committed overt acts in furtherance of obtaining forced labor in order for that member to be civilly liable).[29] This is because, pursuant to Section 1595, a person may be held liable if he ***should have known*** that he was facilitating a trafficking venture, even he did not directly participate in trafficking. *Choice Hotels*, 473 F. Supp. 3d at 154. Allegations that the defendants were aware of the crimes being committed, and tacitly approved of the conduct by not exposing the crimes and benefiting

---

[29] These cases undermine the NW Defendants' argument that Section 1595 only applies to "actual" sex or labor trafficking ventures. NWMTD, at 10 n. 5, 12-14. Further, the cases cited in the NWMTD at footnote 5 do not support their argument. *U.S. v. Afyare*, 632 F. App'x 272, 279 (6th Cir. 2016) involved a criminal prosecution. In *Ricchio v. McLean*, 853 F.3d at 553, 557 (1st Cir. 2017), the First Circuit clearly stated "we do not present this summary as necessarily exhausting every variant of statutory violation and basis for civil liability that could survive the general Rule 12(b)(6) motion.". As made clear in the *Weinstein* cases, the plaintiff's allegations ***were not*** what would typically be described as sex or labor trafficking ventures. *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 168 (S.D.N.Y. 2019); *Canosa*, 2019 WL 498865, at *23; *Noble*, 355 F. Supp. at 515-16. In *J.B. v. G6 Hosp., LLC*, 2020 WL 4901196, at *10 (N.D. Cal. Aug. 20, 2020), the court held that participation in a sex trafficking venture could be alleged under a constructive knowledge theory, that "motel or hotel employees should have known that human trafficking was occurring." *Id.* at *11. *E.S. v. Best Western Int'l, Inc.*, 2021 WL 37457, at *3 (N.D. Tex. Jan. 4, 2021), likewise addressed the issue of constructive notice of a sex trafficking venture. *Ratha v. Phathana Seafood Co.*, 2017 WL 8293174, at *4 (C.D. Cal. Dec. 21, 2017), is a summary judgment opinion that relies on a decision that was reversed by the Tenth Circuit. *See Gilbert*, 423 F. Supp. 3d at 1138. The NW Defendants fail to explain how the knowing and continuous exploitation of Ms. Richardson and her teammates, by placing them in situations where they would be used to titillate wealthy donors and fans who sexually harassed and sexually assaulted them, differs from an "actual" sex or labor trafficking venture.

from the venture,[30] create a reasonable inference that the defendants participated in the venture. *See M.L. v. Craigslist Inc.*, 2020 WL 6434845, at * 5 (W.D. Wa. Apr. 17, 2020), report and recommendations adopted at *M.L. v. Craigslist*, 2020 WL 5494903, at *6 (W.D. Wa. Sept. 11, 2020); *Gilbert*, 423 F. Supp. 3d at 1132; *Jean-Charles*, 937 F. Supp. 2d at 288.

Guided by these principles, it is apparent that Ms. Richardson has plausibly alleged that the NW Defendants participated in a venture. Bonnevier abused Ms. Richardson and her teammates, and knowingly subjected them to sexual harassment and sexual assault at places like the Wilson Club and at alumni events, with the purpose of raising money for Northwestern Athletics, by portraying the cheerleaders as "fun girls" there to titillate donors. Compl. ¶¶ 50-51, 53-66, 70-75, 77, 81, 92, 100; Gorycki Decl., Exs. 1-10. In November 2018, Bonnevier recounted to Athletics Department staff at least one instance of fan sexual harassment against the cheerleading team. *Id.* ¶ 70. No action was taken. Polisky and Obering were top officials in Northwestern's Athletics Department. *Id.* ¶¶ 20-21. Obering was directly involved with the cheer team. Ex. 10. Polisky and Obering were responsible for marketing Northwestern's "Big Ten" teams, generating sales and ensuring first-rate fan experiences. Exs. 8, 10. During the timeframe at issue, Northwestern raised hundreds of millions of dollars for the Athletics Department. Exs. 5-7. After this lawsuit was filed, Polisky was promoted to Northwestern's Athletics Director and it was reported that he was selected for that role by family friend and "mega donor" Pat Ryan. *See supra* notes 5-6. Ms. Richardson told Obering and Polisky about the abuse and exploitation, and they discredited her, kept any inquiry into the allegations within the Athletics Department, and refused to open a formal investigation. Compl. ¶¶ 82-96. DaSilva was also alerted to the abuse and exploitation and kept any inquiry within the Athletics Department. *Id. See* Compl. ¶¶ 185-88, 209-

---

[30] The manner in which the NW Defendants benefited from the venture is discussed *infra* Point II.A.3.

12, 228-31. Obering, Polisky and DaSilva blocked and covered up any investigation into Bonnevier's misconduct in order to avoid public criticism and to continue fundraising. *Id.* ¶¶ 6-11, 26-44, 188, 212, 231. Bonnevier continued to exploit Ms. Richardson and her teammates without repercussions for ***almost a year and a half***. *Id.* ¶¶ 82-104.

Per these allegations, Defendants participated in a venture—fundraising and ensuring fan and donor satisfaction for Northwestern's "Big Ten" Athletics, of which the cheerleading team played a crucial role. The NW Defendants knew that Bonnevier was subjecting Ms. Richardson to sexual harassment and assault at University events, and did nothing to stop her, exhibiting—at the very least—their tacit approval. *See M.L. v. Craigslist Inc.*, 2020 WL 5494903, at * 5; *Jean-Charles*, 937 F. Supp. 2d at 288.

The NW Defendants discount Ms. Richardson's allegations, and the remedial purpose of Section 1595, and urge the Court to apply the definitions of "venture" and "participation in a venture" applied in criminal cases. NWMTD, at 8-11. This approach has been rejected by a number of courts. *See Doe v. Rickey Patel, LLC*, 2020 WL 6121939, at *4 (S.D. Fla. Sept. 30, 2020) (declining to apply definition of "venture" in Section 1591(e)(6) to claim brought under Section 1595); *A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171, 188 (E.D. Pa. 2020) (requiring victim seeking a civil remedy under Section 1595 to first prove a criminal offense was too restrictive a reading given the remedial nature of the Section); *S.J. v. Choice Hotels*, 473 F. Supp. 3d at 153-54 (noting inherent difference between civil and criminal liability and Congress' intent to broaden behavior that can form basis of civil liability); *M.A. v. Wyndham Hotels*, 425 F. Supp. 3d at 969 (rejecting application of § 1591 definition to § 1595).[31] Applying criminal standards to

---

[31] Moreover, even if the Court elects to apply the definition of "venture" found in Section 1591(e)(6) to Ms. Richardson's TVPRA claims, this should not result in dismissal because Ms. Richardson has alleged that the Defendants were "associated in fact" and participated in a venture. *See Gilbert*, 423 F. Supp. 3d at 1138 (holding that coaches, committee and national organization were associated in fact).

Ms. Richardson's civil TVPRA claims is tantamount to imposing a heightened pleading standard, in violation of Rule 8. Relying on Section 1591(e)(4), as the NW Defendants recommend, would also violate rules of statutory construction by voiding the "known or should have known" language in Section 1595. NWMTD, at 10. *See Rickey Patel*, 2020 WL 6121939, at \*5; *G6 Hospitality,* 2019 WL 6682152, at \*4. Consequently, the NW Defendants' recommended definitions of "venture" and "participation in a venture" should be rejected.[32]

### 2. Defendants "Knew or Should Have Known" That the Venture Engaged in Acts That Violated the TVPA

Ms. Richardson has plausibly alleged that the NW Defendants "knew or should have known" that the above-described venture was engaging in activity that violated the TVPA (*i.e.*, forced labor or trafficking). *Gilbert v. U.S. Olympic Committee*, 2019 WL 1058194, at \*16 (D. Colo. Mar. 6, 2019) (defendant that learned of coach's sexual abuse of athletes years after it occurred was liable under Section 1595 because statute did not require knowledge shortly after abuse occurred or even the identity of the victim), *adopted by Gilbert*, 423 F. Supp. 3d at 1132; *M.A. v. Wyndham Hotels*, 425 F. Supp. 3d at 968 (defendant that was on notice of sex trafficking and failed to take adequate steps to prevent it "knew or should have known" that venture was acting in violation of TVPA); *Jean-Charles*, 937 F. Supp. 2d at 288 (university and its employee who knew about sexual abuse, obstructed investigation and stopped communicating with administrator that confronted perpetrator "knew or should have known" that residential school was violating the TVPA).

---

[32] The NW Defendants' comparison of a trafficking venture to an investment with a reasonable expectation of profits is equally unavailing because Section 1595 expressly states that the participant in a venture may receive "anything of value." 18 U.S.C. § 1595(a). *See Bridges*, 487 F. Supp. 3d at 1262 (benefit conferred on defendant was viewing of abuse on video monitor); *M.A. v. Wyndham Hotels*, 425 F. Supp. 3d at 964-65 (benefit from participation need not be specified); *Aguilera*, 72 F. Supp. 3d at 980 (plaintiff sufficiently pled benefit in form of incentivization "financial or otherwise" to promote its study abroad program).

Ms. Richardson alleged that she reported to Northwestern's team doctor that Bonnevier forced her and the cheerleading team to participate in events where they were subjected to sexual harassment, exploitation and sexual assault so that Northwestern could profit. Compl. ¶ 82. This information was relayed to Obering and Ms. Richardson subsequently spoke to her about it in person. *Id.* ¶ 84. Rather than take immediate action, Obering demanded evidence. *Id.* ¶ 85. When Ms. Richardson later delivered evidence to Obering and Polisky, they accused her of fabricating student testimonials and questioned whether she adequately corroborated her claims. *Id.* ¶ 88-89. Ms. Richardson heard nothing for almost a month and then told DaSilva that there were multiple events at which she had been harassed and assaulted. *Id.* ¶¶ 90-91. Obering, Polisky and DaSilva ignored Ms. Richardson's repeated requests for a formal investigation, as required under the Title IX Policy. *Id.* ¶¶ 95, 122. Ms. Richardson's complaints were kept within the Athletics Department and Bonnevier received "training" which had no impact. *Id.* ¶¶ 94-95, 101. Ms. Richardson continued to be sent to the Wilson Club and numerous alumni events at which she was subjected to the same sexual harassment and sexual assault about which Obering, Polisky and DaSilva had already been notified. *Id.* ¶ 100. On May 28, 2019, Ms. Richardson again alerted Polisky and Obering that Bonnevier continued to engage in misconduct. They took no action. *Id.* ¶ 96. The exploitation, sexual harassment and sexual assault continued through the 2019-2020 cheerleading season. *Id.* ¶¶ 100-103. DaSilva waited almost a year and a half after Ms. Richardson's first complaint to formally investigate Bonnevier. *Id.* ¶ 104.

The NW Defendants nonsensically argue that Ms. Richardson's extensive allegations are "conclusory." NWMTD, at 14-16 & n. 10.[33] They alternatively argue that because Ms. Richardson reported the conduct after it happened that they cannot be held liable under Section 1595.

---

[33] *Stein v. World-Wide Plumbing Supply, Inc.*, 71 F. Supp. 3d 320, 328 (E.D.N.Y. 2014), does not support this argument. NWMTD, at 16 n. 10.

NWMTD, at 15-16.[34] However, the statute does not require the participant in a venture to know about the wrongful conduct in real time. *Gilbert*, 2019 WL 1058194, at *16; *Jean-Charles*, 937 F. Supp. 2d at 288. The NW Defendants then ignore the clear allegations of the Complaint—that they were repeatedly told about the exploitation and sexual abuse of Ms. Richardson and did nothing to stop it for almost one-and-a-half years. Compl. ¶¶ 82-104. While Ms. Richardson has alleged that the sexual abuse continued during both cheerleading seasons, such allegations are not required to sustain her claim. *Gilbert*, 2019 WL 1058194, at *16; *Jean-Charles*, 937 F. Supp. 2d at 288.

The NW Defendants outlandishly assert that Ms. Richardson failed to allege that there were "red flags" that should have put the NW Defendants on notice that Bonnevier was trafficking Ms. Richardson. NWMTD, at 16. In reality, Ms. Richardson directly notified the NW Defendants ***and*** provided evidence. Compl. ¶¶ 82-96.[35] The NW Defendants further argue that there is no allegation that they were "informed the purported conduct was the result of the alleged coercion or threats of serious harm." NWMTD, at 17. The case law discussed *supra* does not require courts to employ such a literal reading of Section 1595 at the motion to dismiss stage. The NW Defendants further ignore that Ms. Richardson alleged that she told the team doctor, Obering and Polisky that she and members of the team were being forced to participate in events where they were subjected to sexual

---

[34] No case cited by NW Defendants supports this argument. NWMTD, at 15. In *B.M. v. Wyndham Hotels & Resorts, Inc.*, 2020 WL 4368214, at *6 (N.D. Cal. July 30, 2020), the court held that staff at a hotel knew or should have known that sex trafficking because there were a number of obvious signs. The plaintiff made no allegation that the parent company of the franchisor knew or should have known. In *Jensen v. U.S. Tennis Ass'n*, 2020 WL 6445117, at *6 (D. Kan. Oct. 30, 2020), the plaintiff admittedly alleged ***no facts*** plausibly showing that the defendant knew or should have known that she was being sexually abused by her coach.

[35] Neither case cited by the NW Defendants to support their argument involved facts similar to those alleged here. In each, the plaintiffs attempted to allege claims against the parent companies and franchisors of hotels at which the plaintiffs were sex trafficked. In direct contrast to Ms. Richardson's allegations that Northwestern staff were notified, the plaintiffs in *A.B.* and *E.S.* failed to allege any specific details showing that the defendants were, or should have been, on notice that she was being sex trafficked at their hotels. *See A.B. v. Wyndham Hotels & Resorts, Inc.*, 2021 WL 1235241, at *7 (D. Or. Mar. 31, 2021); *E.S. v. Best Western Int'l Inc.*, 2021 WL 37457, at *5 (N.D. Tex. Jan. 4, 2021). For instance, in *E.S.*, the court found that the complaint failed to allege that hotel employees notified or should have notified a franchisor that the plaintiff was removed from the hotel after staff saw her Backpage advertisement. 2021 WL 37457, at *5.

harassment, exploitation and sexual assault so the University could profit. Compl. ¶¶ 82-96. What the NW Defendants knew or thought about the Spirit Squad contract, or the purpose of the cheerleading webpage, are issues of fact that cannot be decided now. NWMTD, at 17.

### 3.     Defendants Knowingly Benefitted from Participation in the Venture

Ms. Richardson has alleged that the NW Defendants knowingly benefitted from participating in the above-described venture. *See* Section 1595(a) (participant in venture must knowingly benefit "financially or receiving anything of value"). In order to satisfy this requirement, a plaintiff ***need not*** allege a causal relationship between the benefit received and the alleged trafficking or forced labor. *See H.H.*, 2019 WL 6682152, at *2; *Gilbert*, 423 F. Supp. 3d at 1131; *M.A. v. Wyndham Hotels*, 425 F. Supp. 3d at 964-65;[36] *Aguilera*, 72 F. Supp. 3d at 980; *Jean Charles*, 937 F. Supp. 2d at 288.

As alleged in the Complaint: 1) the University received a financial benefit from the venture in the form of large alumni donations which funded Northwestern Athletics (Compl. ¶¶ 191, 215, 234); 2) Polisky's and Obering's salaries were funded by these large donations (*Id.* ¶ 234-35); and 3) upon information and belief, increasing fan and alumni donations to the University resulted in opportunities for larger salaries and continued employment for Polisky, Obering and DaSilva (*Id.* ¶ 234). Moreover, Polisky and Obering were responsible for fan satisfaction, marketing and sales

---

[36] In *M.A.*, the court expressly rejected the causation standard articulated in *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 159 (S.D.N.Y. 2019), which the NW Defendants rely on in their Moving Brief. Defendants simply argue that *M.A.* was "wrongly decided." NWMTD, at 19 n. 11. The NW Defendants then ineffectively argue that the meaning of the terms "knowing" and "from" connote a "causal relationship." To the extent that they mean that a defendant must knowingly benefit from participation in a venture the court in *M.A.* would agree. The point of disagreement between the NW Defendants and the cases that disagree with *Geiss* is that, unlike *Geiss*, the decisions that are in agreement with *M.A.* do not require a direct connection between the trafficking or forced labor and the financial benefit. For example, in *Gilbert*, 423 F. Supp. 3d at 1131, the court held that the plaintiff sufficiently alleged that one defendant knowingly benefitted from a venture with a tae kwon do coach who sexually assaulted a team member by "collecting money through sponsorships, grants and for medals achieved at competitions, and for his recruitment and training of elite athletes." *Id. See Gilbert v. USA Taekwondo, Inc.*, 2020 WL 2800748, at * 6 (D. Colo. May 29, 2020). In *Aguilera*, the plaintiff sufficiently alleged that the plaintiff's employer knowingly benefited from an employee study abroad program that it was incentivized to promote. 72 F. Supp. 3d 980.

for "Chicago's Big Ten Team." Exs. 8, 10. In May 2021, it was reported that Polisky had a close relationship with "mega-donor" Pat Ryan, who selected Polisky to become the next Athletics Director. *See supra* nn. 5-6. During the relevant timeframe, the University was in the midst of a multi-year fundraising campaign for Northwestern Athletics, which included the opening of the new Welsh Ryan Arena and Wilson Club. Exs. 5-7.[37]

The NW Defendants attempt to impose a particularly requirement on Ms. Richardson which does not exist, by asserting that her Complaint fails because she did not tie a particular donation to any Defendant or the cheerleading program. NWMTD, at 18. *See supra* n. 24; *Ali*, 336 F. Supp. 3d at 909. It is preposterous to assume that Ms. Richardson would keep a ledger of incoming donations in the midst of being groped, harassed and assaulted. Moreover, fundraising at the university level is more nuanced than wealthy donors handing envelopes of cash out at fundraising events.

### B.    Ms. Richardson Alleged A Plausible Claim Under 18 U.S.C. § 1591

The Northwestern Defendants contend that Count IV of the Complaint should be dismissed because Ms. Richardson has not plausibly alleged a "commercial sex act" or "coercion." NWMTD, at 19-23. Each of these arguments fail.

### 1.    Ms. Richardson Has Alleged A "Commercial Sex Act"

The NW Defendants do not dispute that Ms. Richardson has alleged a sex act under the statute. *See* 18 U.S.C. § 1591(e)(3). Rather they contend that there is no allegation that anything of value was given or received by any person. As detailed *supra* Point I, Ms. Richardson has alleged that many benefitted from Bonnevier's repeated exploitation of Ms. Richardson. *See Jean*

---

[37] Assuming *arguendo* that Ms. Richardson need allege a causal relationship between the benefit received and the trafficking, she has alleged that the NW Defendants knew about and attempted to cover up Bonnevier's actions in order to avoid public criticism and continue fundraising. Compl. ¶¶ 188, 191-93, 212, 215, 218-19, 231, 234-36.

*Charles*, 937 F. Supp. 2d at 288 (complaint alleged § 1591 claim against university and employee who used private school in Haiti as marketing tool with students and prospective students). It is not the case that Ms. Richardson need identify specific donations that were exchanged at the time that she was sexually harassed and assaulted. NWMTD, at 20. *Roe v. Howard*, 2018 WL 284977, at *2 (E.D. Va. 2018) (rejecting same narrow definition of "commercial sex act"). *See Jean Charles*, 937 F. Supp. 2d at 288. As plainly stated in the statute, anything of value may be received by any person on account of the sexual misconduct and exploitation to which Ms. Richardson was subjected by Bonnevier. 18 U.S.C. § 1591(e)(3). *See Noble*, 335 F. Supp. 3d at 508 ("anything of value" requires liberal reading).

In an appalling—but failed—attempt to distance themselves from the harm that was inflicted on Ms. Richardson, the NW Defendants suggest that they cannot be held liable under Section 1591 because the fans and patrons who groped Ms. Richardson "may not even be affiliated with Northwestern in any way." NWMTD, at 20. The NW Defendants ignore that "Section 1595 does not include the requirement that [the] plaintiff show that defendants personally engaged in a commercial sex act." *Craigslist*, 2020 WL 6434845, at *7. The NW Defendants further ignore that the *only reason* that Ms. Richardson was sexually harassed and sexually assaulted at tailgating events, alumni events and games was because Bonnevier forced her into that position and the NW Defendants condoned Bonnevier's actions so that they could continue to benefit. Compl. ¶¶ 1-15, 53-110, 202-19.

While the NW Defendants question the commercial nature of the acts alleged (NWMTD, at 21), there is nothing more commercial than the marketing and promotion of "Chicago's Big Ten" teams to fans and donors with deep pockets. *See NCAA v. Alston*, 141 S.Ct. 2141, 2155 (2021) (describing NCAA as a "sprawling enterprise" and a "massive business" with billions in

broadcast contracts). Northwestern's cheerleading team—and the sexual abuse and exploitation thereof—was a key component of that venture.[38] *See* discussion, *supra* Point II.A.1. Indeed, the team website encouraged students to "be a part of Chicago's Big Ten Cheer team" and have the opportunity to be on TV every week. Compl. ¶ 204.

### 2. Ms. Richardson Alleged Serious Harm

Section 1591 requires that a plaintiff asserting a claim grounded in coercion allege "serious harm." 18 U.S.C. § 1591(a)(2), (e)(2)(A-B), (e)(5). As detailed *supra* Point I, Ms. Richardson has plausibly alleged serious harm. Like Bonnevier, the NW Defendants callously, and perversely, argue that the harm suffered by Ms. Richardson was not "sufficiently serious" to satisfy the broad and expansive language of Section 1591. NWMTD, at 22. They argue that the loss of Ms. Richardson's scholarship would be of minimal impact to her because it is simply not much money to lose. Tell that to any college student who relies on financial assistance to achieve her educational goals. Not only are the NW Defendants completely out of touch with the everyday realities of being a student, they raise questions of fact that cannot be decided at this stage of the action.[39] Like Bonnevier, the NW Defendants fail to address the psychological and emotional harm inflicted on Ms. Richardson, which is also actionable under Section 1591. 18 U.S.C. § 1591(e)(5).

---

[38] In two of the cases cited by the NW Defendants, involving "casting couch sexual harassment," the courts had to clarify the commercial nature of the acts in question but found a commercial sex act had been alleged. *Ardolf*, 332 F.R.D. at 478-79 and *Noble*, 335 F. Supp. 3d at 520-21. Each of these cases supports a broad reading of Section 1591. *A.B. v. Wyndham Hotels*, 2021 WL 1235421, at *1, concerned sex trafficking at a hotel chain. The facts of this case, in which Bonnevier transported the cheerleading team to various University events is factually closer to *A.B.* than to *Ardolf* and *Noble* which concerned one-on-one sexual assault behind closed doors.

[39] Indeed, *U.S. v. Carson*, 870 F.3d 584, 594 (7th Cir. 2017) and *U.S. v. Dann*, 652 F.3d 1160, 1171 (9th Cir. 2011) concerned post-conviction appeals. NW MTD, at 22. None of the cases cited by the NW Defendants are dispositive, here, because the proper analysis is whether a reasonable person with Ms. Richardson's background and in the same circumstances would feel compelled to stay on the cheerleading team to avoid serious harm such as her loss of scholarship. *See* discussion *supra* Point I.

### C.    Ms. Richardson Alleged A Plausible Claim Under 18 USC § 1589(b)[40]

The NW Defendants assert the same "serious harm" argument with respect to Count V of the Complaint, which alleges forced labor under Section 1589 of the TVPA, as they do with respect to Section 1591. NWMTD, at 23-24. This argument fails for the reasons set forth above, as Section 1589 contains the same definition of serious harm found in Section 1591. *Compare* 18 U.S.C. § 1591(e)(5) *with* 18 U.S.C. § 1589(c)(2). *See also Ross*, 325 F. Supp. 3d at 1164.[41]

Relying on Section 1589(a)(4),[42] the NW Defendants incorrectly assert that Ms. Richardson was required to allege that they intended for her to fear serious harm. NWMTD, at 25-26. As discussed at length *supra* Point II.A, Ms. Richardson's claim against the NW Defendants is grounded in venture liability under Section 1589(b). 18 U.S.C. §§ 1595, 1589(b) *See* Compl. ¶¶ 223, 225, 228-37. Consequently, their liability does not hinge on any allegation that the NW

---

[40] The NW Defendants make no independent argument for dismissal of Count III, trafficking under 18 U.S.C. § 1590. They solely argue that because Ms. Richardson's claim under Section 1589 fails, that her claim under Section 1590 also fails. NWMTD, at 23 n. 12. As discussed *infra*, Ms. Richardson has plausibly alleged a claim against the NW Defendants under Section 1589. Contrary to the NW Defendants' assertion, in *Nunag-Tanedo v. East Baton Rouge Parish Sch. Bd.,* 790 F. Supp. 2d 1134, 1146-47 (C.D. Cal. 2011) the court did not find that a claim was alleged under both Sections 1589 and 1590 because of "the interaction of the forced labor component." NWMTD, at 23 n. 12. Rather, the court held that "with the international nature of this matter, Plaintiffs have also sufficiently alleged that Defendants ***recruited, transported, and provided*** Plaintiffs for that forced labor." 790 F. Supp. 2d 1146-47 (emphasis added). *See Gilbert*, 423 F. Supp. 3d at 1133-34 (Section 1590 imposes liability for human trafficking which is separate and distinct from the liability imposed under Section 1589). As discussed *supra* note 15, Ms. Richardson has plausibly alleged a claim for human trafficking under Section 1590 and, as discussed *supra* Point II.A.1, she has plausibly alleged a claim against the NW Defendants as participants in a venture with Bonnevier.

[41] Relying on *Mouloki v. Epee*, 262 F. Supp. 3d 684, 696 (N.D. Ill. 2017), the NW Defendants continue to urge the Court to construe the TVPA narrowly. NWMTD, at 24. However, as pointed out in *Mouloki*, a defendant need not employ any of the methods enumerated in that case in order to be held liable under Section 1589. *Id.* at 697. *See, e.g.*, *Vaughan v. Aegis Comm'ns Grp., LLC*, 49 F. Supp. 3d 613, 623 (W.D. Mo. 2014). As noted in *Nunag-Tanedo*, 790 F. Supp. 2d at 1145, "the TVPA not only protects victims from the most heinous of human trafficking crimes, but also various additional types of fraud and extortion leading to forced labor." *See Nunag-Tanedo*, 2012 WL 5378742, at *3-4 (C.D. Ca. Aug. 27, 2012) (denying defendants' summary judgment motion, in part due to questions of fact concerning financial harm). *Alvarado v. Universidad Carlos Abizu*, 2010 WL 3385345, at *4 (S.D. Fla. Aug. 25, 2010), in which a college professor making $95,000 per year attempted to allege a forced labor violation because he did not get a pay raise, is inapposite. The employment contract at issue allowed the plaintiff to leave his position upon 30-days' notice and he could have left if he did not wish to take over certain responsibilities absent a pay raise. *Muchira*, 850 F.3d at 605, is a summary judgment opinion which concerned voluntary employment where no pressure was exerted on the plaintiff.

[42] The NW Defendants' focus on this Section is misplaced because Plaintiff's allegations of "serious harm" also satisfy Section 1589(a)(2). *See supra* Point I.

Defendants directly participated in the trafficking of Ms. Richardson. *Paguirigan v. Prompt Nursing Employment Agency LLC*, 2020 WL 122704, at *1 (E.D.N.Y. Jan. 9, 2020) (venture liability under §1589(b) does not depend on the defendant first being found liable under Section 1589(a)); *Gilbert*, 423 F. Supp. 3d at 1137 (Pursuant to § 1589(b) a member of a venture need not have committed an overt act in furtherance of obtaining forced labor or services).[43] The NW Defendants are, further, incorrect in their assertion that Ms. Richardson was required to allege that they "knew the terms of the Spirit Squad contract would be viewed by the cheerleaders as a threatened harm." NWMTD, at 17. *See Paguirigan*, 2020 WL 122704, at *2 (plaintiffs not required to show that defendants knew that contract provision was punitive).

### D. The University May Be Held Vicariously Liable

The University argues that it cannot be held vicariously liable for forced labor or trafficking on account of the individual defendants' "inappropriate" behavior. NWMTD, at 7 n. 3, 12 n. 6. The University ignores that, as discussed *supra* Point II.A, Ms. Richardson has alleged direct forced labor and trafficking claims against the University based on its participation in a venture with the other defendants. Even if she did not, the University can still be held vicariously liable for the acts of its employees. *See A.B. v. Hilton Worldwide Holdings,* 484 F. Supp. 3d 921. 939-40 (D. Or. 2020) (plaintiff alleged TVPRA claim under agency theory); *M.A. v. Wyndham Hotels,*

---

[43] Assuming *arguendo* that Ms. Richardson needed to plead a direct labor trafficking claim against each NW Defendant, she has alleged that the NW Defendants intentionally caused Ms. Richardson "reasonably to believe, given her special vulnerabilities, that she ha[d] no alternative" but to remain on the cheerleading team. *Ross*, 325 F. Supp. 3d at 1164. Ms. Richardson was required to sign the Spirit Squad contract, pursuant to which she was subject to termination if she did not attend all events mandated by the coaching staff. Compl. ¶ 55. Upon termination—or if she quit the team—she would be required to pay back Northwestern for all expenses incurred during the cheer season, including travel. *Id.* Northwestern has not—because it cannot—denied knowledge of the Spirit Squad contract. Polisky and Obering had actual knowledge of the serious harm that Ms. Richardson was experiencing, as she reported it to them in January 2019. *Id.* ¶¶ 83-89. In response, they accused her of fabricating evidence. *Id.* ¶ 88. DaSilva mischaracterized Ms. Richardson's complaint and kept it within the Athletics Department. *Id.* ¶¶ 90-95. The NW Defendants failed to take any formal action against Bonnevier for nearly one and a half years, despite Ms. Richardson's persistent complaints. *Id.* ¶¶ 82-104. At the very least, these allegations raise questions of fact about what the NW Defendants knew, and intended, and at what point in time.

425 F. Supp. 3d at 972 (same); *Jansen v. Packaging Corp. of America*, 123 F.3d 490, 496-499 (7th Cir. 1997) (discussing vicarious liability of employers for sexual harassment in the work place). *See also Golbert v. Aurora Chicago Lakeshore Hosp., LLC*, 2021 WL 952528, at *12 (N.D. Ill. Mar. 11, 2021) (employees' cover up of sexual assault and sexual abuse so that employer could continue to benefit from government patronage was within scope of employment); *Doe v. St. Clair Cnty.*, 2018 WL 3819102, at *3 (S.D. Ill. Aug. 19, 2018) ("*Respondeat superior* liability extends to the negligent, willful, malicious or even criminal acts of …employees, when those acts are committed within the scope of employment.") (citation omitted). Scope of employment is, further, a fact-intensive issue that is generally inappropriate to resolve at the motion to dismiss or summary judgment stage. *Golbert*, 2021 WL 952528, at *11. The Complaint adequately alleges that Bonnevier, Polisky, Obering and DaSilva were acting within the scope of their employment. *See* Compl. ¶¶ 19-22, 50, 55-57, 59, 61, 68-80, 84-85, 88, 90, 93, 95, 98-100, 180-83, 186-189, 202-206, 208-13, 227-35.

Unlike *Doe v. Sperlik*, 2005 WL 3299818, at *3 (N.D. Ill. 2005), in which a teacher admittedly molested several students, it is not clear that Bonnevier's motives, here, were personal. As alleged in the Complaint, she subjected Ms. Richardson and her teammates to sexual harassment and sexual assault at the hands of third parties in order to raise money for Northwestern Athletics. Obering, Polisky and DaSilva covered up the abuse to protect Northwestern's reputation and continue fundraising that would benefit them and Northwestern. In *Wright v. City of Danville*, 174 Ill. 2d 391, 405-407 (1996), the Court acknowledged that "even the criminal acts of an employee may fall within the scope of employment," but the employees in question had been convicted of crimes which required exploitation of their positions for their ***personal*** benefit.

### III. <u>Ms. Richardson Alleged a Breach of Contract Claim Against the University</u>

Ms. Richardson has alleged that the University breached its Sexual Misconduct Policy.[44] It is well settled, and the University does not deny, that the relationship between student and university is contractual in nature, with the terms of the contract generally set forth in the school's catalogs and manuals. *DiPerna v. The Chicago School of Prof'l Psych.*, 2015 WL 361902, at *2 (N.D. Ill. Jan. 27, 2015) (plaintiff alleged breach of contract claim for school's failure to take action when she reported harassment and bullying). Ms. Richardson has alleged specific contractual promises—not mere "aspirational" statements—that the University breached when its administrators: 1) failed to take the required action in response to her Title IX complaint (Compl. ¶¶ 85, 96, 120, 241(b)); 2) failed to promptly refer her complaint to the Title IX Office (*Id.* ¶¶ 82-89, 121, 241(c)); 3) failed to conduct an "initial inquiry" as defined in the Policy and required Ms. Richardson to gather her own evidence (*Id.* ¶¶ 85, 123, 241(f)); 4) informally resolved Ms. Richardson's complaint (*Id.* ¶¶ 94-95, 122, 241(d)); 4) designated Ms. Richardson as a witness (*Id.* ¶¶ 106-108, 124-25, 241(e)); and 5) denied Ms. Richardson the opportunity to review the evidence gathered once a formal investigation of Bonnevier was conducted (*Id.* ¶¶ 109, 124, 126, 241(g)). *Cf. Mulvey v. Carl Sandburg High Sch.*, 66 N.E.3d 507, 514-15 (Ill. App. Ct. 2016) (handbook language at issue expressly referred to "hopes" and "goals" of anti-bullying measures); *Liu v. Northwestern Univ.*, 78 F. Supp. 3d 839, 847 (N.D. Ill. 2015) (contract provision stating that investigations were "usually completed within 30-60 days" did not set forth definite standard that university agreed to abide by). As a result of these breaches, Ms. Richardson continued to be subjected to Bonnevier's exploitative acts, sexual harassment and sexual assault, for over a year. Compl. ¶¶ 82-104.

---

[44] Ms. Richardson has not alleged that the University breached the Handbook or Harassment Policy. NWMTD, at 27.

The University argues that the provisions found in Section III of its Misconduct Policy are nonbinding. This is wholly inaccurate. Section I.B of the Misconduct Policy makes clear that the University will follow the complaint resolution process set forth therein, noting that "**Individuals impacted by sexual misconduct may contact the Office of Equity…even if they do not wish to move forward with the Complaint Resolution Process described in Section III below**." NWMTD, Exs. A and B (emphasis in original). Section III.A, "Introduction and General Procedures" plainly states that "[t]he procedures below *outline the process the University follows* when it receives a report alleging a violation of the *Policy on Sexual Misconduct.*" NWMTD, Exs. A and B, § III.A (emphasis added). Section III.A further states that "[t]he process described below is Northwestern's internal University process to determine whether Northwestern policy was violated." *Id.*

The policy language cited by the University applies only in cases which "raise challenging new issues" (*i.e.*, circumstances not provided for in the Policy) and still requires the University to act in a manner "consistent with the spirit of the applicable policies…while preserving fairness for both parties and maintaining the integrity of the resolution process." *Id.* This language does not permit the University to create a process out of whole cloth nor does it constitute an express disclaimer which precludes Ms. Richardson's breach of contract claim. *Cf. Gociman v. Loyola Univ. of Chicago*, 2021 WL 243573, at *4 (N.D. Ill. Jan. 25, 2021) (catalog expressly stated it was not a contract and was subject to change at any time without notice); *Eisele v. Ayers*, 63 Ill. App. 3d 1039, 1044-45 (Ill. App. Ct. 1978) (bulletin stated without qualification that tuition was subject to increase without notice). At best, the language relied on by the University provides a defense to Ms. Richardson's breach of contract claim, but only if the University can prove that Bonnevier's

case raised "challenging new issues" and the numerous failures of its administrators were in keeping with the written process and fair to Ms. Richardson (they were not).[45]

Despite the University's arguments to the contrary (NWMTD, at 29-30), Ms. Richardson has also alleged that the breaches of the Sexual Misconduct Policy were "arbitrary, capricious and made in bad faith." *DiPerna*, 2015 WL 361902, at *3. *See O'Driscoll v. Argosy Univ.*, 2014 WL 714023, at *3 (N.D. Ill. Feb. 25, 2014) (defendants' retaliation against plaintiff after reporting sexual harassment was arbitrary, capricious and in bad faith). Obering discredited her and required her to gather evidence before Ms. Richardson's concerns would even be acknowledged. Compl. ¶ 84-85. When Ms. Richardson delivered the evidence, Obering and Polisky accused her of fabrication and then questioned whether Ms. Richardson had sufficiently corroborated her claims. *Id.* ¶¶ 86-89. DaSilva minimized Ms. Richardson's allegations and kept her complaint within the Athletics Department. *Id.* ¶¶ 90-95. Ms. Richardson continued to express concerns about Bonnevier's conduct and Obering, Polisky and DaSilva took no formal action for over a year. *Id.* ¶¶ 96-104. DaSilva then shifted Ms. Richardson's role in the formal investigation to witness rather than complainant, obstructing her access to the evidence gathered and the outcome of the investigation. *Id.* ¶¶ 105-109. Defendants' cover up of Ms. Richardson's complaint was part of the Athletic Department's strategy of intentionally exploiting its cheerleaders and subjecting them to sexual assault and harassment, for financial gain. *Id.* ¶¶ 7, 44, 87, 128-29. Ms. Richardson's Title IX sex discrimination claims, which the University has not moved to dismiss, also support the allegation that the University was arbitrary, capricious and acted in bad faith actions when it failed to address Ms. Richardson's complaint against Bonnevier.

---

[45] The allegations and arguments set forth in this section are also asserted in opposition to the University's arguments that Ms. Richardson's claim for promissory estoppel should be dismissed. *See* NWMTD, at 31-32.

*Doe v. Columbia College Chicago*, 933 F.3d 849 (7th Cir. 2019), is readily distinguishable from the present case because the plaintiff, who was accused of, and disciplined for, engaging in sexual misconduct, was already involved in the college's formal Title IX investigation process when he lodged retaliation claims against the Title IX complainant. *Id.* at 853. In response, the college administrators immediately addressed the plaintiff's concerns. The plaintiff's allegations were also contradicted by documentary evidence. *Id.* at 858.[46]

## IV.   Ms. Richardson Alleged A Plausible IIED Claim Against Bonnevier

Ms. Richardson's IIED claim against Bonnevier is not barred by Illinois' two-year statute of limitations because Ms. Richardson pled a continuing injury, caused by Bonnevier's abuse and exploitation, which continued through the end of the 2019-2020 cheerleading season. Compl. ¶¶ 53, 56-58, 61-62, 64, 68-74, 76-81, 92, 96-103. *See Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 278 (2003). Throughout the 2019-2020 cheerleading season, Bonnevier sent Ms. Richardson to numerous alumni events and to the Wilson Club where she was "subjected to the same photo opportunities, groping, and harassment" as the previous season. Compl. ¶ 100. Ms. Richardson plausibly alleged an IIED claim against Bonnevier, which requires: (1) extreme and outrageous conduct; (2) the actor either intended or knew there was a high probability that her conduct would inflict severe emotional distress; and (3) the conduct did in fact cause severe emotional distress. *McGrath v. Fahey*, 533 N.E.2d 806 (Ill. Sup. Ct. 1988).

*First*, Bonnevier's alleged conduct was extreme and outrageous, which Illinois law defines as "so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a

---

[46] *Holert v. Univ. of Chicago*, 751 F. Supp. 1294 (N.D. Ill. 1990), in which the plaintiff was expelled from the university, concerned evidence presented at a bench trial. *Bilut v. Northwestern Univ.*, 645 N.E.2d 536, 540 (Ill. App. Ct. 1994), likewise concerned findings after a bench trial. *Frederick v. Northwestern Univ. Dental Sch.*, 617 N.E.2d 382 (Ill. App. Ct. 1993) is a summary judgment opinion as is *Seitz-Partridge v. Loyola Univ. of Chicago*, 948 N.E.2d 219 (Ill. App. Ct. 2011).

civilized community." *McGrath*, 126 Ill. 2d at 90. "A pattern, course, and accumulation of acts can make an individual's conduct 'sufficiently extreme to be actionable, whereas one instance of such behavior might not be.'" *Feltmeier*, 207 Ill. 2d at 274 (citation omitted). Courts have held that acts of sexual misconduct can constitute extreme and outrageous conduct. *Feltmeier*, 207 Ill. 2d at 275; *Pavlik v. Kornhaber*, 326 Ill. App. 3d 731, 747 (2001); *Pavilon v. Kaferly*, 204 Ill. App. 3d 235, 245 (1990). Moreover, "the degree of power or authority which a defendant has over a plaintiff can impact upon whether that defendant's conduct is outrageous.... Threats...are much more likely to be part of outrageous conduct when made by someone with the ability to carry them out." *McGrath*, 126 Ill. 2d at 86-87 (referencing school authorities). *See Doe v. Moravian Coll.*, 2021 WL 843603, at *5 (E.D. Pa. Mar. 5, 2021) (advising sexual assault victim to be more considerate of attackers and discouraging victim from proceeding with Title IX process constituted outrageous conduct). In such a case, the "result is something very like extortion." *Milton v. Illinois Bell Telephone Co.*, 101 Ill. App. 3d 75, 79 (1981).

Bonnevier engaged in a pattern of conduct which violated Northwestern's Sexual Misconduct Policy by repeatedly "assisting or willfully encouraging" the sexual assault and sexual harassment of Ms. Richardson. Compl. ¶¶ 117-18, 57-59, 61-62, 64-65, 68-71, 75-78, 100. Bonnevier mocked, shamed and dehumanized Ms. Richardson when witnessing, or informed of, the sexual abuse. *Id.* She subjected Ms. Richardson to systematic emotional abuse. *Id.* ¶¶ 71-74, 79-81, 99. Bonnevier was in a position of power over Ms. Richardson by virtue of her position as head coach of the cheerleading team and per the Spirit Squad contract, as well as the fact that Bonnevier's colleagues disbelieved Ms. Richardson, minimized her allegations and failed to investigate Bonnevier for nearly a year and a half. *Id.* ¶¶ 22, 50, 55, 60, 82-104.

Bonnevier understandably tries to distance herself from the horror of what she inflicted on Ms. Richardson by pointing to other cases that she deems "far worse" than a continuing course of emotional abuse, sexual harassment and sexual assault. Bonnevier MTD, at 14. But the cases relied upon by Bonnevier are readily distinguishable. *Slaughter v. Waubonsee Comm'y Coll.*, 1994 WL 663596, at \*4 (N.D. Ill. Nov. 18, 1994) concerned a "single isolated incident." Unlike the present case, in *Rudis v. Nat'l Coll. Of Ed'n*, 191 Ill. App. 3d 1009, 1013-14 (1989), there were no allegations of threats or coercion. *Wrenn v. Exelon Generation*, 2019 WL 11660918, at \*10 (N.D. Ill. Mar. 5, 2019), involved a co-worker who "politely" professed his love to the plaintiff. In *Sanders v. Chicago Transit Auth'y*, 2020 WL 5253867, at \*10 (N.D. Ill. Sept. 3, 2020) (emphasis added) this Court noted a "general reluctance to deem **workplace behavior** as extreme and outrageous." The application of this principle in employment cases has been overlooked by Bonnevier, who predominantly relies on cases involving workplace misconduct to argue for dismissal of Ms. Richardson's IIED claim. *See* Bonnevier MTD, at 13 & nn. 5, 14.

***Second***, Ms. Richardson's pleading satisfies the *scienter* element of an IIED claim, alleging that Bonnevier "either intend[ed] that [her] conduct inflict severe emotional distress, or kn[e]w that there is at least a high probability that [her] conduct [would] cause severe emotional distress." *McGrath*, 126 Ill. 2d at 86. "Courts have generally found this element to be satisfied either when a defendant's actions, by their very nature, were likely to cause severe distress or when the defendant knew that a plaintiff was particularly susceptible to such distress and that, because of this susceptibility, the defendant's actions were likely to cause it to occur." *Honaker v. Smith*, 256 F.3d 477, 494 (7th Cir. 2001).

Bonnevier both intended, and knew, that her actions were causing Ms. Richardson severe emotional distress. Ms. Bonnevier told the cheerleading team at the start of the 2018-2019 season

that they would be exposed to "creepy fans" and that, regardless, they needed to be "fun girls." Compl. ¶ 56. Bonnevier sent Ms. Richardson to the Wilson Club as "a splash of color." *Id.* ¶ 57. She isolated Ms. Richardson from other team members at various events. *Id.* ¶¶ 57-58, 68-69, 75-78. Ms. Richardson **told** Bonnevier that she was uncomfortable and concerned about being harassed and groped, and Bonnevier even witnessed these events. She mocked Ms. Richardson or told her to do her job. *Id.* ¶¶ 59, 68-69, 76-78. Bonnevier gave Ms. Richardson's name to a group of intoxicated fans who she knew were harassing Ms. Richardson and then denied her request to move to a different location. *Id.* ¶ 61. Bonnevier admittedly deprived Ms. Richardson and her teammates of food and proper attire, shamed and humiliated them because they had to look appealing to Northwestern fans. *Id.* ¶¶ 71-72, 80-81, 99. Bonnevier's conduct continued through the 2019-20 season, even after she was alerted to a complaint about her conduct. *Id.* ¶¶ 94, 96, 97-103. Given the degree of power that Bonnevier held over Ms. Richardson as the head coach of the cheerleading team and pursuant to the Spirit Squad contract, Ms. Richardson, a student, was particularly susceptible to emotional distress due to Bonnevier's conduct. *Id.* ¶¶ 22, 50, 55, 60, 82-104.

**Third**, Ms. Richardson has plausibly alleged severe emotional distress, including panic attacks requiring weekly therapy and numerous prescription medications. *Id.* ¶¶ 167, 255. This is typically a question of fact that cannot be decided at the motion to dismiss stage. *See Naem v. McKesson Drug Co.*, 444 F.3d 593, 606 (7th Cir. 2006); *Bristow v. Drake St. Inc.*, 41 F.3d 345, 350 (7th Cir. 19994). Bonnevier nonsensically argues that these allegations have not "established" a "causal connection" between her emotional distress and Bonnevier's alleged conduct. Yet the Complaint is replete with allegations which demonstrate that Bonnevier's acts and omissions in exploiting and abusing Ms. Richardson, and Bonnevier's deliberate placement of Ms. Richardson

44

in harmful situations, caused her emotional distress. The cases relied upon by Bonnevier are inapposite. *See Woods v. Clay*, 2005 WL 43239, at *1 (N.D. Ill. 2005) (plaintiffs presented no evidence regarding severity of emotional distress such as medical treatment or prescription medications); *Knysak v. Shelter Life Ins. Co.*, 273 Ill. App. 3d 360 (1995) (same). *Cf. Naem*, 444 F.3d at 606 ("psychiatric help is not a necessary condition to a finding that a [plaintiff] suffered severe emotional distress").

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court deny the NW Defendants' motion to dismiss Counts III-VII of the Complaint, along with such other and further relief as the Court deems just and proper. Plaintiff withdraws Count VIII of the Complaint as to Polisky, Obering and DaSilva. Plaintiff respectfully requests that the Court deny Bonnevier's motion to dismiss in its entirety, along with such other and further relief as it deems just and proper.

Dated:    July 23, 2021

<div style="margin-left:40%">

Respectfully Submitted,

/s/ Kara L. Gorycki
Kara L. Gorycki (admitted *pro hac vice*)
Andrew T. Miltenberg (admitted *pro hac vice*)
Adrienne Levy (admitted *pro hac vice*)
NESENOFF & MILTENBERG, LLP
363 Seventh Avenue, Fifth Floor
New York, New York 10001
Telephone: (212) 736-4500
Email: KGorycki@nmllplaw.com
Email: AMiltenberg@nmllplaw.com
Email: ALevy@nmllplaw.com

                 -and-

/s/ Damon M. Cheronis
Damon M. Cheronis
LAW OFFICES OF DAMON M. CHERONIS
The Marquette Building

</div>

140 S. Dearborn Street
Suite 411
Chicago, Illinois 60603
Telephone: (312)663-4644
Email: damon@cheronislaw.com

***Attorneys for Plaintiff Hayden Richardson***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 23, 2021, I electronically filed the foregoing **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' RULE 12(b)(6) MOTIONS** with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record.


<div align="right">

   /s/ *Kara L. Gorycki*   

</div>