# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| HAYDEN RICHARDSON, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:21-CV-00522 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| NORTHWESTERN UNIVERSITY, | ) | |
| AMANDA DASILVA, HEATHER | ) | |
| VAN HOEGARDEN OBERING, | ) | |
| MICHAEL POLISKY, and PAMELA | ) | |
| BONNEVIER, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Hayden Richardson alleges that, as a member of the Northwestern University cheerleading team, she suffered sexual assaults and sexual harassment at the hands of fans, alumni, and donors at tailgates, alumni fundraising events, and a private University club. Worse, Richardson alleges that the head cheerleading coach intentionally put Richardson and the other women cheerleaders into the gauntlet of those assaulters, with the explicit purpose that the cheerleaders flirt with the fans, alumni, and donors, and knowing that the assaults would be the result. On top of that, after Richardson complained to University and Athletics Department leaders about the assaults, the leaders did little to stop the victimization.

In a 256-paragraph complaint, Richardson first asserts that Northwestern's mishandling of her cries for help violated federal anti-discrimination statute and regulations governing educational institutions, commonly known as Title XI, 20 U.S.C.

§§ 1681 *et seq.* R. 1, Compl.[1] Those two Title IX counts (Counts 1 and 2) target North-western as the defendant, and Northwestern has not moved to dismiss those claims.[2] Three other counts—labelled Counts 3, 4, and 5—bring claims under the Trafficking Victims Protection Act against Northwestern and other defendants. R. 1, Compl. Count 3 cites to 18 U.S.C. § 1590, R. 1 at 40,[3] which prohibits trafficking in forced labor, and is asserted against the University itself, as well as Heather Obering (the former Associate Athletic Director for Marketing); Amanda DaSilva (the former Deputy Title IX Coordinator); Michael Polisky (the former Deputy Director of Athletics); and Pamela Bonnevier (the former head coach of the cheerleading team). Compl. ¶¶ 19–22.[4] Count 4 asserts that the Defendants violated the sex-trafficking prohibi-tion, in violation of 18 U.S.C. § 1591. *Id.* at 44–48. The final federal law claim, Count 5, alleges that the Defendants violated the ban against forced labor, 18 U.S.C. § 1589.

Richardson also brings state law breach-of-contract and promissory-estoppel claims against Northwestern, and a state law claim for intentional infliction of

---

[1] Citations to the record are noted as "R." followed by the docket number.

[2] Northwestern has not moved to dismiss Counts 1 and 2 and notes that it anticipates addressing the Title XI claims after the completion of discovery. R. 47, NU Defendants' Br. at 1, n. 2.

[3] Although Count 3 cites to Section 1590, it unfortunately goes on to quote Section 1591, which prohibits sex trafficking, not forced-labor trafficking. Given the overlap between Section 1590 (forced-labor trafficking) and Section 1589 (forced labor), which is the subject of the count labeled as Count 4, R. 1 at 48, and given that Count 4 asserts a sex-trafficking claim under Section 1591, and given the flexibility in Civil Rule 8(a)(2) in asserting claims (dividing claims into counts is not formally required), the Court will consider the Complaint as asserting a forced-labor trafficking claim under Section 1590 too.

[4] Northwestern, Obering, DaSilva, and Polisky filed a motion to dismiss together, R. 42, while Bonnevier filed a separate motion through her separate counsel, R. 47. North-western, Obering, DaSilva, and Polisky are referred to throughout this Opinion as the North-western Defendants, while Bonnevier is referred to by name.

emotional distress against Bonnevier.[5] Compl. ¶¶ 238–49, 250–56. For the reasons discussed in this Opinion, the motions to dismiss are granted in part and denied in part. The motions to dismiss the claims for forced-labor trafficking (Count 3), sex trafficking (Count 4), and forced labor (Count 5) are denied as to all of the Defendants. The state law claims for breach of contract and estoppel (Counts 6 and 7) are dismissed, for now without prejudice. The emotional-distress claim (Count 8) against Bonnevier survives.[6]

## I. Background

For purposes of this motion, the Court accepts as true the factual allegations in the Complaint, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), as well as those in Richardson's response brief (but only to the extent that the allegations in the brief are consistent with the Complaint), *see Heng v. Heavner, Beyers & Mihlar, LLC*, 849 F.3d 348, 354 (7th Cir. 2017). *See also Thompson v. Ill. Dep't of Prof. Reg.*, 300 F.3d 750, 753 (7th Cir. 2002) (on a Rule 12(b)(6) motion, the pleadings "consist generally of the complaint, any exhibits attached thereto, and supporting briefs.") (citing Fed. R. Civ. P. 10(c)).

Hayden Richardson transferred to Northwestern University in 2018 to begin her sophomore year of college. R. 1, Compl. ¶¶ 47–48. An avid cheerleader for most of her life, Richardson began looking into Northwestern's cheerleading team soon

---

[5]This Court has subject matter jurisdiction as to claims under Title IX claims and under the Trafficking Victims Protection Act pursuant to federal-question jurisdiction, 28 U.S.C. § 1331, and over the state law claims under 28 U.S.C. § 1367.

[6]Richardson has withdrawn the emotional-distress claims against DaSilva, Obering, and Polisky. Pl.'s Br. at 5.

3

after she transferred. *Id*. ¶¶ 45, 49. After viewing the cheerleading team's website and social-media accounts, Richardson contacted the head coach, Pamela Bonnevier, about joining the team. *Id*. ¶¶ 49–50. Bonnevier asked Richardson to submit videos of her cheerleading skills, including in performing stunts. *Id*. After viewing the videos, Bonnevier quickly accepted Richardson onto the team. *Id*.

For her participation on the team, Richardson received scholarships in both 2019 and 2020. Compl. ¶ 51. In 2019, she received a $5,500 scholarship, and in 2020 the scholarship amount was $4,041. *Id*. As part of joining the team, Richardson was required to sign a contract. *Id*. ¶ 55 The contract, referred to by Richardson as the Spirit Squad Contract, laid out the terms of her membership on the cheerleading team. *Id*. The contract required team members to attend all home games and tournaments, in addition to any other events dictated by the coaching staff. *Id*. Throughout Richardson's two cheerleading seasons, these events mostly included tailgating, alumni donor events, and appearances at the University's limited-membership Wilson Club. *Id*. ¶¶ 55, 100. When Richardson attended any of these events, she and the other female cheerleaders were required to wear their cheer uniforms. *Id*. ¶¶ 2–3, 57, 64, 67. The women's cheer uniforms were scant and exposed much of the women's bodies—yet the men's cheer uniforms did not. *Id*. ¶¶ 57, 64, 67. The contract also stated that if a team member were to quit or be asked to leave the team, then the cheerleader would be required to repay the University for the cheerleading scholarship, as well as for all fees and expenses associated with the cheerleading events—including travel, food, equipment, and camp costs. *Id*. ¶¶ 55, 101.

### A. Bonnevier

Bonnevier was the head coach of the cheerleading team throughout Richardson's two seasons on the team. Compl. ¶¶ 22, 95. As the 2018–2019 cheer season began, Bonnevier told the women cheerleaders that their top priorities were to keep fans happy and always appear as "fun girls." *Id.* ¶ 56. Richardson understood this instruction to especially apply to keeping alumni-donor fans happy. *See id.* ¶ 63. Throughout both 2019 and 2020, Bonnevier acknowledged that some fans might be "creepy," but that the cheerleaders must endure taking photos with fans even if they moved their hands to inappropriate places or made the cheerleaders feel uncomfortable. *Id.* Bonnevier's pre-season prophesies came true: on multiple occasions, fans touched Richardson's breasts and buttocks. *Id.* ¶ 58. Richardson alleges multiple specific instances of these assaults, including at a game in September 2018 when Bonnevier directly instructed Richardson to take photos with fans, and those fans touched Richardson's breasts. *Id.* ¶ 59. During another incident of inappropriate touching that season, Bonnevier gave Richardson's full name to a group of intoxicated fans, who then not surprisingly threatened to find her after the game. *Id.* ¶¶ 61–63. In addition to instances in which Bonnevier acted as a liaison between Richardson and the alumni fans, Bonnevier also instructed Richardson and other women cheerleaders not to eat before games and to undress and change in public view on the team bus; Bonnevier also isolated the women from one another whenever she wanted the cheerleaders to interact with as many as donors as possible, and also controlled the cheerleaders' access to the restroom. *Id.* ¶¶ 71–74, 76–78, 81.

5

As the season progressed, Bonnevier made it clear that Richardson and the other cheerleaders were required not only to attend sporting tailgates, but also specific alumni-donor events and to make appearances at the University's exclusive donor club, the Wilson Club. Compl. ¶¶ 57, 64–65, 100. The Wilson Club is a private space available only to donors who contributed $6,000 or more—the highest donation bracket pertinent to the Athletics Department. R. 48-2, Pl.'s Exh. 1, Fan Priority Seating Order at 3. Yet Richardson's *male* teammates were not required to attend the same alumni fundraising events or make appearances at the Wilson Club. Compl. ¶¶ 67, 164. On multiple occasions Bonnevier sent Richardson to the Wilson Club to flirt with wealthy donors. *Id.* ¶ 57. Bonnevier made it clear to Richardson that if Richardson did not follow the coach's instructions, she would no longer be part of the team. And if Richardson were no longer part of the team, she would lose her sports scholarships and be responsible for reimbursing the University for the scholarships and myriad expenses. *Id.* ¶¶ 60, 101.

## B. Athletics Department Leadership & Title IX Deputy Coordinator

In addition to the accusations against Coach Bonnevier, Richardson alleges misconduct committed by Northwestern itself, through former University leaders Polisky, Obering, and DaSilva. As a reminder, at the time of the alleged misconduct, Polisky was the Deputy Director of Athletics; Obering was the Associate Athletic Director for Marketing; and DaSilva was the Deputy Title IX Coordinator. Compl. ¶¶ 18–21. Before raising her concerns with these University leaders, Richardson first complained about Bonnevier's conduct to the cheerleading team's doctor. *Id.* ¶ 82.

This discussion happened on January 8, 2019 (as explained later in this Opinion, the exact timing is important). *Id.* Richardson told the team doctor that Bonnevier had time and again forced the female cheerleaders to attend—for the University's benefit—events during which the cheerleaders were sexually harassed and assaulted. *Id.* The following day (January 9), Associate Athletic Director Obering emailed Richardson to discuss the allegations. *Id.* ¶ 83. Richardson told Obering about the misconduct, and Obering in turn instructed Richardson to gather testimonials and evidence from other students to corroborate the allegations. *Id.* ¶¶ 84–85. Richardson followed those instructions and submitted corroborating materials. *Id.* ¶¶ 86–87. She also requested a meeting with the University's then-Athletic Director, Jim Phillips, but Deputy Athletic Director Polisky did not set up a meeting with Phillips. *Id.* ¶ 87.

On January 24, 2019, Richardson and a teammate met with Obering and Polisky to discuss the alleged misconduct. *Id.* ¶ 88. Both Obering and Polisky accused Richardson of falsifying the corroborating student testimonials and suggested that she had not done enough to show that the allegations were true. *Id.* ¶¶ 8, 88. Despite the evidence that Richardson had brought forward, the University's Title IX Office did not open a formal investigation. *Id.* ¶ 9.

Around one week later, on February 1, 2019, DaSilva (the Deputy Title IX Coordinator) reached out to Richardson via email. Compl. ¶ 90. DaSilva's email to Richardson mischaracterized Richardson's allegations, including by asserting that Richardson had raised only the single issue of one individual fan harassing her. *Id.* In response, Richardson corrected DaSilva's mischaracterization and set forth multiple

dates and events during which she was assaulted. *Id.* ¶ 91. A few days later (on February 5), Richardson emailed Obering to report that, although Bonnevier had been more organized at a recent basketball game, she "still made derogatory comments to members of the team regarding their physical appearance ...." *Id.* ¶ 92. In the meantime, communication from DaSilva was sparse, with just a general February 18 notification saying that the Title IX Office was still working with Bonnevier to address the situation. *Id.* ¶ 93. Then one month passed with no more outreach from DaSilva, and eventually the response petered out with an end to the "training" of Bonnevier on April 17, 2019. *Id.* ¶¶ 93–95.

So, instead of opening a Title XI investigation, Bonnevier simply received some form of training and was told that she could no longer force the cheerleaders to attend tailgating events. *Id.* ¶ 11. The tailgating stopped but the cheerleaders were still required to attend alumni fundraising events. *Id.* ¶ 11. At that time, the University took no other action was taken against Bonnevier. *Id.* ¶¶ 94–95.

At the end of May 2019, Richardson had a follow-up meeting with Obering and Polisky. *Id.* ¶ 96. Richardson told them that Bonnevier's problematic behavior was ongoing, including the misconduct that she first told them about in January 2019. *Id.* At some later date, DaSilva finally started a formal investigation into the ongoing alleged sexual misconduct. *Id.* ¶ 12. But during the course of the investigation, DaSilva changed Richardson's status from Title IX complainant to witness. *Id.* ¶ 13. The change in status meant that Richardson no longer had access to the status of the

investigation or its ultimate outcome. *Id.* ¶¶ 13–14. On top of that change in status, the misconduct continued into 2020. *Id.* ¶¶ 53, 102–03.

## II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (cleaned up).[7] The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the

---

[7]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678–79.

## III. Analysis

### A. Trafficking Victims Protection Act
### Forced Labor (§ 1589) and Forced-Labor Trafficking (§ 1590)

Generally speaking, the Trafficking Victims Protection Act establishes criminal and civil penalties against forcing a person, by deploying certain prohibited tactics, to perform labor or services. 18 U.S.C. §§ 1589, 1590. Section 1589(a) bans the *primary* conduct, that is, knowingly providing or obtaining the labor or services of a person by using (among other things) force, serious harm, abuse of law, or threats of any of those things. § 1589(a)(1), (2), (3), (4). Section 1589(b) prohibits knowingly *benefiting* from participation in a venture that has provided or obtained forced labor by the prohibited means, when the defendant knows or recklessly disregards the fact that the venture has done so. § 1589(b). And Section 1590(a) addresses *trafficking* of forced labor, that is, knowingly recruiting, harboring, transporting, providing, or obtaining forced labor or services by the forbidden means set forth in primary-conduct statute, § 1589(a)(1)–(4). § 1590(a). The forbidden means in § 1589(a)(1)–(4) run the spectrum from threats of "force," "physical restraint," "serious harm," or "abuse" of legal process:

> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
>
> (2) by means of serious harm or *threats of serious harm* to that person or another person;
>
> (3) by means of the abuse or threatened abuse of law or legal process; or

> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint[.]

18 U.S.C. § 1589(a)(1)–(4) (emphasis added). This case presents the question of the meaning of "threats of serious harm."

Here, Richardson alleges that the Defendants forced Richardson to perform services by requiring her to attend alumni events and tailgating events in violation of both Sections 1589 and 1590. *See* Compl. ¶ 226. The Defendants also knowingly benefitted from participation in their venture of forcing Richardson to perform the services. As detailed in more depth below, Richardson believed that she would suffer serious financial harm if she did not perform those services. *Id*. ¶ 227. The Northwestern Defendants argue that Richardson has not plausibly alleged forced labor under § 1589 or forced-labor trafficking under § 1590 because she has failed to allege that the threat of "serious harm," § 1589(a)(2), caused her to perform the services. NU Defs.' Br. at 23.

As pertinent here, to successfully plead a forced-labor claim under § 1589, Richardson must adequately allege that the Northwestern Defendants and Bonnevier used "threats of serious harm" to obtain her services. Section 1589(c)(2) defines "serious harm" for the Trafficking Victims Protection Act: it "means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18

11

U.S.C. § 1589(c)(2). As the statutory definition spells out, the term "serious harm" covers both overt physical coercion and *nonphysical* forms of coercion, including "financial" harm. *See United States v. Calimlim*, 538 F.3d 706, 714 (7th Cir. 2008) ("Section 1589 is not written in terms limited to overt physical coercion, and we know that when Congress amended the statute it expanded the definition of involuntary servitude to include nonphysical forms of coercion.").

Richardson alleges that the Defendants used a plethora of financially coercive means—that is, the cheerleading contracts, financial incentives, online advertisements, and representations on social media—to compel her to attend and to perform at tailgating events and various alumni events. Compl. ¶¶ 180–81, 226, 227. The key allegation rests on the Sprit Squad contracts, the execution of which was a mandatory condition for joining the team. *Id.* ¶ 55. Under the terms of the contracts, if Richardson had left the team, then she would have owed Northwestern over $10,000, comprising a minimum of $9,541 to pay back the cheerleading scholarships, plus all lodging, food, equipment-rental, and training expenses. *See id.* ¶¶ 55, 101.

This allegation of a mandatory financial burden adequately supports the force-labor and forced-labor trafficking claims as a "threat of serious harm" under the Act. Remember that evaluating whether a harm qualifies as a "serious harm" under the Act takes into account whether the financial harm would compel a reasonable person "of the same background and in the same circumstances" as the victim. § 1589(c)(2). Viewing the allegation in Richardson's favor, as required at the pleading stage, $10,000 at stake is more than enough for a reasonable person in Richardson's shoes—

a young adult (not yet 21 years old at the time, Compl. ¶ 58) pursuing an education funded in part by a scholarship—to reasonably feel compelled to continue performing the services. Indeed, Richardson outright alleges—and this must be accepted as true right now—that she "could not afford the financial liability attendant to quitting the team or being terminated." *Id.* ¶ 60. On top of the sheer dollar amount, the mandatory nature of the reimbursement provision supports the reasonable inference, at the pleading stage, that the payback requirement was indeed intended to coerce Richardson to stay on the team and to attend the dictated events. The looming financial burden of the payback requirement and the go-forward possibility of losing one's access to college education (plus, Richardson had already transferred from another university, Compl. ¶ 47) readily qualify as a threat of serious harm under the Act. At the very, very least, the Complaint sufficiently alleges that the Defendants used a scheme or plan intended to cause Richardson to *believe* (even if in fact it would not happen) that she would suffer serious harm if she did not perform the services. § 1589(a)(4).

With regard to specific Defendants, there is no doubt that the Complaint adequately alleges that the head coach at the time, Bonnevier, knew and relied on the Spirit Squad contracts. It would be odd indeed if the head coach of the Sprit Squad did not know and rely on the terms of the mandatory contracts. With regard to the University itself (through its Athletics Department), as well as Obering, DaSilva, and Polisky, here again it is plausible that, when viewing the allegations in Richardson's favor, that the Northwestern Defendants were all aware of the contents of the Spirit Squad contracts and of the requirement that cheerleaders reimburse the University

if they leave the team. Remember that Richardson had put Obering, DaSilva, and Polisky on notice of the harassment. It is reasonable to infer that, in response to being put on notice of the harassment, these University leaders would (at the very least) examine the fundamental document setting forth the obligations that Richardson (and other cheerleaders) had to the University, and that the University had to Richardson. Giving the benefit of reasonable inferences to Richardson at the pleading stage, the Complaint adequately alleges that the individual Northwestern Defendants (and through them, the University itself) deployed threats of serious financial harm (with all its attendant consequences on Richardson and her education), or at least knew of those threats, to compel Richardson to perform services.

## B. Trafficking Victims Protection Act Sex-Act Trafficking (§ 1591)

Moving on from the forced-labor and forced-labor trafficking claims, Congress expanded the Trafficking Victims Protection Act back in 2000 to specifically combat sex trafficking in an effort "to prevent violence against women …." Pub. L. No. 106-386 § 102, 114 Stat. 1488 (2000) (codified as 18 U.S.C. § 1591). To successfully plead a sex-trafficking claim under Section 1591(a)(1) of the Act—the provision that governs the *primary* conduct of sex-trafficking, as distinct from *benefitting* from sex trafficking—the plaintiff must adequately allege that the defendant (1) knowingly recruited, enticed, harbored, transported, provided, obtained, or maintained by any means a person; (2) 'knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, or coercion … will be used"; (3) "to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a)(1). Here, the Defendants challenged the

sex-trafficking claim in the Complaint on two primary grounds. The defense contends that Richardson has not adequately alleged a "commercial sex act" under the Act, nor has she plausibly alleged that "coercion" (the pertinent form of forbidden conduct in this case) caused the commercial sex act. NU Defs.' Br. at 20– 26; Bonnevier's Br. at 7–12. Again, however, the defense arguments fail at the pleading stage.

The Act defines "commercial sex act" under § 1591 as "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3). Richardson argues that the harassment that she experienced—which included sexual groping and touching—constitutes a "sex act" under the Act. Pl.'s Br. at 2. None of the Defendants actually disagree with Richardson on this specific point. So the question here is whether Richardson adequately alleges that anything of value was given or received "on account of" the sex act. § 1591(e)(3). To the Defendants' way of thinking, the answer is no, because Richardson has not specifically alleged that there was a direct payment of donations from alumni or fans in exchange for the sex acts. Defs.' Br. at 20.

But this argument is premised on a too-narrow definition of commercial sex act when compared to the plain meaning of the statutory text. The statutory defini-tion does not require pleading any direct exchange—only that "on account of" the sex act, act "*anything* of value" was "given to or received by *any* person," § 1591(e)(3) (em-phases added). As set out in the factual Background section in this Opinion, the alle-gations do plausibly allege an exchange of donations for the sex acts. At every home game, cheerleaders were instructed to "flirtatiously mingle" with fans, and on

15

"several" occasions, Coach Bonnevier sent Richardson to the limited-membership Wilson Club "to flirt with wealthy, elderly donors ...." Compl. ¶ 57. These mandated events led to harassment and assaults in which fans "placed their hands on [Richardson's] buttocks and breasts while taking pictures." *Id.* ¶ 58. On top of that, outside of athletics games, the cheerleaders were required to attend alumni events dressed "in their tiny cheerleading uniforms." *Id.* ¶ 64. At the alumni events, the women on the cheerleading team—and only the women, not the male cheerleaders, who were not even required to attend, *id.* ¶ 67—were required to "flirt" and take photos with the alumni, who touched "them inappropriately on their lower backs and behinds while taking photos." *Id.* ¶ 65. Based on these marching orders to the female cheerleaders, and the specific emphasis on the Wilson Club and alumni events, the reasonable inference is that the fans and donors were allowed to engage in sex acts with the cheerleaders in exchange for the fans' and donors' financial support of the Athletics Department and the University. *See id.* ¶ 66.

The other disputed element of the sex-trafficking claim is the Act's requirement that "means of force, threats of force, fraud, [or] coercion" caused the commercial sex act. 18 U.S.C. § 1591(a). Richardson grounds her claim on "coercion." Pl.'s Br. at 34. The Defendants argue that the payback of the scholarship and expenses, plus the go-forward loss of the scholarship, does not amount to "coercion" under the Act.

This back-and-forth is essentially a reprise of the dispute over whether Richardson labored under a threat of serious harm under the forced-labor statutes, §§ 1589, 1590. That is because the Act defines "coercion" for a sex-trafficking claim

16

as (among other things): "(A) threats of serious harm … against any person; (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to … any person." 18 U.S.C. § 1591(e)(2). Threats of serious harm, in turn, is defined—like it is in the forced-labor statutes— sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm," 18 U.S.C. § 1591(e)(5). And, again like the forced-labor definition, "harm" does include "financial" harm. § 1591(e)(5).

Given the similarity between the forced-labor definition and the sex-trafficking definition, the analysis and the answer are the same. Richardson faced the risk (going forward) of losing almost $10,000 in scholarships, as well as (looking backwards) a mandatory repayment of around that same amount of money. With the benefit of the pleading-stage standard of review, Richardson has adequately alleged that she was coerced into performing the commercial sex acts.

### C. Trafficking Victims Protection Reauthorization Act Civil Liability (§ 1595)

In its early versions, the Trafficking Victims Protection Act imposed criminal liability for, among other things, forced labor, forced-labor trafficking, and sex trafficking. 18 U.S.C. §§ 1589, 1590, 1591. In 2003, Congress added a civil-liability provision through the Trafficking Victims Protection Reauthorization Act. Pub. L. No. 108–193, 117 Stat. 2875, 2878 (codified at 18 U.S.C. § 1595). At that time, the civil provision only imposed liability against the direct trafficker of the victims. *Id.* In

17

2008, however, Congress expanded the scope of civil liability. Pub. L. 110-457, 122 Stat. 5044 (William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008). Section 1595 of the Act now provides a civil remedy against not only the direct perpetrator, but also "*whoever knowingly benefits*, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person *knew or should have known* has engaged in an act in violation of this chapter," 18 U.S.C. § 1595(a) (emphases added).

As discussed earlier, Richardson alleges that Northwestern, DaSilva, Obering, Polisky, and Bonnevier all violated specific criminal-liability provisions of the Act, namely, 18 U.S.C. § 1589 (forced labor), § 1590 (forced-labor trafficking), § 1591 (sex trafficking). Because the Defendants allegedly violated the underlying criminal statutes, Richardson argues, they are allegedly liable under 18 U.S.C. § 1595 for civil liability. Richardson argues that Bonnevier is liable as the direct perpetrator, and Northwestern, DaSilva, Obering, and Polisky are liable, at the least, as knowing beneficiaries of the violations. Compl. ¶¶ 185–87, 192, 209–11, 218–19, 228–30, 235–36.

The Northwestern Defendants frame the elements of beneficiary liability differently than Richardson, but all agree in substance that to successfully state a claim for civil liability on the Northwestern Defendants, Richardson must adequately allege that they (1) knowingly benefitted (2) from participation in a venture, and (3) that the venture violated the Act and (4) that the Northwestern Defendants knew or should have known that the venture violated the Act. The Defendants argue that Richardson has failed to plead sufficient facts for any element of the civil-liability

18

provision. NU Defs.' Br. at 7–19; Bonnevier Br. at 7–11. According to all of the Defendants, the allegations do not plausibly allege that a "venture" was formed; nor that the Defendants "particpat[ed]" in the venture; nor that the Defendants knew or should have known that the venture violated the Act; nor that there was any knowing benefit to the Defendants. Defs.' Br. at 8–19. But these objections to the civil-liability claim fall short at the pleading stage. Each element is addressed in turn, taking the "venture" and "participation" in a venture together and first.

### 1. "Venture" and "Participation" in a Venture

As a threshold matter, the parties focus much of their disagreement on the definitions of "venture" and "participation in a venture" under 18 U.S.C. § 1595. Unfortunately, Section 1595 does not define "venture" or "participation" in a venture. But the underlying criminal provision for sex trafficking, passed *before* Congress added a civil liability provision, does define those terms in 18 U.S.C. § 1591 (though, as explained in detail below, there is a distinction between the carry-over (or not) of "venture" versus "participation" in a venture).

On the definition of "venture," the Defendants argue that, because venture is not defined in § 1595, it should be given its plain meaning as provided by dictionary definitions. NU Defs.' Br. at 8. The Defendants rely on various, hand-picked dictionary definitions to suggest that venture must involve some element of "risk." *Id*. But there is no need to turn to dictionary definitions at all, because Congress defined venture in the same statutory scheme. Congress defined "venture" in the sex-trafficking provision, 18 U.S.C. § 1591, as "any group of two or more individuals associated

in fact, whether or not a legal entity," 18 U.S.C. § 1591(e)(6). That's it. There is no reference to riskiness of the venture or, really, to anything else.

With the Section 1591 sex-trafficking definition of "venture" in place, the plain language of the statute is conclusive unless there is some other clear statutory command to the contrary. *United States v. Berkos*, 543 F.3d 392, 396 (7th Cir. 2008) (cleaned up). Identical words used in different parts of the same statute are generally presumed to have the same meaning. *United States v. Achbani*, 507 F.3d 598, 602 (7th Cir. 2007). Given that Section 1595 authorizes civil liability for sex-trafficking violations of Section 1591, the statutory-interpretation tool applies equally well here: the sex-trafficking definition in Section 1591 ought to be incorporated into Section 1595.

It is true that the Eleventh Circuit has declined to carry over the criminal definition of "participation in a venture" to the civil-liability provision and has asserted that the text of § 1591 overcomes that presumption. *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 724 (11th Cir. 2021). In *Red Roof*, the Eleventh Circuit reasoned in part that because § 1591 explicitly says that its definition of "participation in a venture" applies "[i]n this section," § 1591(e) (prefatory clause), Congress did not intend for the definition to apply elsewhere—including to the civil-liability provision. In lieu of the sex-trafficking definition, the Eleventh Circuit applied a mixture of dictionary definitions to define "venture" and "participation in a venture" as taking part in a common undertaking or enterprise involving risk and potential profit. *Red Roof*, 21 F.4th at 725.

But the two statutory sections, Sections 1591 and 1595, were enacted in a sequence that undermines that reasoning. As explained earlier, the sex-trafficking statute, § 1591, was passed in 2000, *before* the civil-liability section, § 1595, was passed in 2003. There is nothing in the text of Section 1591's definitional subsections to suggest that Congress was affirmatively *excluding* their application to any later-passed, related statute—let alone one that actually incorporates the elements of Section 1591, like the civil-liability provision of Section 1595. Also, Section 1591's reference to "In this section" is merely the prefatory clause before the listing of terms. The subsection is set out as "(e) In this section:" and goes on to set forth subparagraphs (1) through (6). § 1591(e), § 1591(e)(1)–(6). It is not as if the clause says, "In this section, and only in this section." Nothing in the text of the sex-trafficking definitional section precludes its application to the civil-liability provision. Indeed, the Public Law that added Section 1595's civil-liability provision contains a congressional finding emphasizing the continued problem of human trafficking: "Trafficking in persons continues to victimize countless men, women, and children in the United States and abroad." Pub. L. 108-193, § 2(1). It would be odd for Congress to make that finding and then laden the civil-liability provision with new, barnacled definitions of terms already defined by pre-existing anti-trafficking provisions.

The Defendants also argue that Richardson must plead that the Defendants *actively* formed a venture. But, again, no requirement like that is found in the sex-trafficking definition of "venture," which is simply "any group of two or more individuals *associated in fact*, whether or not a legal entity." 18 U.S.C. § 1591(e)(6).

21

Associated-in-fact is not a completely new legal term: the Supreme Court has used that term in explaining when a group of individuals can qualify as an "enterprise" under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961(4). An "association-in-fact enterprise" should have at least three structural features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit those associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009).

Applying that definition (from one pre-existing criminal statute to another), Richardson pleads sufficient facts to allege that Northwestern, Obering, DaSilva, and Polisky (and, indeed, Bonnevier) were associated in fact. The individual Defendants were employed by Northwestern and the actions spanned over the course of two years. Despite Richardson's objections and warnings to University leadership, she continued to be forced to attend the alumni events and Wilson Club events that subjected her to sexual assaults. As part of the University and the Athletics Department, the Defendants (it is reasonable to infer) were motivated to promote the financial support and donations of fans and alumni. This is more than enough to allege an association in fact. Richardson has adequately alleged that the Defendants were part of a "venture" under Section 1595(a).

Moving on to "participation" in a venture, the carry-over from the sex-trafficking statute to the civil-liability provision is not nearly as smooth. Section 1591 defines participation in a venture: "the term participation in a venture means *knowingly* assisting, supporting, or facilitating a violation of subsection (a)(1)," where (a)(1) refers

to the first subsection of Section 1591. 18 U.S.C. § 1591(e)(4) (emphasis added). The key term here is the mental state of "knowingly." Under Section 1591, participation in a venture requires a *knowing* mental state:

> (a)Whoever *knowingly*—
>
> …
>
> (2) benefits, financially or by receiving anything of value, from *participation in a venture* which has engaged in an act described in violation of paragraph (1).

18 U.S.C. § 1591(a)(2) (emphases added). In contrast, Section 1595(a) allows civil liability based on a less-culpable mental state, namely, it is enough if the defendant knew or "should have known" that the venture has violated the Act. § 1595(a). This is an important textual difference that creates a more expansive range of culpable mental states for civil liability under § 1595(a) that the mental states required for criminal liability.[8] Yes, it is generally true that the same statutory terms ought to be read identically in related statutes, but the general presumption yields where, as here, "there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent," *Atlantic Cleaners & Dyers v. United States*, 286 U.S. 427, 433 (1932). The upshot is that civil liability does *not* require that the defendant knowingly participate in a violation of the Act—because it is enough for the defendant to benefit from participation in a venture that the defendant "should have known" violated the Act.

---

[8]A similar distinction applies to the forced-labor-beneficiary provision, which requires the mental state of either knowledge or "reckless disregard." § 1589(b).

Having said that, it bears emphasizing that the textual differences between Section 1591 and Section 1595 only pertains to the necessary *mental state*—there is no reason to alter the *conduct* aspect of the definition in Section 1591(e)(4). Participation in a venture still requires "assisting, supporting, or facilitating" the venture. *Id.* But Richardson need not plead that the Defendants themselves committed an overt act in furtherance of "the sex trafficking aspect of the venture," *United States v. Afyare*, 632 F. App'x 272, 286 (6th Cir. 2016) (unpublished order); *see A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171 (E.D. Pa. 2020); *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959 (S.D. Ohio 2019). Here, given the absence of a requirement that the Defendants directly engaged in sex trafficking, the Complaint adequately pleads participation: after each Defendant became aware of the alleged misconduct, they drew distinctions between the misconduct that the Defendants chose to curtail—and the misconduct that they allowed to continue. Bonnevier was still permitted by the Northwestern Defendants to require women cheerleaders to attend alumni fundraising events and events at the Wilson Club. Indeed, it is a reasonable inference from the allegations that the alumni fundraising events and the Wilson Club events were the more financially lucrative events at which the sex acts took place. At the pleading stage, giving Richardson the benefit of the doubt, the Complaint sufficiently alleges that the Defendants facilitated the continued presence of the female cheerleaders specifically at the events that most benefitted the Athletics Department and the University. Both the elements of "venture" and "participation" in a venture have been sufficiently pleaded.

24

## 2. Knew or Should Have Known

Next, the Defendants argue that the Complaint lacks facts to suggest that they knew or should have known that the venture engaged in a violation of the Trafficking Victims Protection Act. NU Defs.' Br. at 14–17; Bonnevier Br. at 2. As part of this argument, the Defendants contend that the last commercial sex act alleged by Richardson happened in January 2019, and that because the University, Obering, Polisky, and DaSilva were not put on notice of the misconduct until that same month, the allegations fail to allege knowledge or even constructive knowledge. NU Defendants' Br. at 16, n. 10, 17.

The Defendants are wrong. The Complaint clearly alleges that the harassment and sex acts continued to happen after Richardson put those University leaders on notice of the misconduct. Richardson alleges that, after putting the Defendants on notice of the harassment, she was "subjected to the *same* photo opportunities, groping, and harassment that she had previously notified Northwestern about." Compl. ¶ 100 (emphasis added). That is not a mere conclusory allegation. The allegation directly refers back to specific conduct that was already laid out in the Complaint, so Richardson need not restate each act of misconduct to show the continuing timeline. So, after being explicitly put on notice (which is actual knowledge, let alone constructive knowledge) of the misconduct, the harassment and sex acts continued. Those allegations sufficiently allege the culpable mental state for civil liability under Section 1595 for all of the Defendants.

Even more specifically, Obering (the Associate Athletic Director for Marketing) allegedly knew of the harassment and sex acts because Northwestern's team doctor directly told Obering that (according to Richardson) Bonnevier forced Richardson to participate in events, including fundraising events and appearances at the Wilson club, where she was sexually harassed and assaulted. Compl. ¶¶ 57, 82. Indeed, in mid-January 2019, Richardson *directly* told Obering about the harassment, *id.* ¶ 84, and even provided on January 22 (in response to Obering's demand) written testimonials from other cheerleaders detailing the misconduct, *id.* ¶¶ 84–86.

With regard to then-Deputy Director of Athletics Polisky, Richardson met with Polisky in January 2019 and told him about the abuse that she had suffered at various alumni events. Compl. ¶ 88. Polisky (and also Obering) accused Richardson of writing the testimonials herself, and put the burden on Richardson to corroborate the claims. *Id.* Polisky later attended the meeting on May 28, 2019, during which Richardson reiterated that the forced and coerced participation in various events where she was sexually harassed and touched had continued. Compl. ¶¶ 88, 96.

Lastly, with regard to Deputy Title IX Coordinator DaSilva, as discussed earlier, here too Richardson adequately alleged that she put DaSilva on notice of the harassment and sex acts. To sum up again, the context starts with, on February 1, 2019, DaSilva emailing Richardson with mischaracterizations of her allegations, including saying that Richardson had only raised the single issue of one individual fan harassing her. Compl. ¶ 90. In response, Richardson corrected DaSilva's mischaracterization and set forth multiple dates and events during which she had been

assaulted. *Id*. ¶ 91. A few days later (on February 5), Richardson emailed Obering to report that, although Bonnevier had been more organized at a recent basketball game, she "still made derogatory comments to members of the team regarding their physical appearance …." *Id*. ¶ 92. Yet DaSilva refused to conduct a formal investigation, and instead only provided training to Bonnevier that did not work. *Id*. ¶ 95. DaSilva's knowledge of the misconduct is adequately alleged.

### 3. Knowingly Benefitted

The next question is whether Richardson has sufficiently alleged that the Defendants "knowingly benefit[ted] … financially or by receiving anything of value" from participation in the venture. 18 U.S.C. § 1595(a). Here, again, at the early pleading stage, the factual allegations are sufficient to support the reasonable inference that the Defendants all knowingly benefitted from their participation in the venture. Remember that Richardson's allegations primarily focus on three categories of events: tailgating; alumni fundraising events; and appearances at the Wilson Club. Of those three categories, only tailgating was addressed by the Defendants, when Richardson finally was no longer forced to attend tailgates. But it is reasonable to infer that the presence of the cheerleaders at tailgates—open to virtually all fans, regardless of whether they were donors—had the *smallest* impact on alumni fundraising and alumni relations. Yet even after Richardson made the Defendants aware of the sexual harassment and the barrage of assaults, she was still required to attend the fundraising events and Wilson Club events, Compl. ¶¶ 12, 100, 104, 152, the most financially lucrative events for the Athletics Department and, in turn, the University.

The Wilson Club is a private space and is restricted to fans who hold loge, Wilson Club, or courtside (for basketball games) tickets. *Id.* ¶ 57 & n.4. Polisky, DaSilva, Obering, DaSilva, and Bonnevier all had an interest—as University leaders and employees—in maintaining the flow of donations from alumni and from Wilson Club members. To be sure, the individual Defendants did not pocket money directly from donors. But that is not needed under the Act. Instead, it is enough to benefit by receiving *anything* of value for participating in the venture, § 1595(a), including the benefit of promoting their own employer's coffers and prestige, and maintain their own employment. The Defendants themselves allegedly drew a distinction between tailgating—with its less-sizeable donation impact—and the fundraising and Wilson Club events. At least at the pleading stage, before discovery can test the facts, the benefit element has been adequately pleaded. In sum, then, the forced-labor claim (Count 5), the force-labor trafficking claim (Count 3), and the sex-trafficking claim (Count 4) are all adequately pleaded and survive the motion to dismiss.

### D. Breach of Contract & Promissory Estoppel

Moving from the federal claims to the state law claims, Richardson also brings state law claims for breach of contract and promissory estoppel. For these two claims, Richardson relies on Northwestern's published Policy on Sexual Misconduct.[9] Compl. ¶¶ 111, 239. But both claims are not adequately pleaded because Richardson has not

---

[9]The Complaint points to the Northwestern Student Handbook, the Policy on Discrimination and Harassment, and the Comprehensive Policy on Sexual Misconduct, Compl. ¶¶ 111, 246, but Richardson's response brief clarifies that she has not alleged claims based on the University's breaches of the Handbook or Harassment Policy. Pl.'s Br. at 38 n. 44.

sufficiently alleged that Northwestern made and broke a *binding* promise somewhere in the Policy.

Under Illinois common law, it is indeed possible that the relationship between a student and a university can amount to a binding contract in certain aspects. *See, e.g.*, *Ross v. Creighton Univ.*, 957 F.2d 410, 416 (7th Cir. 1992). But the mere existence of a student-college relationship is not *carte blanche* for breach-of-contract claims. To successfully state a claim for breach of contract, Richardson must point to a specific contractual *promise*, rather than challenge the way that Northwestern handled the sexual-misconduct complaint. Yes, the handling of the complaint can give rise to other forms of liability, like under Title IX's anti-discrimination provisions. But that does not mean that a contract-based promise was broken, and the Complaint does not identify that kind of promise.

A similar flaw applies to the promissory-estoppel claim. To successfully allege a claim for promissory estoppel under Illinois common law, a plaintiff must allege that (1) the defendants made an unambiguous promise to the plaintiff; (2) the plaintiff relied on the promise; (3) the plaintiff's reliance was expected and foreseeable by defendants; and (4) the plaintiff relied on the promise to the plaintiff's detriment. *Quake Constr., Inc. v. American Airlines, Inc.*, 565 N.E.2d 990, 1004 (Ill. 1990). The Complaint fails on the first element: Richardson has not alleged facts suggesting that Northwestern made any unambiguous promise to her.

Richardson offers the following as the alleged promises: (1) Northwestern's promise to provide a safe environment free from discrimination and harassment,

Compl. ¶ 246; and (2) Northwestern's promise to provide a thorough and equitable process to resolve any alleged violation of the University's policies. *Id*. But neither of those statements are definite enough to constitute an *unambiguous* promise. At most, they reflect a commitment to broad principles of fairness and nondiscrimination without giving specifics about how those principles will be achieved.

Indeed, the context in which the statements were made confirms that they are not the kind of unambiguous promises on which a reasonable person would be entitled to rely. The Sexual Misconduct Policy, for example, begins with broad aspirational statements, noting that the policy is intended to "promot[e] the dignity of all individuals." R. 42-1 at 2, Defs.' Exh. A, 2018 Sexual Misconduct Policy; R. 42-2 at 2, Defs.' Exh. B, 2019 Sexual Misconduct Policy. More to the point, the Policy explicitly says that because of the unique nature of sexual misconduct claims, the University "reserves *discretion* to take reasonable actions to address those issues in a manner consistent with the *spirit* of the applicable policies and these guidelines." 2018 Sexual Misconduct Policy at 21 (emphases added); 2019 Sexual Misconduct Policy at 22. Those discretion-reserving statements hedge so much that a student cannot reasonably rely on them as setting forth specific promises. The promissory-estoppel claim must be dismissed.

### E. Intentional Infliction of Emotional Distress

Richardson's final claim is that Bonnevier intentionally caused her severe emotional distress. As a threshold matter, Bonnevier asserts the statute of limitations, that is, she argues that the emotional-distress claim against her is time-barred

because all of the alleged conduct took place before January 29, 2019, placing it outside the two-year statute of limitations. Bonnevier Br. at 12.

But the statute of limitations is an *affirmative defense*, and "plaintiffs need not anticipate and attempt to plead around all potential defenses." *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004). Indeed, the Seventh Circuit has repeatedly held that dismissal under Civil Rule 12(b)(6) on statute-of-limitations grounds is "irregular," because the defendant bears the burden of proof on affirmative defenses. *United States v. Northern Trust Co.*, 372 F.3d 886, 888 (7th Cir. 2004) (citing Fed. R. Civ. P. 8(c)). It is true, however, that when the allegations of a complaint itself reveal that the case is barred by the statute of limitations—and no factual development is otherwise needed—then dismissal can be appropriate. *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012); *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 383 (7th Cir. 2010) (explaining that "if it is plain from the complaint that the [statute of limitations] defense is indeed a bar to the suit dismissal is proper without further pleading.") (cleaned up). The motion to dismiss would be, in essence, treated as a motion for judgment on the pleadings under Civil Rule 12(c). *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) (citing *Brooks*, 578 F.3d at 579).

Here, it is *not* clear from the Complaint itself that the statute of limitations bars the emotional-distress claim against Bonnevier. The statute of limitations on emotional-distress claims in Illinois is two years. *Flentye v. Kathrein*, 485 F. Supp. 2d 903, 923 (N.D. Ill. 2007) (citing 735 ILCS 5/13-202). Richardson filed the Complaint

in this case on January 29, 2021. Bonnevier would be right that the claim is barred by the statute of limitations if all of the alleged misconduct happened before January 29, 2019. But, as detailed earlier, the Complaint does allege ongoing misconduct after January 29, 2019. For example, Richardson alleged that during the 2019 athletics season—which would start in Fall 2019—she still suffered the harassment and assaults:

> Plaintiff was still sent to numerous alumni events as well as the Wilson Club during games to be paraded around in her skimpy uniform in order to please alumni and garner donations. As such, she was subjected to *the same photo opportunities, groping, and harassment* that she had previously notified Northwestern about.

Compl. ¶ 100 (emphasis added). Even later in time, Richardson also alleges that she told DaSilva again in May 2020 that the "same issues" concerning Bonnevier continued. *Id.* ¶ 103. To repeat what the Opinion explained earlier, Richardson need not spell out the specific conduct again in every single paragraph and every single time frame—it is enough that she incorporates by reference the conduct that she specifically alleged earlier in the Complaint. Maybe discovery will disprove the allegations, but at the pleading stage, the statute of limitations is not a barrier.

On the merits of the emotional-distress claim, to successfully allege that type of claim under Illinois common law, a plaintiff must allege that (1) the defendant's conduct was "extreme and outrageous;" (2) the defendant either intended that his conduct inflict severe emotional distress or knew that there was at least a high probability that his conduct would cause severe emotional distress; and (3) the defendant's conduct in fact caused severe emotional distress. *Shweihs v. Chase Home Fin., LLC*,

77 N.E.3d 50, 63 (Ill. 2016). Run-of-the mill annoyances and oppressions do not qualify as "extreme and outrageous" conduct. Instead, the offending conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (cleaned up).

The Complaint readily alleges for the emotional-distress claim to survive the dismissal motion. Richardson has plausibly alleged that Bonnevier, among other things, intentionally and repeatedly put Richardson in situations where she would be sexually assaulted; forced Richardson to undress and to change clothes in public spaces; restricted her ability to eat; and mocked her attempts to report sexual harassment. Compl. ¶¶ 117–18, 57–59, 61–62, 64–65, 68–71, 75–78, 100. As the head coach, Bonnevier was in a position of supreme authority over Richardson—which intensifies the outrageousness of the misconduct. Nor were these one-off instances. Bonnevier allegedly knew that she was putting Richardson in the path of assault, and yet continued to do so again and again over the course of two years. And given Richardson's complaints to and about Bonnevier, Bonnevier knew how Richardson was suffering—yet continued on anyway. Viewing the light in the most favorable to Richardson, as required at the pleading stage, the allegations amount to extreme and outrageous misconduct. What's more, Richardson has alleged that as a result of Bonnevier's misconduct, Richardson experienced panic attacks, and needed both mental-health therapy and prescription medications. *Id.* ¶¶ 167, 255. At this stage, all of the elements of an emotional-distress claim have been adequately alleged.

## IV. Conclusion

In sum, the motions to dismiss the claims for forced-labor trafficking (Count 3), forced labor (Count 5), and sex trafficking (Count 4) are denied. Those federal claims survive and shall move forward (along, of course, with the untargeted Title IX claims against Northwestern in Counts 1 and 2). The breach-of-contract and promissory-estoppel claims (Counts 6 and 7, respectively) against Northwestern are dismissed for failure to adequately state a claim. Those claims are dismissed without prejudice for now, and Richardson may seek to amend the Complaint at the appropriate time if the facts end up supporting the adding the claims back in based on additional allegations. The emotional-distress claim (Count 8) against Bonnevier survives.

To move forward, the Defendants shall answer the Complaint by October 10, 2023. Rule 26(a)(1) disclosures shall be made on October 24, 2023. The parties must serve their first set of written discovery requests no later than October 31, 2023. Fact discovery, including discovery as to any healthcare provider, shall close on July 8, 2024, extendable (or accelerable) for good cause. No early summary judgment motion may be filed without prior leave of Court. The Rule 16(b) deadline to add parties or to amend pleadings is set for May 20, 2024. Rule 26(a)(2)(C) summaries shall be disclosed 75 days in advance of fact-discovery deadline (the Rule 26(a)(2)(C) deadline shall move if conjunction with any changes to the fact-discovery deadline). The retained-expert schedule, if any, will be set as the close of fact discovery approaches. The tracking status hearing of September 22, 2023, is reset to November 10, 2023, at

8:30 a.m., but to track the case only (no appearance is required). Instead, the parties shall file a status report confirming that discovery has commenced on schedule by November 3, 2023, and setting forth any other information that the parties wish to report on.

ENTERED:

Honorable Edmond E. Chang
United States District Judge

DATE: September 21, 2023